UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

**03 CV 12211 DPW**

MAGISTRATE JUDGE Alexander

---

| | |
|---|---|
| FRED DEN, individually and on behalf of all others similarly situated, | C. A. No.: |
| Plaintiff, | **SECURITIES FRAUD CLASS ACTION COMPLAINT** |
| - v. - | |
| KAREN A. WALKER, EDWARD H. SNOWDEN and BOSTON COMMUNICATIONS GROUP, INC., | **Jury Trial Demanded** |
| Defendants. | |

---

Plaintiff, individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint, alleges upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based upon, *inter alia,* the investigation made by and through his attorneys, which investigation included, among other things, a review of the public documents, Securities and Exchange Commission ("SEC") filings, analyst reports, news releases and media reports of Boston Communications Group, Inc. ("BCGI" or the "Company"), as follows:

### JURISDICTION AND VENUE

1.      The claims alleged herein arise under Sections 10(b) and 20 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t, and Rule 10b-5, 17 C.F.R. § 240.10b-5 promulgated thereunder.

2.      The jurisdiction of this Court is based on Section 27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1331 (federal question jurisdiction).

1

3.	Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act. Many of the acts and transactions giving rise to the violations of law complained of herein, including the preparation and dissemination to the investing public of materially false and misleading information, occurred in this judicial district. BCGI maintains its executive offices at 100 Sylvan Road, Suite 100, Woburn, Massachusetts.

4.	In connection with the acts, transactions and conduct alleged herein, defendants used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications and the facilities of a national securities exchange and market.

## THE PARTIES

5.	Plaintiff purchased shares of BCGI common stock during the Class Period, as set forth in the accompanying Certification, and has been damaged as a result of defendants' conduct as alleged herein.

6.	Defendant BCGI is a Massachusetts corporation that maintains its principal offices in Massachusetts. The Company provides software services to the wireless industry through software applications. The services provided include processing services, roaming services and prepaid systems services. As of May 7, 2003 the Company had 18,059,848 shares of common stock issued and outstanding. The Company's stock trades on the NASDAQ Exchange (the "NASDAQ").

7.	Defendant Karen A. Walker ("Walker") has at all relevant times served as the Company's Chief Financial Officer.

8.	Defendant Edward H. Snowden ("Snowden") has at all relevant times served as the Company's President and Chief Executive Officer and as a director of the Company.

2

9. Defendants Walker and Snowden are, at certain times in this complaint, collectively referred to as the "Individual Defendants."

## CLASS ACTION ALLEGATIONS

10. Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons who purchased BCGI common stock during the period June 12, 2003 through July 16, 2003, inclusive (the "Class Period") and who were damaged thereby (the "Class"). Excluded from the Class are the Company, its officers and directors, employees, affiliates, legal representatives, heirs, predecessors, successors and assigns, and any entity in which the Company has a controlling interest or of which the Company is a parent or subsidiary.

11. The members of the Class are located in geographically diverse areas and are so numerous that joinder of all members is impractical. The Company has over 18 million shares of common stock outstanding. While the exact number of Class members is unknown to the plaintiff at this time, and can only be ascertained through appropriate discovery, plaintiff believes there are, at a minimum, over five hundred members of the Class who held Company stock.

12. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether defendants engaged in acts or conduct in violation of the federal securities laws as alleged herein;

(b) Whether defendants had a duty to disclose certain information;

(c) Whether defendants acted negligently, knowingly or recklessly in making materially false and misleading statements or in failing to correct such statements upon learning that they were materially false and misleading during the Class Period;

(d) Whether the market price of the Company's common stock during the Class Period was artificially inflated because of defendants' conduct complained of herein; and

(e) Whether members of the Class have sustained damages and, if so, the proper measure of damages.

13. Plaintiff's claims are typical of the claims of the members of the Class because plaintiff and members of the Class sustained damages arising out of defendants' wrongful conduct in violation of federal law as complained of herein.

14. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

15. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impractical. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**Fraud on the Market Presumption**

16. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

4

(a) Defendants made public misrepresentations or failed to disclose material facts regarding BCGI's financial situation during the Class Period;

(b) the omissions, misrepresentations and failures to correct prior statements were material;

(c) the securities of the Company traded at all relevant times on the NASDAQ, an efficient and open market;

(d) the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e) Plaintiff and the members of the Class, without knowledge of the misrepresented facts, purchased their BCGI securities between the time defendants failed to disclose and/or misrepresented material facts and the time the truth was disclosed.

(f) BCGI trades on the NASDAQ. The Company is followed by numerous market makers including Credit Suisse First Boston and Raymond James & Associates. The price of BCGI's stock reflects the effect of news disseminated in the market.

17. Based upon the foregoing, plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market

**The Safe Harbor Provision is Inapplicable**

18. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not adequately identified as "forward-looking statements" when made, there were no statements made with respect to any of those representations forming the basis of the

complaint that actual results "could differ materially from those projected," and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker had actual knowledge that the particular forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of BCGI who knew that those statements were false when made.

## SUBSTANTIVE ALLEGATIONS

19. BCGI provides services to wireless telephone providers such as the preparation of billing software applications, roaming software applications and other telecommunications associated software. BCGI provides such services to over seventy wireless carriers and re-sellers, but the Company is heavily dependent on five or six of those customers for most of its yearly revenues. Verizon Wireless ("Verizon") is a particularly important customer of BCGI, as its most recent annual report indicates that Verizon accounted for 49% of the Company's total revenues in 2002 and 33% of the Company's total revenues in 2001. Thus far in fiscal 2003, Verizon has accounted for approximately 52% of BCGI's revenues. Cingular, another important BCGI customer, accounts for approximately 27% of BCGI's revenue.

20. During the first two quarters of the Company's fiscal 2003, certain market analysts raised concerns relating to BCGI's ability to maintain relationships with its primary customers and the risk to the Company of its dependence on so few customers. For example, on April 24, 2003, First Analysis analyst, Howard Smith ("Smith"), commented in a research report

that BCGI's customer concentration was of particular concern to him (the "Smith Report"). In the Smith Report, Smith stated that despite Cingular's recent signing of a multi-year contract with BCGI, Cingular could develop its own 'in-sourced' pre-paid capability, a scenario that would lead to significant losses of BCGI revenue.

21.     Such was the concern among investors that BCGI could lose primary customers, that during June 2003, approximately 51% of the Company's outstanding common stock was held in short interest by investors (i.e. investors had borrowed and sold BCGI stock so that if the price of the Company's stock dropped those investors could reap gains by repurchasing the borrowed stock at lower prices).

22.     To allay investor fears concerning BCGI's customer concentration, BCGI attempted to reassure investors that contract negotiations with Verizon, and other customers were continuing as planned. BCGI's comments concerning Verizon represented a departure from Company policy by the Defendant's, who, as Smith noted in the Smith Report, had a policy of not commenting on ongoing contract negotiations.

23.     On April 16, 2003, BCGI issued a press release announcing the Company's financial results for the first quarter fiscal 2003, ended March 31, 2003 (the "1Q03 Press Release"). In the 1Q03 Press Release, BCGI commented on the Company's relationships with its key customers. The 1Q03 Press Release included comments from Defendant Walker who stated, in pertinent part:

> Our tremendous growth in first quarter subscriber additions was the key factor in our earnings growing more than 60% compared to the fourth quarter of 2002. Although we are now entering the seasonally slower second and third quarters, we believe that our carrier's commitment to prepaid and our business model and value proposition will continue to position bcgi for growth and healthy profits. As a result, we are raising our annual 2003 earnings guidance.....

7

> Our business model continues to be validated and our overall financial position, with $48.6 million in cash and investments and no debt, gives us the strength to capitalize on weaknesses across the telecommunications industry....

24. Defendant Snowden also contributed comments in the 1Q03 Press Release, stating, in pertinent part:

> We are obviously very pleased with our performance for the quarter and as a leader in real-time billing and transaction processing services, we feel that we are well positioned to continue to execute on our business plan. By serving both the largest national carriers and the smaller regional U.S. carriers who have just begun to gain momentum with their prepaid offerings, we look forward to continuing to competently provide them the best platform to demonstrate competitive success in a challenging industry.

25. On April 16, 2003, Defendants hosted a publicly broadcast conference call with industry analysts to discuss the Company's first quarter 2003 financial results (the "1Q03 Conference Call"). Defendants Snowden and Walker attended the 1Q03 Conference Call on behalf of BCGI. The tone of the 1Q03 Conference Call was very positive, with both the analysts and the hosts lauding the success of BCGI's quarterly results. Defendant Snowden affirmed that guidance figures for 2003 had been raised, and that expectations for the Company were good.

26. Defendant Snowden stated in the 1Q03 Conference Call that prospects for Company growth were "as good as ever."

27. During the 1Q03 Conference Call, Defendants Walker and Snowden reiterated that the Company's contract with Verizon was being negotiated, and, marking a significant departure from its policy of not specifically characterizing contract negotiations, Defendant Snowden twice characterized the Verizon negotiation process as "customary" and claimed that BCGI expected Verizon to renew its prepaid services agreement with BCGI.

8

28. On April 17, 2003, and despite her assertions the previous day that BCGI had good financial prospects, Defendant Walker sold 14,418 shares (or approximately 28.6%) of her personally controlled Company stock for proceeds of approximately $257,000.

29. On April 17, 2003, and despite his assertions the previous day that BCGI had good financial prospects, Defendant Snowden sold 4,600 shares of his personally controlled Company stock for proceeds of approximately $78,200.

30. The information concerning BCGI's relationship with Verizon as disclosed in the 1Q03 Conference Call and the 1Q03 Press Release was misleading. Before releasing the information, BCGI knew or was reckless in not knowing, that Verizon was seriously considering various alternatives to contract renewal, including the development of internal capabilities, or "insourcing," the work being performed by BCGI, or the use of a competitor's products. At the time the information was disclosed therefore, BCGI knew, or was reckless in not knowing, that the negotiations were anything but "customary" and that, more than ever, BCGI was at risk of losing Verizon as a customer and therefore 52% of the Company's revenue.

31. On April 21, 2003, Defendant Snowden sold 4,600 shares of personally controlled Company stock for proceeds of approximately $92,000.

32. On April 24, 2003, Smith and First Analysis issued the Smith Report. In the Smith Report, Smith stated that he believed the contract between BCGI and Verizon would be renewed, an opinion Smith based, in part, on BCGI's specific comments concerning the Verizon negotiations, a departure from BCGI policy.

33. On May 1, 2003, Defendant Snowden sold 14,100 shares of personally controlled Company stock for proceeds of approximately $249,781.

488648v1
08/21/03 12:53

34.     On May 15, 2003, BCGI filed with the SEC its Form 10-Q for the first quarter 2003 (the "1Q03 Form 10-Q"). In the 1Q03 Form 10-Q, BCGI admitted the Company faced specific concerns relating to the Company's contact with Cingular. BCGI stated, in pertinent part:

> We currently service only Cingular's TDMA markets and Cingular uses other vendors to service its GSM markets. As Cingular expands the buildout of its GSM network overlay, there is no guarantee that Cingular will not migrate its existing TDMA prepaid business onto the GSM network or that we would be chosen as the supplier for prepaid services on Cingular's GSM network. If Cingular's TDMA customers migrate to GSM technology, our revenue from this TDMA business would decrease. In addition, we must compete with other vendors to obtain Cingular's GSM business, including vendors already chosen by Cingular to provide this service in some existing markets, and we can give no assurance that we will obtain this business.

35.     The Company's concerns regarding Cingular, as expressed in the 1Q03 Form 10-Q, were picked up by Smith, who, on May 16, 2003, published a second report, via First Analysis, that echoed the concerns voiced by BCGI. Smith claimed in the May 16, 2003, report that the concerns surrounding the contract with Cingular and the uncertainty surrounding the Verizon contract, could, "provide downside pressure to the [Company's] shares in the near term."

36.     In the 1Q03 Form 10-Q, and in an attempt to allay market fears concerning BCGI's contract negotiations, the Defendants again broke with the Company policy of not commenting on contract negotiations and reiterated that BCGI expected to re-new its contract with Verizon. The 1Q03 Form 10-Q was signed by Defendant Walker.

37.     The information contained in the 1Q03 Form 10-Q concerning BCGI's relationship with Verizon was materially misleading. BCGI knew or was reckless in not knowing, before issuing the information, that Verizon was seriously considering various

10

alternatives to contract renewal, including the development of internal capabilities, or "insourcing," the work being performed by BCGI, or the use of a competitor's products.

38.     On June 2, 2003, Defendant Snowden sold 14,100 shares of personally controlled Company stock for proceeds of approximately $235,536.

### EVENTS TAKING PLACE DURING THE CLASS PERIOD

39.     On June 12, 2003, Mike Latimore ("Latimore") an analyst with Raymond James and Associates ("Raymond James"), issued a research report on BCGI, following a meeting Raymond James had with BCGI management the previous day (the "Raymond James Meeting"). At the Raymond James Meeting, BCGI, in a sudden reversion to traditional BCGI practices, informed Latimore that it would not comment on the on-going contract negotiations with Verizon, but according to the Latimore report, BCGI did "refer to a recent statement by the 50% customer, where Verizon said it was happy with BCGI and the outsourcing solution."

40.     BCGI's decision not to comment on the contract negotiations with Verizon, and its reference to the Verizon statement as described above, constituted a material omission and a false and misleading act. BCGI knew, or was reckless in not knowing, that Verizon was seriously considering various alternatives to contract renewal with BCGI, including the development of internal capabilities, or "insourcing," the work being performed by BCGI, or using a competitor's products. BCGI also knew that the statements made to Raymond James would enter the public domain.

41.     On July 1, 2003, Defendant Snowden sold 14,100 shares of personally controlled Company stock for proceeds of approximately $209,974.

42.     On July 8, 2003, Defendant Snowden sold 4,600 shares of personally controlled Company stock for proceeds of approximately $92,000.

11

43.     On July 11, 2003, Verizon made a formal request to BCGI to assist Verizon in testing an internal system that would provide essentially the same services as provided by BCGI. In other words, Verizon had requested that BCGI assist Verizon in creating its own 'in-house' service, a business move by Verizon that would significantly reduce BCGI's revenue in the long-term.

44.     On July 16, 2003, and only after the Individual Defendants had sold approximately $1,214,491 worth of personally controlled Company shares, BCGI finally revealed in a press release the truth concerning the Company's contract negotiations with Verizon (the "2Q03 Press Release"). In the 2Q03 Press Release BCGI revealed that contract negotiations with Verizon where still on-going but that Verizon had requested that BCGI provide support services to assist Verizon in testing its own internal prepaid platform in 2004 which could potentially displace prepay services currently being provided by BCGI. Also on July 16, 2003, the Defendants hosted a conference call to discuss the Company's second quarter 2003 financial results (the "2Q03 Conference Call"). In the 2Q03 Conference Call, Defendant Snowden stated that on July 11, 2003, Verizon had informed BCGI that Verizon was creating its own in-house, pre-paid billing system. Defendant Snowden characterized Verizon's as a "<u>formal</u>" request to BCGI for assistance in building the in-house system implying that there had been earlier informal requests by Verizon relating to its intended creation of in-house facilities which would displace BCGI.

45.     News of Verizon's intention to "insource" BCGI services caused an immediate negative reaction from the Company's investors and by the close of trading on July 17, 2003, the price of BCGI's shares had fallen to $12.70 down $8.45 (40%) on very heavy volume.

12

46. On July 17, 2003, Reuters news agency published an article concerning BCGI's shock announcement that the Company would likely lose 52% of its revenue in 2004 (the "Reuters's Article"). The Reuters Article included comments from Verizon spokesperson Brenda Raney, who confirmed that Verizon had already begun work on a pre-payment billing system. The service BCGI provides to Verizon is a highly complex, pre-paid billing system. Pre-paid billing systems are complex because 'real-time' information about a customer's balance is needed to ensure the customer has enough credit to make a telephone call. Therefore, any pre-paid billing system created by Verizon, even in part, would have required significant consultation and significant research and development expenditure by Verizon.

## **DEFENDANTS' MISREPRESENTATIONS**

47. In knowing or reckless disregard of the truth, defendants omitted to inform investors in BCGI securities, and the market place, of materially important information. Furthermore, in knowing or reckless disregard of the truth, defendants failed to correct prior statements so as to make those prior statements less misleading, as particularized above. The omissions were materially false and misleading when made for the reasons set forth herein in that the omitted information pertained to a significant portion of BCGI's revenue, total company finances and financial prospects. The following material and adverse facts were known to, or recklessly disregarded by defendants and defendants knew, or recklessly disregarded that the following material and adverse facts misled members of the Class and caused the Class to purchase BCGI stock:

    a) The information that BCGI had received from Verizon concerning contractual relations between the two entities and Verizon's request that BCGI assist Verizon with insourcing BCGI's services, which the Individual Defendants omitted to inform the investing

public during the Class Period, constituted a fraudulent financial manipulation which deceived the investing public who, had they known the truth, would not have purchased BCGI securities or would not have purchased BCGI securities at the inflated prices they did. The omissions materially mislead investors as to the Company's contractual negotiations with Verizon and the long-term prospects of the Company's business.

b)   That the Individual Defendants knew, or were reckless in not knowing that prior statements made by the defendants concerning BCGI's contractual negotiations were misleading and defendants knew or were reckless in not knowing that their failure to correct such prior statements concerning the status and nature of the negotiations between BCGI and Verizon made those earlier statements even more misleading. The Defendant's failure to correct the prior made statements, as described in detail herein, materially mislead investors as to the Company's contractual negotiations with Verizon and the long-term prospects of the Company's business.

48.   Defendants' false representations and material omissions were made with <u>scienter</u> in that: defendants knew or recklessly disregarded that the material omissions as described herein and the Individual Defendants' failure to correct prior misleading statements would cause harm to plaintiff and other class members. The following factor indicates that defendants omitted to inform knowingly or with reckless disregard for the truth:

(a)   The Individual Defendants were intimately involved in the daily business operations of the Company and had access to financial reports, financial disclosures, Company personnel associated with the Company's finances and other sources of Company information.

488648v1
08/21/03 12:53

## COUNT 1

### For Violations of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5

49.     Plaintiff incorporates by reference and realleges each of the foregoing paragraphs.

50.     During the Class Period, defendants, individually and in concert, engaged in a plan, scheme, and course of conduct, pursuant to which they knowingly and/or recklessly engaged in acts, practices, and courses of business which operated as a fraud upon plaintiff and other members of the Class. During the Class Period, defendants omitted to inform plaintiff and the other class members of materially important, adverse information, an omission that significantly harmed plaintiff and other members of the Class. Furthermore, defendants omitted to state material facts necessary in order to make prior statements less misleading to plaintiff and other Class members. The purpose and effect of this scheme was to induce plaintiff and the Class to purchase BCGI common stock at artificially inflated prices.

51.     During the Class Period, Defendants knew and/or recklessly disregarded the falsity of omitting the above-described information. As senior officers and directors of the Company, involved in its business and operations, the Individual Defendants had access to the non-public information detailed above, by virtue of their receipt of internal reports detailing contractual negotiations between BCGI and Verizon.

52.     Throughout the Class Period, BCGI acted through the Individual Defendants, whom it portrayed and represented to the press and public as its valid representatives. The willfulness, motive, knowledge, and recklessness of the Individual Defendants are therefore imputed to BCGI, which is primarily responsible for the securities law violations of the Individual Defendants while acting in their official capacities as Company representatives, or, in the alternative, which is liable for the acts of the Individual Defendants under the doctrine of *respondent superior*.

15

53.     Each of the defendants knew or recklessly disregarded the fact that the above acts and practices, misleading statements, omissions and failures to correct prior misleading statements, would adversely affect the integrity of the market in BCGI's common stock. Had the adverse facts defendants concealed been properly disclosed, BCGI's stock would not have sold at the artificially inflated prices it did during the Class Period.

54.     The value of BCGI common stock declined materially upon public disclosure of the truth concerning the Company's financial circumstances, financial circumstances which had been misrepresented and concealed, as alleged in this complaint. Plaintiff and other members of the proposed Class have suffered substantial damages as a result of the wrongs alleged herein.

55.     By reason of the foregoing, defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

56.     By reason of their status as officers and/or members of management and as directors of BCGI, the Individual Defendants were "controlling persons" of BCGI within the meaning of Section 20 of the Exchange Act and had the power and influence to cause BCGI to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of BCGI's business, the information contained in its filings with the SEC and public statements about its business.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues.

**WHEREFORE,** plaintiff on his own behalf and on behalf of the Class prays for judgment as follows:

488648v1
08/21/03 12:53

A. Declaring this action to be a proper class action maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure and plaintiff to be a proper class representative and his counsel lead counsel;

B. Awarding plaintiff and the Class compensatory damages, together with appropriate prejudgment interest at the maximum rate allowable by law;

C. Awarding plaintiff and the Class their costs and expenses for this litigation including reasonable attorneys' fees and other disbursements; and

D. Granting such other and further relief as this Court deems to be just and proper.

Dated: November 10, 2003                SHAPIRO HABER & URMY LLP

*[signature]*

Thomas G. Shapiro BBO #454680
Theodore M. Hess-Mahan BBO #557109
75 State Street
Boston, Massachusetts 02109
617-439-3939

Christopher J. Keller
GOODKIND LABATON RUDOFF
& SUCHAROW LLP
100 Park Avenue
New York, New York 10017
Telephone: (212) 907-0700

Paul Geller
CAULEY GELLER BOWMAN & RUDMAN, LLP
2255 Glades Road
Suite 421A
Boca Raton, Fl 33431
Telephone: (561) 750-3000

*Attorneys for Plaintiff*

## CERTIFICATION

I, FRED DEN hereby certify as follows:

1. I did not purchase securities of Boston Communications Group, Inc. ("BCGI") at the direction of counsel or in order to participate in any private action under the federal securities laws;

2. I have reviewed a complaint prepared against BCGI alleging violations of the securities laws and I authorized the filing of this complaint;

3. I am willing to serve as a lead plaintiff in this matter, including providing testimony at deposition and trial, if necessary;

4. I have transactions in the securities of BCGI as reflected in Exhibit A hereto;

5. I have not sought to serve as a lead plaintiff in any class action under the federal securities laws during the last three years;

6. I will not accept payment for serving as a lead plaintiff beyond my pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I certify under penalty of perjury that the foregoing is true and correct.

Dated:   July 17, 2003

1

488731v1
07/17/03 17:55

# EXHIBIT A

## TRANSACTIONS.

| TRANSACTION (Purchase/Sale) | TRADE DATE (mm/dd/yyyy) | PRICE (per share) | NO. OF SHARES | TOTAL COST / PROCEEDS |
|---|---|---|---|---|
| Purchase | 7/11/03 | $20.5 | 2000 | $41,000 |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

add further transactions below as necessary:

488731v1
07/17/03 17:55