UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

------------------------------------------------------------ x
FRED DEN, individually and on behalf of  )
all others similarly situated,                        )    C. A. No.: 03-12211-DPW
                                                                )
                                   Plaintiff,              )
        - v. -                                              )    **AMENDED CONSOLIDATED**
                                                                )    **CLASS ACTION COMPLAINT**
                                                                )
KAREN A. WALKER, EDWARD H.      )
SNOWDEN and BOSTON                    )    **Jury Trial Demanded**
COMMUNICATIONS GROUP, INC.,  )
                                                                )
                                   Defendants.          )
                                                                )
------------------------------------------------------------ x

Lead Plaintiffs Fred Den, Adam Feldman and Beth Stockinger ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint, alleges upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based upon, *inter alia,* the investigation made by and through their attorneys, which investigation included, among other things, a review of the public documents, Securities and Exchange Commission ("SEC") filings, analyst reports, news releases and media reports of Boston Communications Group, Inc. ("BCGI" or the "Company"), and interviews with former employees of BCGI and other witnesses, as follows:

## JURISDICTION AND VENUE

1. The claims alleged herein arise under Sections 10(b) and 20 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t, and Rule 10b-5, 17 C.F.R. § 240.10b-5 promulgated thereunder.

2. The jurisdiction of this Court is based on Section 27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1331 (federal question jurisdiction).

1

3.      Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act. Many of the acts and transactions giving rise to the violations of law complained of herein, including the preparation and dissemination to the investing public of materially false and misleading information, occurred in this judicial district. BCGI maintains its executive offices at 100 Sylvan Road, Suite 100, Woburn, Massachusetts.

4.      In connection with the acts, transactions and conduct alleged herein, defendants used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications and the facilities of a national securities exchange and market.

## THE PARTIES

5.      Plaintiffs purchased shares of BCGI common stock during the Class Period, as set forth in the accompanying Certifications, and have been damaged as a result of defendants' conduct as alleged herein.

6.      Defendant BCGI is a Massachusetts corporation that maintains its principal offices in Massachusetts. The Company provides software services to the wireless industry through software applications. These services include processing services, roaming services and prepaid systems services. As of May 7, 2003 the Company had 18,059,848 shares of common stock issued and outstanding. The Company's stock trades on the NASDAQ Exchange (the "NASDAQ").

7.      Defendant Edward H. Snowden ("Snowden") has at all relevant times served as the Company's President and Chief Executive Officer and as a director of the Company.

8.      Defendant Karen A. Walker ("Walker") has at all relevant times served as the Company's Chief Financial Officer.

504498v1
03/22/04 10:51

9. Defendants Walker and Snowden are, at certain times in this complaint, collectively referred to as the "Individual Defendants."

## CLASS ACTION ALLEGATIONS

10. Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons who purchased BCGI common stock during the period June 12, 2003 through July 16, 2003, inclusive (the "Class Period") and who were damaged thereby (the "Class"). Excluded from the Class are the Company, its officers and directors, employees, affiliates, legal representatives, heirs, predecessors, successors and assigns, and any entity in which the Company has a controlling interest or of which the Company is a parent or subsidiary.

11. The members of the Class are located in geographically diverse areas and are so numerous that joinder of all members is impractical. The Company has over 18 million shares of common stock outstanding which trade on the NASDAQ, an efficient market. The Company is followed by numerous securities analysts including Advest, First Analysis and Raymond James & Associates ("Raymond James"). While the exact number of Class members is unknown to the plaintiff at this time, and can only be ascertained through appropriate discovery, plaintiffs believe there are, at a minimum, over five hundred members of the Class.

12. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

    (a) Whether defendants engaged in acts or conduct in violation of the federal securities laws as alleged herein;

    (b) Whether defendants had a duty to disclose material adverse information;

(c)   Whether defendants acted knowingly or recklessly in making materially false and misleading statements or in failing to correct such statements upon learning that they were materially false and misleading during the Class Period;

(d)   Whether the market price of the Company's common stock during the Class Period was artificially inflated because of defendants' conduct complained of herein; and

(e)   Whether members of the Class have sustained damages and, if so, the proper measure of damages.

13.   Plaintiffs' claims are typical of the claims of the members of the Class because plaintiffs and members of the Class sustained damages arising out of defendants' wrongful conduct in violation of federal law as complained of herein.

14.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

15.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impractical. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background

16.   BCGI provides real-time transaction processing services to wireless telephone providers, the bulk of which relate to prepaid wireless call processing.  While BCGI provides

such services to over seventy wireless carriers and re-sellers, the Company is heavily dependent on just a hand full of those customers for most of its yearly revenues. Verizon Wireless ("Verizon") is a particularly important customer of BCGI, contributing 44%, 49% and 51% of the Company's total revenues in 2001, 2002 and 2003, respectively. In contrast, Cingular, BCGI's second largest customer, accounted for approximately 28%, 25%, and 23% of BCGI's revenue during the same period.

17.     Given that Verizon accounted for approximately half of the Company's revenues, the status of its ongoing relationship with BCGI was extremely material and, indeed, was noted by securities analysts in early 2003 as a cause for concern -- especially since it was well known that BCGI's Verizon contract was due to expire later that year.

18.     For example, on February 6, 2003, First Analysis Securities Corporation ("First Analysis") analyst, Howard Smith ("Smith"), commented in a research report that BCGI's customer concentration was of particular concern to him. In that report, Smith noted that "[r]egarding Verizon, *while management never comments on contract status*, we believe this contract is up for renewal this year. Based on Verizon's success with its service and several other factors, we think there is a high likelihood Verizon will renew (though nonrenewal is always a risk)." (Emphasis added).

19.     As Smith noted in the February 6, 2003 First Analysis Report, it had been the long-term policy and practice of BCGI to stay silent on the status of contract negotiations. However, as described below, in an effort to allay investor and analyst fears concerning BCGI's customer concentration, BCGI departed from its policy in order to reassure investors that its relationships with its key customers were strong and that its contract negotiations with Verizon were going well.

5

20.     On April 16, 2003, BCGI issued a press release announcing the Company's financial results for the first quarter fiscal 2003, ended March 31, 2003 (the "1Q03 Press Release").  In the 1Q03 Press Release, BCGI commented on the Company's relationships with its key customers.  Specifically, defendant Snowden stated in the 1Q03 Press Release:

> We are obviously very pleased with our performance for the quarter and as a leader in real-time billing and transaction processing services, we feel that we are well positioned to continue to execute on our business plan. By serving both the largest national carriers and the smaller regional U.S. carriers who have just begun to gain momentum with their prepaid offerings, we look forward to continuing to competently provide them the best platform to demonstrate competitive success in a challenging industry.

21.     Following the release of the 1Q03 Press release, on April 16, 2003, Defendants hosted a publicly broadcast conference call with industry analysts to discuss the Company's first quarter 2003 financial results (the "1Q03 Conference Call").  Defendants Snowden and Walker participated on the 1Q03 Conference Call on behalf of BCGI.  The tone of the 1Q03 Conference Call was very positive, with both the analysts and the hosts lauding the success of BCGI's quarterly results.  In a further effort to allay investors' concerns, and in a departure from its practice of not commenting on contract negotiations, Defendant Snowden stated during the 1Q03 Conference Call that "recently Verizon Wireless has become a *customary* contract renewal process with us that we expect to result in the renewal of our prepaid services agreement with them." (Emphasis added).  Later in the 1Q03 Conference Call, in response to an analyst's questions about the Verizon contract, Snowden reiterated that BCGI had begun "the *customary* contract renewal process with Verizon."  (Emphasis added).  Snowden added during the call that prospects for Company growth were "as good as ever."

22. Following the 1Q 03 Conference Call, analysts issued reports that were based on information provided to them by Defendants during the call. For example, Morgan Keegan & Company, Inc. ("Morgan Keegan") issued a report on April 17, 2003 which stated that "[m]anagement appeared extremely confident in re-signing Verizon this year (this represents the largest risk to the stock), which will likely alleviate some investor concern."

23. The market was very encouraged by BCGI's representations about the Verizon contract negotiations. The price of BCGI's stock closed at $15.101 per share on April 16, 2003, prior to the conference call that was held after the market closed. On April 16, 2003, the stock skyrocketed 25% on extraordinarily heavy volume to close at $18.90 per share.

24. In an April 24, 2003 report, First Analysis analyst Smith issued another report that commented on the customer concentration risk at BCGI. Specifically, Smith noted that in addition to customer concentration posing a risk that a particular contract (such as Verizon) would not be renewed, there was also a risk that even if the customer did renew its contract, it could be working on its own in-house system to handle prepaid calls which would eventually displace BCGI. Smith stated that:

> we think there is a high likelihood Verizon renews its contract with BCGI. We think the comments made by BCGI management that it is in active negotiations to renew the contract 1) are atypical (historically, BCGI has never commented on contract negotiations) and 2) required permission of Verizon management. We think these two factors increase the bias we already had from other signals in the market that the contract will be renewed.

25. On May 15, 2003, BCGI filed with the SEC its Form 10-Q for the first quarter 2003 (the "1Q03 10-Q"), which was signed by defendant Walker. In the 1Q03 10-Q, BCGI acknowledged the Company faced specific concerns relating to the Company's contact with Cingular (its second largest customer). BCGI stated, in pertinent part:

7

> We currently service only Cingular's TDMA markets and Cingular uses other vendors to service its GSM markets. As Cingular expands the buildout of its GSM network overlay, there is no guarantee that Cingular will not migrate its existing TDMA prepaid business onto the GSM network or that we would be chosen as the supplier for prepaid services on Cingular's GSM network. If Cingular's TDMA customers migrate to GSM technology, our revenue from this TDMA business would decrease. In addition, we must compete with other vendors to obtain Cingular's GSM business, including vendors already chosen by Cingular to provide this service in some existing markets, and we can give no assurance that we will obtain this business.

26. The 1Q03 10-Q was silent with respect to potential problems with Verizon, however, and, departing again from Company policy of not commenting on contract negotiations, the 1Q03 10-Q noted that "[o]ur Verizon prepaid wireless services contract and certain other contracts expire in 2003 and beyond," and added that "we expect to renew these contracts."

27. BCGI's stock price declined in response to the disclosure about Cingular, dropping from $17.19 a share on May 15, 2003 to $15.95 on May 16, 2003. Based on this reaction, Defendants well knew that if BCGI were to announce similar problems with Verizon, the Company's largest customer, the price of BCGI stock would suffer a far more dramatic decline.

28. However, as of mid-May 2003, investors were under the impression, created by Defendants' representations, that BCGI's relationship with Verizon was strong, it's contract negotiations were "customary," and that the contract was likely to be renewed. Given the materiality of Verizon to BCGI's revenues and, therefore, its profitability going forward, defendants were under a duty to swiftly disclose information that undermined the accuracy of the impression that they had created in the marketplace.

8

29. At or about the same time, serious issues began to arise between BCGI and Verizon, which threatened the renewal of the Verizon contract and the continuation of their existing business relationship going forward. According to a former project manager for Verizon who personally dealt with BCGI, prior to this time, Verizon had been considering developing its own system internally because it would have been a cheaper and more "cost-effective" alternative to the BCGI system.

30. Defendants Snowden and Walker were both involved with the contract renewal negotiations with Verizon. According to a former Senior Account Manager at BCGI, Snowden got personally involved in contract negotiations with BCGI's customers.

31. During the course of negotiating a new contract with BCGI, Verizon shared its intent to begin investigating an in-house alternative to BCGI's prepaid system with Snowden and Walker, as well as BCGI Director of Business Development, Maureen Riley. During those negotiations, Verizon made several informal requests to include an addendum to the contract that would require BCGI to assist Verizon with developing its own internal prepaid platform in 2004. These issues were discussed at meetings of the Company's senior management, including Snowden, Walker, Riley and BCGI Vice President of Sales, Kim Obremski, that were held every Tuesday morning in the Executive Conference Room. As disclosed by a former BCGI administrative assistant who left the Company in January 2004, Walker acknowledged in a July 2003 meeting with BCGI employees that she knew for a long time that Verizon had been thinking about developing its own system.

32. Instead of immediately disclosing this adverse information to the market, as they were obligated to do, Defendants stayed silent on the issue, leading investors and analysts to believe that, as previously represented by the defendants, the Verizon contract negotiations were

proceeding apace, were still "customary," and would result in renewal of the contract. As detailed below, during the Class Period, defendant Snowden took the opportunity to unload more than $300,000 of his BCGI shares on an unsuspecting market before finally disclosing the truth.

**False and Misleading Statements During the Class Period**

33.   On June 12, 2003, Mike Latimore ("Latimore") an analyst with Raymond James, issued a research report on BCGI, following a meeting Raymond James had with Snowden and other BCGI management the previous day (the "Raymond James Meeting"). At the Raymond James Meeting, in a sudden reversion to traditional BCGI practices, Snowden informed Latimore that he would not comment on the on-going contract negotiations with Verizon, but according to the Latimore report, referred "to a recent statement by the 50% customer, where Verizon said it was happy with BCGI and the outsourcing solution." Latimore added in his report that "BCGI remains upbeat about its prospects."

34.   BCGI's decision not to comment on the contract negotiations with Verizon is indicative of Defendants' knowledge that their prior statements about the contract were no longer true. As noted above, BCGI then knew that Verizon was seriously considering developing its own in-house prepaid system and was requesting BCGI's cooperation in that project as a condition of resigning its contract. Defendants' silence on the issue constituted a material omission since they were under a duty to correct their earlier statements (described in ¶¶ 21 and 26) once it became known that they were no longer true. Snowden also knew and intended that his statements made to Raymond James would enter the public domain.

35.   On July 1, 2003, Defendant Snowden sold 14,100 shares of personally controlled Company stock, at prices ranging from $16.8164 to $17.00 per share, for proceeds of approximately $209,974.

10

36. On July 8, 2003, Defendant Snowden sold 4,600 shares of personally controlled Company stock at $20.00 per share, for proceeds of approximately $92,000.

37. Snowden's disposition of almost 19,000 shares for more than $300,000 in a one-week period was unusual and suspicious as compared with his selling during the same period a year earlier (during which time he had no sales). Moreover, Snowden's sales during this period exceeded his selling in the prior few months, indicating that the sudden increase in his stock sales was prompted by the adverse non-public information that he possessed about BCGI's relationship with Verizon.

38. On July 11, 2003, consistent with prior discussions between BCGI and Verizon about Verizon shifting to an internal system for prepaid services, Verizon "formally" requested that BCGI assist Verizon in testing an internal system that would provide essentially the same services as provided by BCGI. In other words, Verizon had requested that BCGI assist Verizon in creating its own 'in-house' service, a business move by Verizon that would significantly reduce BCGI's revenue in the long-term.

39. On July 16, 2003 -- less than two weeks after Snowden sold more than $300,000 of his own BCGI shares -- BCGI finally revealed in a press release the truth concerning the Company's contract negotiations with Verizon (the "2Q03 Press Release"). Although the 2Q03 Press Release disclosed strong earnings growth and included increased guidance for fiscal year 2003, BCGI revealed that contract negotiations with Verizon where still on-going but that Verizon had requested that BCGI "provide support services to assist Verizon Wireless in testing its own internal prepaid platform in 2004 which could potentially displace prepay services currently being provided by BCGI."

11

40.     Also on July 16, 2003, the Defendants hosted a conference call to discuss the Company's second quarter 2003 financial results (the "2Q03 Conference Call"). In the 2Q03 Conference Call, Defendant Snowden stated, "[d]uring the course of our contract renegotiations, we were asked to attend a meeting late Friday afternoon [July 11,] at Verizon Wireless' office and during the meeting we were given a *formal request* intended to become an addendum to our contract." Snowden's characterization of the July 11 request as a "formal" one, constitutes an admission that BCGI knew, at least informally, of Verizon's intention to begin testing an in-house system prior to that date.

41.     On the same date, defendant Walker admitted during a BCGI employee meeting that she knew for a long time that Verizon was interested in developing their own prepaid wireless system.

42.     Analysts were understandably upset about BCGI's revelation. In a July 17, 2003 report, Morgan Keegan downgraded its rating on BCGI to "Market Perform/Speculative based on near term uncertainty surrounding Verizon situation." Likewise, Raymond James downgraded BCGI to "Market Perform from Outperform because of the risk surrounding Verizon Wireless."

43.     Highlighting the materiality of the negative Verizon disclosure, notwithstanding the fact that the 2Q03 Press release disclosed record earnings and reflected increased guidance for fiscal 2003, by the close of trading on July 17, 2003, the price of BCGI's shares had fallen to $12.70 down $8.45 (40%) on very heavy volume.

44.     On July 17, 2003, an article by *Reuters* noted that BCGI's "shares lost a third of their value after it said it could lose its largest customer." Significantly, the Reuters Article included comments from Verizon spokesperson Brenda Raney, who confirmed that Verizon had

*already begun* work on a pre-payment billing system. This information was available to BCGI prior to the so-called "formal request" on July 11, 2003. Indeed, according to a former BCGI administrative assistant, Maureen Riley met frequently with Verizon at its offices in Bedminster, New Jersey, both *before* and after the mid-July disclosure.

## COUNT I

### For Violations of Sections 10(b) of the Exchange Act and Rule 10b-5

45. Plaintiffs repeat and reallege all of the allegations set forth above as if fully set forth herein.

46. This Count is asserted against Defendants, for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

47. Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein.

48. As alleged herein, Defendants, individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and of the mails, engaged and participated in a continuous course of conduct to artificially inflate the reported financial value of BCGI and to conceal its true financial condition. Such defendants employed devices, schemes, and artifices to defraud and engaged in acts, practices, and a course of conduct that included omitting to state material facts necessary in order to make prior statements made about BCGI not misleading.

49. Defendants knew or recklessly disregarded that Verizon was developing its own in-house prepaid wireless billing system that could eventually displace BCGI.

13

50.     The Individual Defendants, as officers and/or directors of BCGI, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as the CFO and CEO of the Company, the Individual Defendants were able to and did control the content of the public statements disseminated by BCGI.

51.     Defendants' omissions were intentional or reckless and done for the purposes of concealing the fact that BCGI was at risk of losing more than half of its revenues and, in the case of defendants Snowden, to allow him to dump more than $300,000 of BCGI common stock prior to the Company's eventual disclosure about the problems with Verizon.

52.     Defendants acted with scienter, in that they either had actual knowledge of the omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose the true facts, even though such facts were available to them. As noted above at ¶¶ 30 - 31, defendants Snowden and Walker were active in the negotiations with Verizon, had access to nonpublic information concerning those discussions, and participated in weekly meetings with other executive officers of the Company during which the status of the Verizon negotiations, including Verizon's intent to develop an internal system, was discussed. Moreover, Snowden was motivated to maintain the false impression that negotiations with Verizon were going well so that he could profit from his insider stock sales.

53.     As a result of the deceptive practices, common schemes and artifices, and false and misleading statements and omissions alleged herein, the price of BCGI securities were artificially inflated. In ignorance of the false and misleading statements, the material omissions, and the deceptive and manipulative devices and contrivances employed by the Defendants, plaintiffs relied on the statements complained of herein in purchasing or acquiring BCGI

14

securities. Had plaintiffs known the truth, they would not have purchased the securities or would not have purchased or acquired them at the artificially inflated prices they actually paid.

54. Upon disclosure of the true facts, the price of BCGI securities dropped precipitously, and plaintiffs suffered damages in an amount to be proven at trial.

55. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes, or artifices to defraud; (b) omitted to state material facts they had a duty to state in order to make prior statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of business which operated as a fraud and deceit upon plaintiffs in connection with their purchases of BCGI securities.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act

56. Plaintiffs repeat and reallege all of the allegations set forth above as if fully set forth herein.

57. Defendants Walker and Snowden, by reason of their positions as CFO and CEO, respectively, were controlling persons of BCGI and had the power and influence, and exercised such power and influence, to cause BCGI to engage in the violations of law complained of herein.

58. Defendants Walker and Snowden had the power, influence and authority to direct or cause the direction of the management and policies of BCGI, and, therefore, to cause or to prevent the wrongful conduct and practices complained of herein, and in fact, directed and caused, in whole or in material part, such management and policies of the Company, so as to cause, and to fail to prevent, the wrongful conduct alleged herein.

15

59. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs were damaged in connection with their purchase or acquisition of BCGI securities.

60. By reason of the conduct alleged above, the Individual Defendants are liable jointly and severally for the wrongful conduct alleged herein, and are liable to plaintiffs for the damages they suffered in connection with their purchases of BCGI securities at artificially inflated prices as a result of BCGI's violations of the Exchange Act.

## COUNT III

### Against Defendants Snowden For Violations of Section 20A of the Exchange Act

61. Plaintiffs repeat and reallege all of the allegations set forth above as if fully set forth herein.

62. This claim is brought by plaintiffs on behalf of Class members who purchased BCGI securities at or about the time that Snowden sold BCGI common stock during the Class Period.

63. Defendants Snowden sold 4,600 shares of BCGI common stock on July 8, 2003 while in possession of material adverse nonpublic information.

64. On July 8, 2003, plaintiff Adam Feldman purchased 1,500 shares of BCGI common stock (*i.e.*, contemporaneously with Snowden's sale). Other Class members purchased BCGI stock contemporaneously with Snowden's other sales during the Class Period.

65. As described herein, Snowden violated § 10(b) of the Exchange Act.

66. As a result of the foregoing, Snowden violated Section 20A of the Exchange Act and is liable to plaintiff Feldman and other Class Members who purchased shares of BCGI common stock contemporaneously with Snowden's insider sales.

16

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues.

**WHEREFORE,** plaintiff on his own behalf and on behalf of the Class prays for judgment as follows:

  A. Declaring this action to be a proper class action maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure and plaintiff to be a proper class representative and his counsel lead counsel;

  B. Awarding plaintiff and the Class compensatory damages, together with appropriate prejudgment interest at the maximum rate allowable by law;

  C. Awarding plaintiff and the Class their costs and expenses for this litigation including reasonable attorneys' fees and other disbursements; and

  D. Granting such other and further relief as this Court deems to be just and proper.

Dated: March 22, 2004       By their attorneys,

                /s/Theodore M. Hess-Mahan
                Theodore M. Hess-Mahan BBO #557109
                SHAPIRO HABER & URMY LLP
                75 State Street
                Boston, Massachusetts 02109
                Telephone: (617) 439-3939

                Jonathan M. Plasse
                Lisa Buckser-Schulz
                GOODKIND LABATON RUDOFF
                & SUCHAROW LLP
                100 Park Avenue
                New York, New York 10017
                Telephone: (212) 907-0700

                *Attorneys for Plaintiffs*