UNITED STATES DISTRICT COURT
FOR THE DISTRICT COURT OF MASSACHUSETTS

_____ )
                                          )
FRED DEN, individually and on behalf of   )
all others similarly situated,            )
                Plaintiff,                )
                                          )
    v.                                    )    Civil Action No. 03-12211DPW
                                          )
KAREN A. WALKER, EDWARD H. SNOWDEN )
and BOSTON COMMUNICATIONS GROUP,          )
INC.,                                     )
                Defendants.               )
_____ )

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO
DISMISS THE AMENDED CONSOLIDATED CLASS COMPLAINT**


KAREN A. WALKER, EDWARD H.
SNOWDEN and BOSTON
COMMUNICATIONS GROUP, INC.,

By their attorneys,

Jeffrey B. Rudman (BBO #433380)
Andrea J. Robinson (BBO #556337)
Lisa M. Cameron (BBO #639951)
Alison R. Aubry (BBO #657298)
Hale and Dorr LLP
60 State Street
Boston, MA 02109
(617) 526-6000


Dated:  May 10, 2004

TABLE OF CONTENTS

Introduction ................................................................................................................. 1

Allegations of Complaint ............................................................................................ 2

Argument .................................................................................................................... 5

I.     THE COMPLAINT MUST MEET THE HEIGHTENED PLEADING
       REQUIREMENTS OF RULE 9(b) AND THE REFORM ACT. ....................... 6

II.    PLAINTIFFS HAVE FAILED TO PLEAD SPECIFIC FACTS ESTABLISHING
       THAT DEFENDANTS HAD ANY DUTY TO UPDATE ................................. 7

       A.     Defendants Had No Duty to Update the Statement That BCGI Expected
              the Verizon Contract To Be Renewed Because It Was A Forward-
              Looking Statement of Opinion. ................................................................. 9

       B.     No Duty to Update Forward-looking Statements Under Reform Act .................. 11

       C.     No Duty to Update Statement of Historical Fact that BCGI Had "Begun"
              Customary Contract Negotiations With Verizon ..................................... 12

       D.     Forward-Looking Statements Accompanied By Abundant Cautionary
              Language Are Not Actionable ................................................................ 12

       E.     Plaintiffs Fail to Plead Facts Demonstrating That the Forward-Looking
              Statements About Contract Renewal Were Rendered Misleading,
              Requiring Any Update ........................................................................... 15

III.   PLAINTIFFS HAVE NOT PLEAD SCIENTER ........................................... 17

       A.     Plaintiffs Have Not Plead Facts Establishing That Any One At BCGI
              Knew or Was Reckless in Not Knowing, Prior to July 11, 2003, That
              Verizon Had Initiated Plans To Build Its Own Internal Billing System. ............... 18

              1.     Plaintiffs Improperly Rely On Information and Belief Allegations
                     Without Identifying The Basis for Their Belief. .............................. 18

              2.     The Allegations That Are Supported By A Source Do Not Suggest
                     That Defendants Knew Or Should Have Known, Prior To July 11,
                     2003, That Verizon Had Begun The Development Of An Internal
                     Pre-Paid System ................................................................... 20

       B.     Plaintiffs Fail to Establish That Mr. Snowden's Trades Were Unusual Or
              Suspicious ............................................................................................ 22

              1.     Mr. Snowden's Trades In the Class Period Were Consistent With
                     His Past Trading History. ......................................................... 22

              2.     Mr. Snowden Sold Only A Small Portion of His Overall Holdings
                     During The Class Period ......................................................... 26

IV.    PLAINTIFFS FAIL TO ESTABLISH CONTROL PERSON LIABILITY FOR
       ANY OF THE INDIVIDUAL DEFENDANTS ............................................ 27

V.    PLAINTIFFS FAIL TO STATE A SECTION 20A CLAIM AGAINST MR.
      SNOWDEN..........................................................................................................27

Conclusion ...............................................................................................................................29

# TABLE OF AUTHORITIES

<u>Cases</u>

<u>Acito v. IMCERA Group, Inc.</u>,
   47 F.3d 47 (2d Cir. 1995) ............................................................................................. 23

<u>Alabaster v. Bastiaens</u>,
   Civ. Act. No. 99-10237-NG, 2000 U.S. Dist. LEXIS 22354 (D. Mass. July
   27, 2000) ...................................................................................................... 25, 27

<u>Aldridge v. A.T. Cross Corp.</u>,
   284 F.3d 72 (1st Cir. 2002) ........................................................................................... 6

<u>Backman v. Polaroid Corp.</u>,
   910 F.2d 10 (1st Cir. 1990) ..................................................................................... 8, 17

<u>Baron v. Smith</u>,
   Civ. Act. No. 02-11189GAO, 2003 WL 22273094  (D. Mass. Sept. 30,
   2003) ............................................................................................................... 9

<u>Basic Inc. v. Levinson</u>,
   485 U.S. 224 (1988) ..................................................................................................... 15

<u>Capri Optics Profit Sharing v. Digital Equip. Corp.</u>,
   950 F.2d 5 (1st Cir. 1991) ........................................................................................... 15

<u>Colby v. Hologic, Inc.</u>,
   817 F. Supp. 204 (D. Mass. 1993) .......................................................................... 7, 19

<u>Cooperman v. Individual, Inc.</u>,
   171 F.3d 43 (1st Cir. 1999) ....................................................................................... 2, 8

<u>Copley Pharm., Inc. Secs. Litig.</u>,
   Civ. A. No. 94-11897-WGY, 1995 WL 169215 (D. Mass. Mar. 16, 1995) ................. 15

<u>Crystal v. Foy</u>,
   562 F. Supp. 422 (S.D.N.Y. 1983) .............................................................................. 19

<u>Eisenstadt v. Centel Corp.</u>,
   113 F.3d 738 (7th Cir. 1997) ....................................................................................... 11

<u>Elliott Assoc., L.P. v. Covance, Inc.</u>,
   No. 00-Civ. 4115 SAS, 2000 WL 1752848 (S.D.N.Y. Nov. 28, 2000) .......................... 9

<u>Evanowski v. BankWorcester</u>,
   788 F. Supp. 611 (D. Mass. 1991) .............................................................................. 16

Fisher v. SpecTran Corp.,
   No. 99-12359-NG, slip. op (May 31, 2001) ...................................................................11

Fitzer v. Sec. Dynamics Techs., Inc.,
   119 F. Supp.2d 12 (D. Mass. 2000) .................................................................. 6, 7, 22, 24

Giarraputo v. UNUMProvident,
   No. Civ. 99-301-PC, 2000 WL 1701294 (D. Me. Nov. 8, 2000) ................................. 22

Glassman v. Computervision Corp.,
   90 F.3d 617 (1st Cir. 1996)....................................................................................... 2, 13, 19

Greebel v. FTP Software, Inc.,
   194 F.3d 185 (1st Cir. 1999)........................................................................................ 7, 17, 22

Gross v. Suma Four, Inc.,
   93 F.3d 987 (1st Cir. 1996)............................................................................................... 3, 8

Hogan v. Piasecki,
   No. 96-C-7399, 1997 U.S. Dist. LEXIS 6858 (N.D. Ill. May 5, 1997) ....................... 28

In re Advanta Corp. Sec. Litig.,
   180 F.3d 525 (3d Cir. 1999)............................................................................................... 11

In re Boston Tech., Inc. Sec. Litig.,
   8 F. Supp.2d 43 (D. Mass. 1998) ............................................................................... 6, 7, 24

In re Burlington Coat Factory Sec. Litig.,
   114 F.3d 1410 (3d Cir. 1997).......................................................................................... 8, 17

In re Cabletron Syst. Inc.,
   311 F.3d 11 (1st Cir. 2002)............................................................................................... 20

In re Chipcom Corp. Sec. Litig.,
   Civ. Act. No. 95-1114, slip. op. (D. Mass. April 29, 1996)........................................... 24

In re Comshare Inc. Sec. Litig.,
   No. 96-73711-DT, 1997 U.S. Dist. LEXIS 17262 (E.D. Mich. Sept. 18,
   1997), aff'd, 183 F.3d 542 (6th Cir. 1999).................................................................... 26

In re FVC.COM Sec. Litig.,
   136 F. Supp.2d 1031 (N.D. Cal. 2000) ......................................................................... 26

In re Healthco Int'l, Inc. Sec. Litig.,
   777 F. Supp. 109, 115 (D. Mass. 1991) ....................................................................... 10

In re Humana Inc. Sec. Litig.,
   3:99-CV-0398-S, 2000 U.S. Dist. LEXIS 21671 (W.D. Ky. Nov. 7, 2000) ............ 8, 10

*In re* Lockheed Martin Corp. Sec. Litig.,
    272 F. Supp.2d 944 (C.D. Cal. 2003) ................................................................ 11-12, 19

*In re* Milestone Scientific Sec. Litig.,
    103 F. Supp.2d 425 (D.N.J. 2000) ................................................................................ 23

*In re* Number Nine Visual Tech. Corp. Sec. Litig.,
    51 F. Supp.2d 1 (D. Mass. 1999) ............................................................................ 13, 14

*In re* Parametric Tech. Corp. Sec. Litig.,
    300 F. Supp.2d 206 (D. Mass. 2001) ............................................................................ 27

*In re* Peritus Software Servs., Inc. Sec. Litig.,
    52 F. Supp.2d 211 (D. Mass. 1999) ...................................................................... *passim*

*In re* Silicon Graphics, Inc. Sec. Litig.,
    183 F.3d 970 (9th Cir. 1998) ...................................................................................... 23

*In re* Splash Tech. Holdings, Inc. Sec. Litig.,
    160 F. Supp.2d 1059 (N.D. Cal. 2001) .................................................................... 12, 16

*In re* Stone & Webster Sec. Litig.,
    253 F. Supp.2d 102 (D. Mass. 2003) ............................................................................ 23

Int'l Bus. Machines Corp. Sec. Litig.,
    163 F.3d 102 (2d Cir. 1998) .......................................................................................... 9

Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.,
    32 F.3d 697 (2d Cir. 1994) .......................................................................................... 28

Karacand v. Edwards,
    53 F. Supp.2d 1236 (D. Utah 1999) ............................................................................ 11

Lirette v. Shiva Corp.,
    999 F. Supp. 164 (D. Mass. 1998) .......................................................................... 18, 24

Meyer v. Biopure Corp.,
    221 F. Supp.2d 195 (D. Mass. 2002) ...................................................................... 13, 27

Morse v. McWhorter,
    No. 3:97-0370, 1998 U.S. Dist. LEXIS 19053 (N.D.N.Y. Feb 13, 1998) .................... 26

Oran v. Stafford,
    226 F.3d 275 (3d Cir. 2000) .................................................................................... 12, 17

Pittiglio v. Michigan Nat'l Corp.,
    906 F. Supp. 1145 (E.D. Mich. 1995) ................................................................ 9-10, 17

Roeder v. Alpha Indus., Inc.,
    814 F.2d 22 (1st Cir. 1987) ......................................................................... 8

Ronconi v. Larkin,
    253 F.3d 423 (9th Cir. 2001) ..................................................................... 26

San Leandro Emergency Med. Group Profit Sharing Plan v. Phillip Morris
    Cos. Inc.,
    75 F.3d 801 (2d Cir. 1996) ........................................................................ 10

Schott Motorcycle Supply, Inc. v. American Honda Motor Co.,
    976 F.2d 58 (1st Cir. 1992) ......................................................................... 2

SEC v. HealthSouth Corp.,
    261 F. Supp.2d 1298 (N.D. Ala. 2003) ...................................................... 25

Shaw v. Digital Equip. Corp.,
    82 F.3d 1194 (1st Cir. 1996) ....................................................... 2, 6, 8, 9, 26

Suna v. Bailey Corp.,
    107 F.3d 64 (1st Cir. 1997) .............................................................. 7, 15, 27

Van Ormer v. Aspen Tech., Inc.,
    145 F. Supp.2d 101 (D. Mass. 2000) ......................................................... 18

W.R. Carney v. Cambridge Tech. Partners, Inc.,
    135 F. Supp.2d 235 (D. Mass. 2001) ............................................... 6, 20, 28

Watterson v. Page,
    987 F.2d 1 (1st Cir. 1993) .......................................................................... 23

Wietschner v. Monterey Pasta Co.,
    294 F. Supp.2d 1102 (N.D. Cal. 2003) ...................................................... 25

Wilkes v. Heritage Bancorp., Inc.,
    Civ. Act. No. 90-11151-F, 1990 WL 263612 (D. Mass. Nov. 20, 1990) ..................... 16

Federal Statutes

15 U.S.C. § 78u-4 ................................................................................................. 1

15 U.S.C. § 78u-4(b)(1)(B) .................................................................................. 7

15 U.S.C. § 78u-4(b)(3)(A) ................................................................................ 17

15 U.S.C. § 78u-5(c)(1)(A) ................................................................................ 13

15 U.S.C. § 78u-5(i) .......................................................................................... 12

15 U.S.C. §78u-5(d) ................................................................................................. 11

Federal Regulations

17 C.F.R. § 240.10 ................................................................................................. 26

17 C.F.R. §243.100 (2003) ...................................................................................... 4

**Introduction**

Pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act ("PSLRA" or "Reform Act"), 15 U.S.C. § 78u-4, defendants Karen A. Walker and Edward H. Snowden (collectively the "Individual Defendants") and Boston Communications Group, Inc. ("BCGI" or the "Company") submit this memorandum in support of their motion to dismiss plaintiffs' Amended Consolidated Class Action Complaint ("Complaint" or "Compl."), which asserts claims on behalf of BCGI stock purchasers between June 12, 2003 through July 16, 2003 (the proposed "Class Period") against all defendants under Section 10(b) of the Securities Exchange Act (the "Act") and Rule 10b-5 thereunder; against the Individual Defendants under Section 20(a) of the Act; and against Mr. Snowden under Section 20(A) of the Act.

This is an unusual case in which (1) the challenged conduct relates to statements made *prior to* the start of the proposed Class Period; and (2) there is no dispute that the challenged statements were correct when made. In particular, the Complaint hinges precariously on allegations that certain statements about the Company's expectation of a contract renewal triggered a duty to update that defendants did not discharge in violation of Section 10(b). For several independent reasons, however, including plaintiffs' failures to identify any subsequent events that made prior statements misleading and to plead facts supporting a strong inference of scienter, these allegations cannot sustain a claim. Accordingly, this Court should dismiss the Complaint.

## Allegations of Complaint[1]

BCGI provides to numerous wireless carriers and re-sellers real-time transaction processing services, the bulk of which relate to pre-paid wireless call processing. Compl. ¶ 16. Among the Company's largest customers is Verizon Wireless ("Verizon"), which accounted for between 44% and 51% of Company revenues between 2001 and 2003. Id. ¶ 16. Edward Snowden is President and Chief Executive Officer of BCGI, and Karen Walker is the Company's Chief Financial Officer. Id. ¶¶ 7-8.

On April 16, 2003, on the BCGI earnings conference call following the release of BCGI's first quarter results, Mr. Snowden made two statements concerning the Company's relationship with Verizon. The first was, "recently Verizon Wireless has become [sic] [begun] a customary contract renewal process with us that we expect to result in the renewal of our prepaid services agreement with them." Id. ¶ 21. The second was essentially a reiteration of the first, that BCGI had begun "the customary contract renewal process with Verizon." Id.[2] There is no allegation (nor could there be) of any statement that contract renewal was guaranteed.[3]

---

[1]     For the purposes of this motion to dismiss, the Court must presume true only the well-pleaded facts contained in the complaint. Cooperman v. Individual Inc., 171 F.3d 43, 46-7 (1st Cir. 1999); In re Peritus Software Servs., Inc. Sec. Litig., 52 F. Supp.2d 211, 218 (D. Mass. 1999). The Court need not accord deference to legal conclusions or inferences not logically drawn from the well-pleaded facts. Glassman v. Computervision, 90 F.3d 617, 628 (1st Cir. 1996) (citing Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1216 (1st Cir. 1996)).

[2]     The Complaint also refers to optimistic statements about BCGI's prospects made either in the earnings call or the press release of the same date, such as "prospects for Company growth 'were as good as ever,'" "we feel that we are well positioned to continue to execute on our business plan," and "we look forward to continuing to competently provide [our customers] the best platform to demonstrate competitive success in a challenging industry." Id. ¶¶ 20-21. It is not clear whether the Complaint's theories of liability embrace such statements at all. That is doubtful, however, because they are textbook examples of inactionable corporate puffery. See e.g., Shaw, 82 F.3d at 1218 n.32 ("courts typically would find . . . [optimistic] statements to be mere 'puffing' or sales talk upon which no reasonable person would rely, and thus to be legally insufficient to support a claim."); Schott Motorcycle Supply, Inc. v. American Honda Motor Co., 976 F.2d 58, 65 (1st Cir. 1992) (statements regarding future profitability are mere puffing upon which no reasonable person could rely); In re Peritus Software Servs., Inc. Sec. Litig., 52 F. Supp.2d 211, 220 (D. Mass. 1999) (corporate puffery rule rejects liability based on statements of loose optimism about a company's prospects). Consequently, no duty to update such statements exists. See pp. 9-12 infra.

[3]     Plaintiffs allege that Walker also "participated on the 10-Q conference call on behalf of BCGI." Compl. ¶ 21. They allege no statement by her, however.

Similarly, BCGI's Form 10-Q for the same quarter, filed on May 15, 2003, contained the following paragraph:

> Our Verizon Wireless prepaid wireless services contract and certain other contracts expire in 2003 and beyond. While we expect to renew these contracts, when *and if* each of the contracts is renewed, some contractual rates per minute may be lower than in previous years.

First Quarter 2003 Form 10-Q, p. 17, Excerpt at Ex. 1 (emphasis added) (<u>cited</u> in Compl. ¶ 26.)[4]

Plaintiffs do not claim these statements were false when made, or that they were not made in good faith. Nor do they suggest the market perceived any inconsistency between the prospects for Verizon's contract renewal and its consideration of the development of its own in-house system to handle prepaid calls. To the contrary, the Complaint cites an analyst report which expressly recognized that BCGI's customers could be working on such a system even if they renewed their contracts with BCGI. Compl. ¶ 24 (<u>citing</u> First Analysis Securities Corporation Report, April 24, 2003, pp. 2-3, Ex. 3).

On June 12, 2003, the Complaint alleges that Snowden declined to comment to a visiting analyst about on-going contract negotiations with Verizon, and referred "'to a recent statement by the 50% customer, where Verizon said it was happy with BCGI and the outsourcing solution.'" Compl. ¶ 33. The Complaint asserts that Snowden's lack of

---

[4]    An excerpt from the Form 10-Q, in addition to others documents cited in the Complaint, are set forth in relevant part in the Appendix to this brief ("Appx.") and are referenced with respect to the Exhibit Number at which they appear within the Appendix. These documents may properly be considered in connection with this motion because the Complaint cites to, and relies upon them. <u>See</u> <u>Gross v. Suma Four, Inc.</u>, 93 F.3d 987, 994 n.6 (1st Cir. 1996) (Court "may consider in its entirety a relevant document explicitly relied on by the plaintiff in the Complaint") (citations omitted).
       Plaintiffs cut and paste from the statements in the 10-Q, apparently to obscure its language reflecting the uncertainty of contract renewal. <u>See</u> Compl. ¶ 26 (omitting from quoted language, "when and if each of the contracts is renewed…"). Even absent such language, however, there would be no escaping the market's awareness that "nonrenewal is always a risk." Compl. ¶ 18 (citing First Analysis Securities Corporation Report, Feb. 6, 2003, p. 2, Ex. 2).

further commentary about the status of contract negotiations establishes his knowledge that prior statements about Verizon were untrue, although Regulation FD prohibited Mr. Snowden from providing non-public information about the contract negotiations to an analyst in the course of a private conversation.  See 17 C.F.R. §243.100 (2003). Plaintiffs also strive to plead scienter on the basis of Snowden's early July sales of 18,700 shares of Verizon stock, Compl. ¶¶ 35-36, although those sales are dwarfed by his pre-Class Period transactions and involved only a small fraction of his BCGI holdings.

On July 16, 2003, BCGI issued a press release concerning its second quarter earnings.  Compl. ¶ 39.  The press release included the following language concerning the Verizon negotiations:

> As the Company has stated in its public disclosures, its contract with Verizon Wireless is scheduled, according to its terms, to be renegotiated in 2003.  *The Company is currently in contract negotiations with Verizon Wireless*. The terms and conditions, including the length of the contract and pricing have not been determined.  Verizon Wireless has also requested that BCGI provide support services to assist Verizon Wireless in testing its own internal prepaid platform in 2004 that could *potentially* displace prepay services currently being provided by BCGI.

July 16, 2003 Press Release, Ex. 4 (emphasis added).

That same date, Mr. Snowden announced on BCGI's second quarter conference call that, on July 11, 2003, Verizon had given BCGI "a formal request intended to become an addendum to our contract," requesting BCGI's assistance in testing an in-house billing system at Verizon.  Compl. ¶ 40.  More specifically, he stated:

> As we have stated in public disclosures our contract with Verizon Wireless is scheduled to be renegotiated in 2003. During the course of our contract renegotiation we were asked to attend a meeting late Friday afternoon at Verizon

- 4 -

> Wireless offices and during the meeting we were given a formal request intended to become an addendum to our contract to provide support services to assist Verizon Wireless in testing its own internal prepaid platform in 2004.
>
> While they did not intend to make a public announcement of this, they stated that we were free to, as long as they approved any language we would use. Today we received that approval for the language in this press release.

July 16, 2003 Conference Call Transcript, p. 3, Ex. 5 (emphasis added).

Plaintiffs argue that defendants had known Verizon was "thinking about" developing its own pre-paid system, and that such knowledge required defendants, on or before June 12, 2003, to update pre-Class Period statements that BCGI had "begun" "customary" contract negotiations and "expected" the Verizon contract to be renewed. Id. ¶¶ 41; 48. Plaintiffs make no allegation – supported by facts or otherwise – that prior to July 11, 2003, any defendant ever became aware that Verizon had begun any work on a prepayment billing system. Conspicuously, the Complaint only speculates that such information was "available" (id., ¶ 44), without pleading facts to demonstrate (or even articulating) when or how.

### <u>Argument</u>

Plaintiffs' entire case hinges on whether the defendants had a duty to update the pre-class statements concerning the Company's "expectation" that BCGI's contract with Verizon would be renewed. No such duty existed for a myriad of reasons. First, the challenged statements were forward-looking statements of opinion that are not actionable, because they lack the precision of a material statement. Second, the duty to update a forward-looking statement, to the extent it existed, did not survive the passage of the Reform Act. Third, even if such a duty could attach to a forward-looking statement,

it did not attach here where the challenged statements were accompanied by abundant cautionary language. Finally, there was no duty to update because plaintiffs have failed to allege facts that render the challenged statements false or misleading.

Moreover, even if a duty to update existed here (and it plainly does not), plaintiffs have failed to plead scienter. They fail to adequately plead that any defendant knew, or was reckless in not knowing, facts that rendered the challenged statements misleading. In addition, Mr. Snowden's trades during the Class Period, which plaintiffs assert demonstrate scienter, were neither unusual or suspicious, and therefore do not support a strong inference of scienter.

## I.    THE COMPLAINT MUST MEET THE HEIGHTENED PLEADING REQUIREMENTS OF RULE 9(b) AND THE REFORM ACT.

In order to state a claim under Section 10(b) or Rule 10b-5, a plaintiff must plead specific facts showing that *each* defendant: (i) misstated or omitted a material fact; (ii) with the requisite scienter; (iii) that plaintiffs relied upon; (iv) with resultant injury. See Aldridge v. A.T. Cross Corp., 284 F.3d 72, 78 (1st Cir. 2002); *In re* Boston Tech., Inc. Sec. Litig., 8 F. Supp.2d 43, 52 (D. Mass. 1998). Moreover, courts consistently recognize that corporations may issue "exaggerated, vague or loosely optimistic" statements about their business and general prospects for success without fear of being held liable for "fraud" under Section 10(b). *In re* Boston Tech., 8 F. Supp.2d at 54, 71.[5]

For a complaint to withstand dismissal, Rule 9(b) further requires that the "circumstances constituting fraud . . . be stated with particularity." Fed. R. Civ. P. 9(b).

---

[5]      "Th[is] rule covers loose optimism about both an issuer's *current* state of affairs and its *future* prospects." *In re* Boston Tech., 8 F. Supp.2d at 54; see also W.R. Carney v. Cambridge Tech. Partners, Inc., 135 F. Supp.2d 235, 245 (D. Mass. 2001) (same); Fitzer v. Sec. Dynamics Techs., Inc., 119 F. Supp.2d 12, 23 (D. Mass. 2000) (same). Courts reject such statements as a basis for a Section 10(b) claim for at least two reasons: (1) no reasonable investor would rely on such statements, see, e.g., *In re* Boston Tech., 8 F. Supp.2d at 54 ("patently unreasonable" for an investor to rely on puffery when making an investment decision); and (2) such statements are immaterial as a matter of law. See Shaw, 82 F.3d at 1218 (noting that this theory is "especially robust" in cases relying upon fraud-on-the-market theory).

A plaintiff must: (i) specify the statements that the plaintiff contends were fraudulent; (ii) identify the speaker; (iii) state when and where the statements were made; and (iv) *explain why the statements were fraudulent*. Suna v. Bailey Corp., 107 F.3d 64, 68 (1st Cir. 1997) (citations omitted) (emphasis added).  In addition, a plaintiff must allege with particularity facts that give rise to a *strong* inference of scienter.  See Greebel v. FTP Software, Inc., 194 F.3d 185, 186 (1st Cir. 1999).  The First Circuit has "been notably strict in applying the Rule 9(b) standard in securities fraud actions," even where allegations purportedly relate to matters "particularly within the knowledge of the opposing party."  Id. at 193-194.

The Reform Act imposes additional obligations upon plaintiffs.  "If an allegation regarding the statement is made on information and belief, the complaint shall state with particularity all facts upon which that belief is formed."  15 U.S.C. § 78u-4(b)(1)(B). This obligation applies whenever a plaintiff's source of information is not personal knowledge.  See Greebel, 194 F.3d at 193; *In re* Boston Tech., 8 F. Supp.2d at 53 (allegations "explicitly or implicitly" on information and belief must be supported by the source of the information and the reasons for the belief); Colby v. Hologic, Inc., 817 F. Supp. 204, 212 (D. Mass. 1993) ("without specified sources or supporting facts," complaint "must be regarded as speculative and fatally defective").

## II.    PLAINTIFFS HAVE FAILED TO PLEAD SPECIFIC FACTS ESTABLISHING THAT DEFENDANTS HAD ANY DUTY TO UPDATE.

Plaintiffs do not dispute that the statements at issue were correct when made. Consequently, the Complaint cannot survive this motion to dismiss absent facts sufficient

to establish defendants' duty to update the pre-Class Period statements alleged. [6]  It is not

misleading to be silent about changed expectations if there is no duty to disclose a

change.  See Shaw, 82 F.3d at 1202 ("The proposition that silence, absent a duty to

disclose, cannot be actionably misleading, is a fixture in federal securities law.");

Backman v. Polaroid Corp., 910 F.2d 10, 12 (1st Cir. 1990) (en banc).  *"Even if*

*information is material*, there is no liability under Rule 10b-5 unless there was a duty to

disclose it."  Roeder v. Alpha Indus., Inc., 814 F.2d 22, 26 (1st Cir. 1987) (emphasis

added).

Moreover, other than the putative duty to update, there is no other duty of

disclosure that defendants might have breached.  When defendants voluntarily disclose

information, they have a duty *only* to make it complete and accurate *at the time that they*

*make the disclosure*.  See Greebel, 194 F.3d at 193-94 (emphasis added); Gross v.

Summa Four, Inc., 93 F.3d at 992-3.  There is no general duty to inform the market of the

ongoing status of contract negotiations.  See, e.g., *In re* Humana Inc. Sec. Litig., 3:99-

CV-0398-S, 2000 U.S. Dist. LEXIS 21671, at *10 (W.D. Ky. Nov. 7, 2000) ("The

required disclosure of the status of all contract negotiations would . . . confuse the

stockholder, burden the management and harm the overall position and interest of the

corporation in those negotiations.  The status of contract negotiations clearly amounts to

'soft' information").  Further, no statute sets forth a 'specific obligation' to disclose

information of the type the plaintiffs claim was omitted.  Cf. Cooperman v. Individual,

Inc., 171 F.3d 43, 49-50 (1st Cir. 1999).  Thus, plaintiffs' Section 10(b) claim must be

---

[6]     The Complaint alternatively refers to a "duty to correct."  See, e.g., Compl. ¶ 34.  However, a duty to correct exists only when information on which the company based its statement which is believed to be correct was actually false at the time the statement was made, but its falsity is not discovered by the company until after the statement is issued.  See, e.g., *In re* Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1430-31 (3d Cir. 1997).  Plaintiffs do not allege such a scenario; to the contrary, they allege that subsequent events rendered the earlier statement false.  Accordingly, the duty to correct is not at issue here.

dismissed unless they have pleaded sufficient facts to establish that defendants had a duty to update the pre-Class Period statements.

>    **A.    Defendants Had No Duty to Update the Statement That BCGI Expected the Verizon Contract To Be Renewed Because It Was A Forward-Looking Statement of Opinion.**

Statements concerning a company's "expectation" that a contract would be awarded are nothing more than forward-looking statements of opinion. There is no duty to update such "vague statements of optimism or expressions of opinion." Int'l Bus. Machines Corp. Sec. Litig., 163 F.3d 102, 110 (2d Cir. 1998); see also Shaw, 82 F.3d at 1219 n.33 ("The other alleged statements are cautiously optimistic comments that would not be actionable in the first instance" and "lack the sort of definite positive projections that might require later correction").

Accordingly, Courts have consistently found forward-looking statements about a Company's future *expectations*, like the statements challenged here, to be unactionable. See, e.g., Shaw, 82 F.3d at 1219 n.33 (statement that "prospect of turning a profit was a '*reasonable expectation'* in fiscal year 1994" not actionable) (emphasis added); Baron v. Smith, Civ. Act. No. 02-11189GAO, 2003 WL 22273094, at *8 (D. Mass. Sept. 30, 2003) (finding no duty to update, and stating "[t]hese statements about what Company's management '*expect[ed]* to be able' to achieve in the bankruptcy . . . were the kinds of optimistic statements that the market 'would easily recognize as nothing more than a kind of self-directed corporate puffery' and thus not actionable.") (emphasis added); Elliott Assoc., L.P. v. Covance, Inc., No. 00-Civ. 4115 SAS, 2000 WL 1752848, at *10 (S.D.N.Y. Nov. 28, 2000) (holding there was no duty to update statement that merger was "on track" to close in September because statement was "vague expression[ ] of opinion which [was] not sufficiently concrete or specific to impose a duty to update."); Pittiglio v.

- 9 -

Michigan Nat'l Corp., 906 F. Supp. 1145, 1149, 1154 (E.D. Mich. 1995) (no duty to update statement by Board that it was "committed to 'maintaining the company's independence'" despite subsequent merger because merely a statement of hope, and not a promise of continued independence); San Leandro Emergency Med. Group Profit Sharing Plan v. Phillip Morris Cos. Inc., 75 F.3d 801, 811 (2d Cir. 1996) ("announcements by Philip Morris that it was 'optimistic' about its earnings and 'expected' Marlboro to perform well" did not create duty to update concerning the "possibility of adoption of an alternative marketing strategy" because "[s]uch puffery cannot have mislead a reasonable investor to believe that the company had irrevocably committed itself to a particular strategy").[7]

In Humana Inc. Sec. Litig., 2000 U.S. Dist. LEXIS 28671 at *12-13, the court specifically refused to recognize a duty to update with respect to contract negotiations and explained:

> [Plaintiffs] fail . . . to cite any case which imposed a duty to update the public on the status of contract negotiations. The fact that Humana may have known that 'it wasn't going to be as good of a contract as in the past,' . . . is not a historical fact or something that is objectively verifiable. Instead, it is 'soft' information which, by its very nature, was a matter of opinion. The Defendants had no legal duty to inform the public of these developments until the outcome of the negotiations became as certain as hard facts. *Even then*, they had no duty to announce the terms of the

---

[7]    Cf. *In re* Healthco Int'l, Inc. Sec. Litig., 777 F. Supp. 109, 115 (D. Mass. 1991) (statement that company "spokesman" was "'comfortable' that the [merger] would close before the late February deadline" not actionable because it was "optimistic, vague projection" unaccompanied by any 'specific quantification or projected results implying certainty.').

- 10 -

deal unless they made a statement that would have been misleading without that information.[8]  (emphasis added).

Likewise, no duty to update attaches to the statements challenged here because they are nothing more than Company's *opinion* that its negotiations with Verizon were off to an encouraging start.

### B.    No Duty to Update Forward-looking Statements Under Reform Act.

The Safe Harbor Provision of the Reform Act explicitly states, "[n]othing in this section shall impose upon any person a duty to update a forward-looking statement."  15 U.S.C. §78u-5(d).  Accordingly, courts that have had opportunity to address the issue have held that there is no duty to update forward-looking statements (if one ever existed) after the enactment of the Reform Act.  See, e.g., In re Advanta Corp. Sec. Litig., 180 F.3d 525, 536 (3d Cir. 1999) (relying on Section 78u-5(d), among other authority, in finding no duty to update challenged statement); Eisenstadt v. Centel Corp., 113 F.3d 738, 746 (7th Cir. 1997) (noting likelihood that no duty to update existed "in this circuit, and maybe now in all circuits" after enaction of Reform Act); Fisher v. SpecTran Corp., No. 99-12359-NG, slip. op. 14 (D. Mass. May 31, 2001) (finding no duty to update statements that were forward-looking statements within meaning of PSLRA) (Ex. 8); Karacand v. Edwards, 53 F. Supp.2d 1236, 1244 (D. Utah 1999) ("Nor, as made express by the Reform Act, do[ ] [the Securities laws] impose a duty to update forward-looking statements.").  Because the statements at issue are forward-looking statements as defined in the Reform Act, they are not actionable.  In re Lockheed Martin Corp. Sec. Litig., 272

---

[8]      Plaintiffs allege that the initial statements concerning the Verizon contract negotiations made during the first quarter earnings call were material because BCGI's stock price increased the day after the call.  Compl. ¶ 23.  This contention disregards the fact that the Company also announced record earnings that exceeded analysts' expectations in that call and in the press release entitled, "Boston Communications Group Reports Record Earnings And Exceeds Expectations For The First Quarter Of 2003" issued that same day (see Ex. 6).  Contemporaneous analyst reports demonstrate that the earnings information was the lead headline from the call.  See, e.g., April 17, 2003 Morgan Keegan Report on BCGI entitled, "Q1 Results Far Better Than Estimates; Guidance Raised Substantially."  Ex. 7 (cited in Compl. ¶ 22.)

F. Supp.2d 944, 950 (C.D. Cal. 2003) (finding statement that Company "expected to sign

a significant F-16 order with the United Arab Emirates ('UAE') by year-end 1998" to be

forward-looking statement within meaning of the PSLRA); 15 U.S.C. § 78u-5(i)

(defining forward-looking statement as including "statement[s] of the plans and

objectives of management for future operations," "statement[s] of future economic

performance," or "any statement of the assumptions underlying or relating to" such

statements).

        **C.**     **No Duty to Update Statement of Historical Fact that BCGI Had "Begun" Customary Contract Negotiations With Verizon.**

"Statements regarding past events contain no implicit prediction that those events

or conditions will continue in the future." *In re* Splash Tech. Holdings, Inc. Sec. Litig.,

160 F. Supp.2d 1059, 1078 (N.D. Cal. 2001) (citations omitted); see also Oran v.

Stafford, 226 F.3d 275, 286 (3d Cir. 2000) ("[T]he omission of material information from

a prior statement is actionable under a duty to update theory only if the previous

statement contained an 'implicit factual representation that remained 'alive' in the minds

of investors as a continuing representation"). Here, the portion of the statements at issue

"that customary contract negotiations had begun," is narrowly tethered to a point in the

past, the beginning of the contract negotiation, and therefore, is in no respect a continuing

representation. Further, there is no assertion that the statement was false, i.e., that the

contract negotiations were not "customary" at the time they were initiated. Accordingly,

it is not actionable.

        **D.**     **Forward-Looking Statements Accompanied By Abundant Cautionary Language Are Not Actionable.**

At both common law and under the "safe harbor" codified in the Reform Act,

forward-looking statements accompanied by meaningful cautionary language are non-

actionable.  15 U.S.C. § 78u-5(c)(1)(A) (Reform Act safe harbor); <u>In re</u> <u>Art Tech. Group,</u> <u>Inc. Sec. Litig.</u>, C.A. No. 01-11731-NG, slip. op. at 15 (Sept. 4, 2003) ("I find the disclaimer in ATG's press release more than sufficient to trigger the [Reform Act's] safe harbor and 'bespeaks caution' doctrine.") (Ex. 9); <u>Meyer v. Biopure Corp.</u>, 221 F. Supp.2d 195, 204 (D. Mass. 2002) ("[T]he safe harbor prevents the plaintiffs from bringing an action based on these forward-looking statements accompanied by meaningful cautionary language."); <u>Fitzer</u>, 119 F. Supp.2d at 31 (rejecting as non-actionable statements regarding the integration of the operations of two companies); <u>In re</u> <u>Number Nine Visual Tech. Corp. Sec. Litig.</u>, 51 F. Supp.2d 1, 21 (D. Mass. 1999) (applying common law "bespeaks caution" doctrine to bar liability for alleged misstatement regarding expected profitability, where accompanied by specific cautionary language).  When a forward-looking statement is accompanied by an express warning, there can be no liability because "a reasonable investor would not view the statement as material."  <u>Number Nine</u>, 51 F. Supp.2d at 22.  Here, not only were all the statements alleged to provide the basis for the duty to update accompanied by abundant cautionary language; the May statements were excerpted by plaintiffs directly from the risk factor section of the Form 10-Q.

Forward-looking statements "bespeak caution" when a defendant has provided the investing public with cautionary statements that nullify the potentially misleading effect of the representations.  <u>Glassman v. Computervision Corp.</u>, 90 F.3d 617, 636 (1st Cir. 1996) ("Computervision's mild statements of hope, couched in strongly cautionary language, cannot be said to have become materially misleading").  The challenged

statements here are non-actionable because of the extensive and specific cautionary

language BCGI issued along with them. These warnings included:

> I would also like to caution everyone that various remarks
> that the company may make about the company's *future
> expectations*, plans and prospects constitute forward-
> looking statements for purposes of the Safe Harbor
> provisions under the Private Securities Litigation Reform
> Act of 1995. Actual results may differ materially from
> those indicated by these forward-looking statements as a
> result of various important factors *including those
> discussed in Form 10-K for the year ended December 31,
> 2002,* which is on file with the SEC. In addition, any
> forward-looking statements represent our views only as of
> today, April 16, 2003, and *should not be relied upon as
> representing our views as of any subsequent date.* While
> we may elect to update forward-looking statements at some
> point in the future, we specifically disclaim any obligation
> to do so even if our estimates change, and therefore you
> *should not rely on these forward-looking statements as
> representing our views as of any subsequent date.*

4/16/03 earnings call transcript, Ex. 10, pp. 2-3 (emphasis added), and

> Our Verizon Wireless prepaid wireless services contract
> and certain other contracts expire in 2003 and beyond.
> While we expect to renew these contracts, when *and if* each
> of the contracts is renewed, some contractual rates per
> minute may be lower than in previous years. . . . These
> contracts are not exclusive and therefore do not prevent our
> customers from using competitors' billing and transaction
> processing platforms. A loss of business from any of our
> major customers, including non-renewal of contracts or a
> decrease in business due to factors outside our control,
> would have a material adverse effect on our business,
> financial condition and results of operation.

2002 Form 10-K, excerpt at Ex. 11, p. 26 (emphasis added); First Quarter 2003 Form 10-

Q, excerpt at Ex. 1, p. 17.

In light of these direct warnings, the forward-looking statements upon

which the plaintiffs purport to rely were immaterial as a matter of law. See

Number Nine, 51 F. Supp.2d at 22.

- 14 -

**E.    Plaintiffs Fail to Plead Facts Demonstrating That the Forward-Looking Statements About Contract Renewal Were Rendered Misleading, Requiring Any Update.**

"To be actionable, of course, a statement must also be misleading."  Basic Inc. v. Levinson, 485 U.S. 224, 239 n.17 (1988); see also Capri Optics Profit Sharing v. Digital Equip. Corp., 950 F.2d 5, 9 (1st Cir. 1991) (rejecting plaintiff's attempt to base fraud claim on four true statements; remarking that "recklessness as to these four statements was not in defendant's making them, but was in plaintiff's complaint.").  The plaintiff must plead specific facts to explain *why* each statement is false or misleading.  Suna, 107 F.3d at 68.  Here, plaintiffs fail to plead any facts that rendered the pre-Class Period statements false or misleading.

Plaintiffs allege that defendants failed to discharge a duty to update the pre-Class Period statement about contract renewal when, during the Class Period, they became aware that Verizon was "thinking about," at some unspecified future time, developing its own internal billing system.  See, e.g., Compl. ¶ 31.[9]  The fatal flaw with this duty to update theory, however, is that Verizon's consideration of an internal billing system is not inconsistent with Verizon renewing its contract with BCGI.  This is made evident by the April 24, 2003 analyst report the Complaint selectively quotes:

> Even if a contract is renewed and on reasonable terms, there is always a risk that a major customer could alter its strategy on prepaid in a way that negatively impacts BCGI.
>
> . . . .

---

[9]    Plaintiffs' inappropriate attempt to broaden defendants' actual statement that BCGI "*had begun* customary contract negotiations" and that BCGI "expected" the contract to be renewed, by stating these statements created "the impression" that "BCGI's relationship with Verizon was strong, it's contract negotiations were 'customary,' and that the contract was likely to be renewed." Compl. ¶ 28.  However, plaintiffs cannot rely on "implication;" they can sue only on the basis of actual statements or omissions. See Copley Pharm., Inc. Secs. Litig., Civ. A. No. 94-11897-WGY, 1995 WL 169215, at *2 n.5 (D. Mass. Mar. 16, 1995) ("Securities law is *not* about fostering senses; *it is about actual statements, whether or not they are true or false, and if false, whether or not the utterer knew at the time that the statements were made that they were false.*") (emphasis supplied).

> Therefore, if Verizon or any other customer continues a strong commitment to prepaid, we could envision an overall customer corporate strategy for building up in-house capabilities. A customer could do this while still relying on BCGI for service. Therefore, a renewal of a BCGI contract on favorable terms would not necessarily be inconsistent with this strategy. Over time, Verizon could build up its expertise and slowly add or convert subscribers to its own network.

First Analysis Securities Corp. April 24, 2003 Report, Ex. 3, pp. 2-4 (quoted in Compl. ¶ 24.)

Because Verizon might pursue an in-house system and also renew the Verizon contract, the allegation that defendants "knew" Verizon was "thinking about" the use of an in-house system does not establish the falsity of, or a duty to update, the challenged statements about contract renewal. See, e.g., Splash Tech., 160 F. Supp.2d at 1078 (fact that competitor adopted similar "open-systems" approach to that of corporate defendant did not render false or misleading statement that defendant "would continue to have a competitive advantage over those companies that adopted a 'closed systems' approach."). The scope of any duty to update simply is too narrow to sustain a claim here.

The point is well-illustrated by Evanowski v. BankWorcester, 788 F. Supp. 611 (D. Mass. 1991), where the court held that the defendant bank had no obligation to update its statements about its expected merger with another bank (where the merger was never consummated) to include the renegotiation of the merger terms because "the issue of renegotiations was not within the scope of the initial disclosure." Id. at 615. "The mere existence of renegotiation discussions does not mean that BankWorcester had stopped working towards completing the merger on its original terms." Id. at 614. See also Wilkes v. Heritage Bancorp., Inc., Civ. A. No. 90-11151-F, 1990 WL 263612, at *5 (D. Mass. Nov. 20, 1990); recommendation adopted, 767 F. Supp. 1166 (D. Mass. 1991)

(noting that the "First Circuit narrowly cabined" the duty to update "by indicating that it was triggered only when statements no longer remain true within the scope of the initial disclosure.") (citing <u>Backman v. Polaroid Corp.</u>, 910 F.2d 10 (1st Cir. 1990)); <u>Oran</u>, 226 F.3d at 286 (since prior statements by defendant drug company about adverse heart-valve data did not include statement about when it learned of data, it had no legal duty to update market about such timing); <u>Burlington Coat Factory</u>, 114 F.3d at 1434 n.20 ("we think that the duty to update, to the extent it might exist, would be a narrow one to update the public as to *extreme* changes in the company's originally expressed expectation of an event such as a takeover, merger, or liquidation.") (emphasis added).  Here, BCGI did not address, in any respect, Verizon's plans with respect to the development of an internal billing system; consequently, defendants made no disclosure that could have triggered any duty to update the market about that topic.[10]

## III.    PLAINTIFFS HAVE NOT PLEAD SCIENTER.

In the First Circuit, scienter pleading requirements are strict and rigorous; a complaint alleging securities fraud must be dismissed if it fails to "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(3)(A) (emphasis added); <u>Greebel</u>, 194 F.3d at 195-196 (inferences of scienter can "survive a motion to dismiss only if they are both reasonable and '*strong*' inferences.") (emphasis in original).  Plaintiffs fail to plead with specificity

---

[10]    That the investing community, both *before* and during the alleged Class Period, was well aware of the possibility that Verizon could develop its own internal system, <u>see</u>, <u>e.g.</u>, April 24, 2003 First Analysis Securities Report, discussed <u>supra</u>; June 12, 2003 Raymond James Report, Ex. 12, p. 2 ("main risks for investors in BCGI" include "potential for insourcing") (<u>cited in</u> Compl. ¶ 33), provides an additional, independent reason why there was no duty to update on the part of BCGI.  <u>See</u> <u>Pittiglio</u>, 906 F. Supp. at 1154 ("Additionally, Plaintiffs fail to state a claim for a 'failure to update', because they have cited in the Amended Complaint numerous commentaries in the press which indicated that it was highly unlikely that MNC would be able to remain independent. . . .  Given the considerable press speculation about the likelihood of a takeover, reasonable investors were alerted that MNC's continued independence was not assured.").

facts supporting a strong inference of conscious wrongdoing on the part of any defendant here, requiring dismissal of their Complaint. First, they fail to provide sufficient facts to support their "information and belief" allegations that any defendant knew, or was reckless in not knowing, prior to July 11, 2003, that Verizon had begun implementing plans to build its own billing system. Further, contrary to plaintiffs' allegations, Snowden's trades during the Class Period were neither unusual nor suspicious, and therefore, provide no basis for a finding of scienter.

### A. Plaintiffs Have Not Plead Facts Establishing That Any One At BCGI Knew or Was Reckless in Not Knowing, Prior to July 11, 2003, That Verizon Had Initiated Plans To Build Its Own Internal Billing System.

#### 1. Plaintiffs Improperly Rely On Information and Belief Allegations Without Identifying The Basis for Their Belief.

Plaintiffs ignore their responsibility to specify their source for "each particular allegation." See Lirette v. Shiva Corp., 999 F. Supp. 164, 165 (D. Mass. 1998); see also Van Ormer v. Aspen Tech., Inc., 145 F. Supp.2d 101, 104 (D. Mass. 2000) (Reform Act requires that plaintiffs "*set forth the source of the information* and reasons for the belief when allegations are made on information and belief.") (emphasis added). In particular, they fail adequately to plead the reasons why they believe statements were false (or known to be false) by failing to identify any source for their core factual assertions.

For example, plaintiffs fail to allege any sources for the following allegations:

- "At or about the same time, serious issues began to arise between BCGI and Verizon, which threatened the renewal of the Verizon contract and the continuation of their existing business relationship going forward." (Compl. ¶ 29);

- "Defendants Snowden and Walker were both involved with the contract renewal negotiations with Verizon." (Compl. ¶ 30);

- 18 -

- "During the course of negotiating a new contract with BCGI, Verizon shared its intent to begin investigating an in-house alternative to BCGI's prepaid system with Snowden and Walker, as well as BCGI Director of Business Development. During those negotiations, Verizon made several informal requests to include an addendum to the contract that would require BCGI to assist Verizon with developing its own internal prepaid platform in 2004. These issues were discussed at meetings of the Company's senior management, including Snowden, Walker, Riley and BCGI Vice President of Sales, Kim Obremski that were held every Tuesday morning in the Executive Conference Room." (Compl. ¶31); and

- BCGI then knew that Verizon was seriously considering developing its own in-house prepaid system and was requesting BCGI's cooperation in that project as a condition of resigning its contract." (Compl. ¶ 34)

Plaintiffs do not indicate whether this supposed information came from a source, reflect plaintiffs' inferences, or is rank speculation.[11]  Moreover, to mask that these statements are nothing more than unsupported conclusory allegations, plaintiffs place them next to other statements that are supported by a source in an effort to *imply* that the unsourced statements might be supported by the same source.  See, e.g., Compl. ¶¶ 29-31 (paragraph of unsourced allegations ending with single sentence attributed to a source).

Courts rejected such pleading games even *before* the Reform Act.  See, e.g., Glassman, 90 F.3d at 631 (plaintiffs must "establish a link" between challenged statement and supposed "actual fact").[12]  After the Reform Act, there can be no question that where plaintiffs deprive the Court of a basis to determine whether allegations are supported by something any person or document actually said, their claims must be dismissed.  See, e.g., In re Allaire Corp. Sec. Litig., No. Civ. A. 00-11972-WGY, Sept. 25, 2001 Hearing

---

[11]      Elsewhere in the Complaint, plaintiffs clearly rely on nothing more than speculation.  Specifically, in Paragraph 40 of the Complaint, plaintiffs speculate that "Snowden's characterization of the July 11 request as a 'formal' one, constitutes an admission that BCGI knew, at least informally, of Verizon's intention to begin testing an in-house system prior to that date."  As recognized in Lockheed Martin, "[i]f these types of logical inferences and generalizations were sufficient to meet the PSLRA's requirements, plaintiffs could effectively manufacture support in any case to overcome the PSLRA's requirements." In re Lockheed Martin, 272 F. Supp.2d at 951.

[12]      See also Colby, 817 F. Supp. at 212 ("without specified sources or supporting facts" complaint "must be regarded as speculative and fatally defective"); Crystal v. Foy, 562 F. Supp. 422, 425-26 (S.D.N.Y. 1983) ("Plaintiff must 'indicate how . . . these sources . . . provide the requisite factual support for the complaint's accusations' [and must] link the sources to subsequent allegations in the pleading.").

- 19 -

Transcript at 9-10 (Ex. 13) (requiring that "[w]here allegations are made on information and belief, or on investigation of counsel, the source of the information, to include content, time, place and speaker, and the basis for the belief must be stated with particularity"); Carney, 135 F. Supp. at 247, 247 n.5 ("as to all the sources of information alleged to have been the subject of inquiry by the plaintiffs' counsel, the plaintiffs fail to set out with particularity what information counsel discovered in their inquiry, where that information was discovered, and how that information led to the belief that the defendants had engaged in fraudulent conduct . . . [t]he pervasiveness of the problem is enough itself to justify the granting of the motion to dismiss").

Simply put, because the Complaint does not specifically identify any source for these allegations, the court lacks sufficient information to evaluate whether the statements are to be credited. See, e.g., In re Cabletron Syst. Inc., 311 F.3d 11, 29-30 (1st Cir. 2002) (in order to determine whether to credit allegations based on anonymous sources, the court should consider "the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of sources, and similar indicia").

    2.    The Allegations That Are Supported By A Source Do Not Suggest That Defendants Knew Or Should Have Known, Prior To July 11, 2003, That Verizon Had Begun The Development Of An Internal Pre-Paid System.

In a failed effort to remedy their complete lack of factual support for their ultimate conclusion, plaintiffs rely on sourced allegations that prove nothing. For instance, an unidentified Verizon project manager is quoted for the proposition that "Verizon had been considering developing its own system internally because it would

- 20 -

have been a cheaper and more 'cost-effective' alternative to the BCGI system." Compl. ¶ 29. This statement notably contains *no* representation that any information concerning Verizon's plans for an internal billing system was relayed to defendants at any time, let alone prior to the July 11 meeting between Verizon and BCGI. Similarly, "a former Senior Account Manager at BCGI," contributes the statement that "Snowden got personally involved in contract negotiations with BCGI's customers." Compl. ¶ 30. This statement provides no information about Mr. Snowden or Ms. Walker's involvement with the Verizon contract negotiations – or what they learned to the extent they participated in such negotiations.

Plaintiffs' primary source is a "former administrative assistant" at BCGI who allegedly contributed two statements to the Complaint. The first is the rather unremarkable fact that "Maureen Riley met frequently with Verizon at its offices in Bedminster, New Jersey, both before and after the mid-July disclosures." Id. at ¶ 44. Certainly, a sales person is to be expected to meet with a client with whom her company is trying to renew a contract. The Complaint sheds absolutely no light on the content of such meetings.

The second statement attributed to the "administrative assistant" is characterized in slightly different ways in two places in the Complaint. The first time it appears as an allegation that "Walker acknowledged in a July 2003 meeting with BCGI employees that she knew for a long time that Verizon *had been thinking about* its own system." Compl. ¶ 31 (emphasis added). The second time it appears as an allegation that "Walker admitted . . . she knew for a long time that Verizon *was interested in* developing their own prepaid wireless system." Compl. ¶ 41 (emphasis added). These assertions are

unremarkable. Knowing that Verizon is generally "interested," or "considering" developing an internal billing system at some unspecified future time is far from the equivalent of knowing that Verizon had *already decided* to develop an internal billing system, let alone that these plans would have an effect on contract renewal.

**B.      Plaintiffs Fail to Establish That Mr. Snowden's Trades Were Unusual Or Suspicious.**

The challenged sales by Mr. Snowden fail to support a strong inference of scienter for several reasons. First, "[l]ike motive and opportunity allegations, bare allegations of insider trading are insufficient, in and of themselves, to generate a strong inference of scienter." Giarraputo v. UNUMProvident, No. Civ. 99-301-PC, 2000 WL 1701294, at *19 (D. Me. Nov. 8, 2000) (citing Greebel); see Peritus Software, 52 F. Supp.2d at 224 ("[o]f course, the mere fact that insider stock sales occurred does not suffice to establish scienter.") (citation and quotation omitted). Trading by insiders is relevant to scienter only if a plaintiff, with well pleaded facts, discharges his burden of demonstrating that the trades in question were "unusual, *well beyond* the normal patterns of trading by those defendants." Greebel, 194 F.3d at 198 (emphasis added); Fitzer, 119 F. Supp.2d at 25.

1.      Mr. Snowden's Trades In the Class Period Were Consistent With His Past Trading History.

"One fact *necessary* to a showing of unusualness is the amount of trading that the insider conducted before or after the class period." Peritus Software, 52 F. Supp.2d at 224 (emphasis added). It is plaintiffs' burden to plead such facts. Id. The Complaint fails to provide any information, however, regarding the percentage of his total shares Mr. Snowden traded during the Class Period, nor does it contain factual allegations from which to determine how that percentage compares to what he sold outside the Class Period.

Consideration of Mr. Snowden's publicly filed reports with the SEC, Ex. 14, make evident the reasons for Plaintiffs' silence. [13] Specifically, those reports demonstrate that Mr. Snowden's sales during the Class Period were entirely consistent with his pattern of trading in the months preceding the Class Period, and thus were not unusual in any respect:

| DATE | NUMBER OF SHARES SOLD | % Of HOLDINGS SOLD[14] |
|---|---|---|
| 10/02 | 3,300 shares sold | .6 |
| 11/02 | 34,100 shares sold | 7.2 |
| 12/02 | 22,919 shares sold | 5.2 |
| 1/03 | 4,900 shares sold | 1.1 |
| 2/03 | 7,200 shares sold | 1.6 |
| 3/03 | 9,500 shares sold | 2.2 |
| 4/03 | 18,700 shares sold | 4.4 |
| 5/03 | 14,100 shares sold | 3.5 |
| 6/03 (before 6/12) | 14,100 shares sold | 3.6 |
| **6/12/03** | **Class Period Begins** | |
| 7/03 | 18,700 shares sold | 5.0 |
| **7/16/03** | **Class Period Ends** | |
| 8/03 | 3,900 shares sold | 1.1 |
| 9/03 | 3,900 shares sold | .9 |

Mr. Snowden's Class Period sales of 18,700 shares are a small fraction of the 128,819 shares he sold in the nine months immediately proceeding the proposed Class Period.

---

[13]    Copies of Mr. Snowden's Form 4 filings for the relevant period are collected in the Appendix. Given the plaintiffs' specific allegations of insider trading, it is appropriate for the Court to consider the entirety of defendants' Form 4 filings without converting this motion into one for summary judgment; the Form 4 filings are public records integral to the Complaint.  See In re Stone & Webster Sec. Litig., 253 F. Supp.2d 102, 129 n.11 (D. Mass. 2003) (considering defendants' SEC filings without converting motion to dismiss into one for summary judgment); In re Milestone Scientific Sec. Litig., 103 F. Supp.2d 425, 450 n.15 (D.N.J. 2000) (considering Form 4, in addition to other public filings, on a motion to dismiss); see also Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993) (district courts may rely on "official public records" without converting motion to dismiss into one for summary judgment).

[14]    See, e.g., In re Silicon Graphics, Inc. Sec. Litig., 183 F.3d 970, 986-87 (9th Cir. 1998) ("Actual shares plus exercisable stock options represent the owner's trading potential more accurately than the stock shares alone"); Acito v. IMCERA Group, Inc., 47 F.3d 47, 54 (2d Cir. 1995) ("The additional 30,000 shares that Kennedy sold in January represented less than 11% of his holdings; after the sale, Kennedy owned approximately 259,000 shares and/or options of IMCERA stock.").

Moreover, his Class Period sales are consistent with a pattern of structured selling that pre- and post-dates the Class Period. Courts have repeatedly found plaintiffs' scienter allegations to be deficient under such circumstances. See, e.g., Peritus Software, 52 F. Supp.2d at 224 (defendants' sales of 150,000 and 60,000 shares respectively not out of line with prior sales of 500,000 and 50,000 shares respectively).

Against this backdrop, plaintiffs are left to myopically posit that Mr. Snowden's Class Period sales were unusual because they were not identical to those in the same month a year before and that his trading during the proposed Class Period, in raw volume, exceeded that of "the prior few months." Compl. ¶ 3. The former assertion is almost nonsensical, since it ignores the individual defendant's trading immediately before (and after) the Class Period in favor of the same month a year ago. The law is clear that such a comparison is too narrow. See, e.g., Fitzer, 119 F. Supp.2d at 25 (no strong inference of scienter where plaintiffs did not present information regarding pre-class period trading of two defendants); Lirette, 27 F. Supp.2d at 283 (no scienter inferred from stock trades where plaintiff failed to set forth the amount of trading conducted before or after class period); In re Boston Tech., 8 F. Supp.2d at 58 (allegation of cumulative stock sale of 300,000 shares during class period did not demonstrate a strong inference of scienter where plaintiffs failed to assert any facts as to amounts normally traded); In re Chipcom Corp. Sec. Litig., No. 95-1114, slip op. at 36 (D. Mass. April 29, 1996) (alleged insider trading could not support fraud claim where plaintiffs' failure to plead amount of trading normally conducted by individuals, including sale of exercised options, made comparison with prior practices impossible) (Ex. 15).

In addition, although the amount of Mr. Snowden's sales in July 2003 slightly exceeded those in May and June 2003, it was identical to the amount he traded in April 2003 and less than he sold in November and December 2002, as detailed in his publicly filed reports with the SEC.

Furthermore, all of Mr. Snowden's sales were prescheduled pursuant to a Rule 10b5-1 plan.  See Ex. 14, Snowden Forms 4; see also Wietschner v. Monterey Pasta Co., 294 F. Supp.2d 1102, 1117 (N.D. Cal. 2003) ("both defendants sold shares under individual SEC Rule 10b5-1 trading plans, which allows corporate insiders to set a schedule by which to sell shares over a twelve to fifteen month period. . . .  This could raise an inference that the sales were pre-scheduled and not suspicious."); cf. SEC v. HealthSouth Corp., 261 F. Supp.2d 1298, 1322-23 (N.D. Ala. 2003) (granting motion to dismiss petition for emergency relief and recognizing as a defense to an insider trading claim that the purchase or sale at issue occurred pursuant to a Rule 10b5-1 plan); 17 C.F.R. § 240.10b5(c) (existence of trading plan an affirmative defense to 10b claim). The fact that Snowden's sales occurred pursuant to a Rule 10b5-1 plan accounts for the similarity in the amounts traded each month, including during the proposed Class Period.

Finally, plaintiffs fail to allege any facts indicating that the timing of the July trades was suspicious in view of information Mr. Snowden is specifically alleged to have possessed at the time.  Absent such allegations, Mr. Snowden's stock sales could not raise a strong inference of scienter.  See e.g., Alabaster v. Bastiaens, CV No. 99-10237-NG, 2000 U.S. Dist. LEXIS 22354, at *23 (D. Mass. July 27, 2000) (insider stock sales did not raise strong inference of scienter where complaint provided no indication that insiders were, at the time they traded, privy to information not available to general

public.); <u>Peritus Software</u>, 32 F. Supp. 2d at 226 (insider trading and other scienter allegations were insufficient where they "lack[ed] the detail necessary to render it believable that the insiders knowingly misled investors.  A successful narrative requires texture; that is, in order to believe the motives attributed to the story's main characters, the story must be richly drawn.").

> 2.    Mr. Snowden Sold Only A Small Portion of His Overall Holdings During The Class Period.

The challenged transactions also fail to establish scienter because Mr. Snowden sold only a small fraction of his total BCGI holdings during the Class Period.  <u>See Morse v. McWhorter,</u> No. 3:97-0370, 1998 U.S. Dist. LEXIS 19053, at *92 (N.D.N.Y. Feb 13, 1998) (no scienter established from insider trading where defendants retained significant portions of their stock); <u>In re Comshare Inc. Sec. Litig.,</u> No. 96-73711-DT, 1997 U.S. Dist. LEXIS 17262, at *28 (E.D. Mich. Sept. 18, 1997), <u>aff'd,</u> 183 F.3d 542 (6th Cir. 1999) (fact that defendants retained stock weighs heavily against inference of scienter). Here, Mr. Snowden sold less than five percent of his total BCGI holdings during the proposed Class Period – a percentage that is hardly probative of scienter.  <u>See</u>, <u>e.g.</u>, <u>Peritus Software</u>, 52 F. Supp.2d at 228 (defendants' sale of up to 38% of holdings did not support inference of unusual trading); <u>Shaw</u>, 82 F.3d at 1224 (characterizing as "marginal" level of suspicion warranted by officers' alleged sale of 20% and 68% of holdings); <u>Ronconi v. Larkin</u>, 253 F.3d 423, 435 (9th Cir. 2001) (plaintiffs failed to establish scienter from insider trading where a defendant sold 10-17% of their total shares and options); <u>In re FVC.COM Sec. Litig.</u>, 136 F. Supp.2d 1031, 1038-39 (N.D. Cal. 2000) (finding no scienter and dismissing claim where defendants collectively sold only 13% of their stock, despite fact that one defendant sold 92% of his holdings).

In short, plaintiffs have failed to meet their dual burden of "plead[ing] facts which would warrant, first, a finding that there was a suspiciously abnormal or unusual pattern of trading, and second, an inference of scienter from that finding." _In re_ Parametric Tech. Corp. Sec. Litig., 300 F. Supp. 2d 206, 217 (D. Mass. 2001). This warrants dismissal of the Section 10(b) claim.

## IV. PLAINTIFFS FAIL TO ESTABLISH CONTROL PERSON LIABILITY FOR ANY OF THE INDIVIDUAL DEFENDANTS.

Plaintiffs have also failed to plead allegations sufficient to state a claim for control person liability against the individual defendants under Section 20(a) of the Exchange Act. The plaintiffs' failure to establish a primary violation of Section 10(b) dooms their claim under Section 20(a). Alabaster, 2000 U.S. Dist. Lexis 22354 at *32; see also Meyer, 221 F. Supp.2d at 209; Suna, 107 F.3d at 72; Parametric, 300 F. Supp. 2d at 224.

## V. PLAINTIFFS FAIL TO STATE A SECTION 20A CLAIM AGAINST MR. SNOWDEN.

Plaintiffs allege that Mr. Snowden violated Section 20A of the Exchange Act by improperly trading BCGI stock. Compl. ¶¶ 56-60. This claim similarly fails by dint of plaintiffs' failure to plead a violation of Section 10(b).

Section 20A confers a private right of action only upon persons who traded "contemporaneously" with the alleged trader under circumstances where there is an underlying violation by the alleged trader of the Exchange Act, in this case Section 10(b) or Rule 10b-5; Section 20A does not create an independent right of action. See Parametric, 300 F. Supp. 2d at 223. ("To establish an individual's liability under section 20A, the plaintiff must allege and prove a predicate violation of the Exchange Act . . . Since, as set forth above, their attempt to plead such a violation has been unsuccessful,

they are necessarily unable to plead a claim for liability under Section 20A."); <u>Advanta</u>, 180 F.3d at 541 ("[l]iability under Section 20A is predicated upon an independent violation of 'this chapter or the rules or regulations thereunder.'") (quoting Section 20A); <u>Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.</u>, 32 F.3d 697, 703 (2d Cir. 1994) ("to state a claim under § 20A, a plaintiff must plead a predicate violation of the '34 Act or its rules and regulations."); <u>Hogan v. Piasecki</u>, No. 96-C-7399, 1997 U.S. Dist. LEXIS 6858, at *4 (N.D. Ill. May 5, 1997) ("language [of 20A] has *uniformly* been construed as requiring an independent predicate violation of the 1934 Act or of the rules or regulations promulgated under it to state a claim under Section 20(A).") (emphasis added).

It follows that to pursue a claim under Section 20A against Mr. Snowden, plaintiffs must properly plead a separate, underlying violation of Section 10(b) or Rule 10b-5. <u>See</u> <u>Carney</u>, 135 F. Supp.2d at 256 ("[b]ecause the plaintiffs have not adequately pleaded a predicate violation of the Securities Exchange Act of 1934, they do not state a claim under either Section 20(a) or Section 20A."). This they have failed to do, requiring dismissal of their Section 20A claim.

## Conclusion

For all of these reasons, the Court should dismiss the Amended Consolidated Class Action Complaint in its entirety.

KAREN A. WALKER, EDWARD H. SNOWDEN and BOSTON COMMUNICATIONS GROUP, INC.,

By their attorneys,

/s/  Lisa M. Cameron
Jeffrey B. Rudman (BBO #433380)
Andrea J. Robinson (BBO #556337)
Lisa M. Cameron (BBO #639951)
Alison R. Aubry (BBO #657298)
Hale and Dorr LLP
60 State Street
Boston, MA 02109
(617) 526-6000

Dated:  May 10, 2004

## CERTIFICATE OF SERVICE

I, Lisa M. Cameron, hereby certify that on May 10, 2004, I caused a copy of the foregoing document to be served by overnight mail to counsel who are not listed to receive service electronically.


/s/  Lisa M. Cameron
Lisa M. Cameron