**EXHIBIT 6**



Boston Communications Group (ticker: BCGI, exchange: NASDAQ) News Release – 4/16/2003

**Boston Communications Group Reports Record Earnings And Exceeds Expectations For The First Quarter Of 2003**

• **Generated record GAAP Earnings of $0.18 per share for the first quarter (which includes $0.03 per share in legal costs, primarily associated with the Freedom Wireless lawsuit), exceeding Company's guidance**
• **Increased 2003 annual GAAP guidance to $0.78 to $0.80 per share up from $0.52 to $0.58 per share, both of which include $0.12 per share in estimated legal costs**
• **Record first quarter revenues reached $23.1 million, up 53% from the same period a year ago**
• **Added 455,000 net new prepaid subscribers in the first quarter, bringing subscriber count to 3.35 million, up 69% from the first quarter of 2002**
• **Increased average monthly MoUs to 106, a 22% increase over the first quarter of 2002**

WOBURN, Mass., April 16, 2003 - Boston Communications Group, Inc. (Nasdaq: BCGI) today announced that its consolidated GAAP net income for the first quarter ended March 31, 2003 totaled $3.3 million, or $0.18 per share, which includes $915,000 in legal charges, or $0.03 per share after taxes, primarily to defend the Freedom Wireless suit. These record earnings were up 64% sequentially over the 2002 fourth quarter GAAP earnings of $0.11 per share. In the first quarter of 2002, the Company reported a net loss of $1.5 million, or $0.09 per share, which included $3.3 million in pre-tax legal charges, or $0.11 per share. Total revenues for the first quarter increased 53% to $23.1 million from $15.0 million in the first quarter of 2002 and increased 9% from $21.1 million in the fourth quarter of 2002.

**Billing and Transaction Processing Services**
Billing and Transaction Processing Services, which include the Company's Prepaid Wireless Services, Voyager Billing and Customer Care, and Payment Services, generated record revenues of $21.1 million in the first quarter of 2003, a 74% increase over the first quarter of 2002 and an 18% increase over the 2002 fourth quarter. The increase in revenues, which have a corresponding low incremental cost, contributed to higher gross margins on Billing and Transaction Processing Services Revenues of 76%, compared to 68% in the first quarter of 2002 and 73% in the fourth quarter of 2002. The higher than expected revenues and corresponding gross margins were principally due to very strong net prepaid subscriber additions of 455,000 for the quarter. Total prepaid subscribers on the platform are now 3.35 million, a 69% increase over March 31, 2002.

"Our outstanding performance for the quarter reflects the solid positioning of our Billing and Transaction Processing Services business. The strength of our prepaid subscriber additions for the quarter continues to validate our carrier customers' success in selling to the under-penetrated youth and budget conscious segments with attractive prepaid customer propositions that are based on solid carrier economics. This year in particular, gross additions across most all of our carrier customer programs continued with nice momentum well beyond the typical end of holiday promotions. More and more, our carriers are offering a rich consumer experience with postpaid-like features using our real-time rating, billing, and customer care solutions that are generating new growth while reducing operational costs and churn," commented E. Y. Snowden, President and CEO.

**Freedom Wireless Update**
During the quarter ended March 31, 2003, the Company incurred $915,000 in legal costs, or approximately $0.03 per share after taxes, primarily for the continued defense of the Freedom Wireless patent infringement suit. These costs are in line with previous guidance and are expected to continue at this level until the matter is resolved. There are no developments to report on the case and exact timing of procedures has not been determined. There has also been no change to the Company's position on the case and *bcgi* remains confident that it does not infringe the Freedom Wireless patents and that the patents are invalid in light of prior art.

• *bcgi* Investor Home
• Analysts
• Annual Reports
• Calendar of Events
• Corporate Governan
• E-mail Alerts
• Mailing Request/Inv
• Press Releases
• SEC Filings
• Stock Quote
• Webcast Presentatic

**Board of Directors**

Paul J. Tobin
Chairman of the Boar
Directors

Brian E. Boyle
Vice-Chairman of the

E.Y. Snowden
President & Chief Exe
Officer, Director

Fritz von Mering
Vice President Corpor
Development, Directc

Jerrold D. Adams
Director

Paul R. Gudonis
Director

Gerald Segel
Director

Gerald McGowan
Director

Daniel Somers
Director

## Outlook

"Our tremendous growth in first quarter subscriber additions was the key factor in our earnings growing more than 60% compared to the fourth quarter of 2002. Although we are now entering the seasonally slower second and third quarters, we believe that our carrier's commitment to prepaid and our business model and value proposition will continue to position *bcgi* for growth and healthy profits. As a result, we are raising our annual 2003 earnings guidance," commented Karen A. Walker, Chief Financial Officer.

The Company is raising its 2003 GAAP earnings to $0.78 to $0.80 per share, which includes an estimate of $0.12 per share in legal costs primarily to defend the Freedom Wireless lawsuit. This guidance is more than four times higher than the Company's 2002 annual GAAP earnings of $0.19 per share. For the second quarter of 2003, the Company anticipates GAAP earnings of $0.19 to $0.20 per share, which includes $0.03 per share in estimated legal costs. "Our business model continues to be validated and our overall financial position, with $48.6 million in cash and investments and no debt, gives us the strength to capitalize on weaknesses across the telecommunications industry. This is evidenced by our recent building purchase that will initially house our second data center and our ability to continue to attract and retain top talent across our organization," commented Ms. Walker.

Mr. Snowden concluded, "We are obviously very pleased with our performance for the quarter and as a leader in real-time billing and transaction processing services, we feel that we are well positioned to continue to execute on our business plan. By serving both the largest national carriers and the smaller regional U.S. carriers who have just begun to gain momentum with their prepaid offerings, we look forward to continuing to competently provide them the best platform to demonstrate competitive success in a challenging industry."

The Company will be holding a conference call and Webcast at 5:00PM on Wednesday, April 16, 2003 to discuss results for the period ended March 31, 2003 and management's outlook. The Company's President and CEO, E.Y. Snowden, and Chief Financial Officer, Karen A. Walker, will host the call. Parties interested in listening to the call should dial 1-800-423-5972 at least 10 minutes prior to the start of the call. For those unable to participate at the designated time, a replay will be available for 30 days following the call via telephone at 1-800-642-1687 (conf id 9584673) and for one year on the web at www.bcgi.net.

## ABOUT THE COMPANY

Boston Communications Group, Inc. (NASDAQ: BCGI), an S&P Small Cap 600 Index company and Russell 2000 Index company, is a leader in transaction processing solutions for real-time wireless subscriber management, payment services, billing and customer care. Through these solutions, *bcgi* delivers prepaid and postpaid billing, ATM recharge, mobile commerce and other payment services. Founded in 1988, bcgi provides solutions to carriers through a combination of industry-leading proprietary software applications, a highly scalable transaction processing platform, and its end-to-end implementation model. Through this nationwide real-time infrastructure, *bcgi* provides one or more of its services to approximately 70 wireless carriers and resellers, including five of the top six national carriers. *bcgi* handles more than four billion minutes of service a year. Please visit the bcgi Web site at http://www.bcgi.net.

## CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS

This press release contains, in addition to historical information, forward-looking statements that involve risks and uncertainties including statements regarding earnings per share estimates and estimates of future legal expenses. Such statements are based on management's current expectations and are subject to a number of uncertainties and risks that could cause actual results to differ materially from those described in the forward-looking statements. Among the important factors that would cause actual results to differ materially from those indicated by such forward looking statements are the loss of a customer or certain of their markets, specifically, Verizon Wireless and Cingular Wireless who represented 51% and 27%, respectively, of the Company's consolidated revenues for the three months ended March 31, 2003, or greater than expected pricing reductions from major carrier customers, an unfavorable judgment in the Freedom Wireless suit which could result in substantial damages and could significantly restrict *bcgi's* ability to conduct business, as well as the others factors that may affect future operating results

detailed in *bcgi's* annual report on Form 10-K for the year ended December 31, 2002
filed with the Securities and Exchange Commission.

Company Contact:
Dan Brosnan
Investor Relations - *bcgi*
(781) 904-5410
email: dbrosnan@bcgi.net

FRB\Weber Shandwick NY:
Alison Ziegler, General Inquiries (212) 445-8432
Peter Seltzberg, Investor Inquiries (212) 445-8457

To view this release with financial information click here

home / solutions / real-time subscriber management solutions
payment services / billing services / customers and partners / about *bcgi*
investor info / news careers at *bcgi* / site map / demos

# EXHIBIT 7

# Morgan Keegan

Morgan Keegan & Company, Inc.
Members New York Stock Exchange, Inc.

## BOSTON COMMUNICATIONS GROUP, INC.

BCGI • [NASDAQ] • $15.10
www.bcgi.com

## Analysis of Sales/Earnings

April 17, 2003

## Q1 Results Far Better Than Estimates; Guidance Raised Substantially

- EPS Before Special Items $0.21; Estimate Was $0.14; GAAP EPS of $0.18 vs. $0.11 Estimate
- Net Prepaid Adds 455k vs. 200k Estimate
- GAAP EPS Guidance Raised To Range Between $0.78 And $0.80 From $0.52 - $0.58 Range

Boston Communications Group reported first quarter results yesterday that were substantially better than our expectations. In addition, management raised 2003 full year guidance from between $0.64 and $0.70 (excluding legal expenses) to between $0.78 and $0.80 (which now includes $0.12/share in legal expenses). The results were driven by Q1 net prepaid adds of 455,000, more than double our expectation. We would also note that this is the first full quarter that includes results from the company's fourth quarter acquisition of Infotech Solutions. The following table provides an overview of Q1:03 results compared to both Q1:02 and our expectations.

| ($000s) | Q1:03 | Q1:02 | % Ch | Q1:03E |
|---|---|---|---|---|
| Revenues | $23,067 | $15,042 | 53.4% | $21,292 |
| EBITDA* | 10,275 | 4,498 | 128.4% | 8,629 |
| EPS, Diluted* | $0.21 | $0.03 | 600.0% | $0.14 |
| EPS, GAAP | $0.18 | $0.03 | 500.0% | $0.11 |
| Net Prepaid Adds | 450k | 228k | 97.4% | 200k |

*Excludes $915k ($0.03/share after tax) of legal expenses related to Freedom Wireless lawsuit in Q1:03

**Revenues:** Compared to Q1:02, overall revenues increased 53.4% to $23.1 million, despite a (40.8%) revenue decline in the company's legacy roaming business. Our estimate for overall revenue had been $21.3 million. Growth was driven by net prepaid customer adds of 455,000, which exceeded our estimate of 200,000 by 125%. MOUs in the quarter were 106, up 21.8% from 87 in Q1:02 and 1.0% from Q4:02, but short of our estimate of 110. We believe the superior subscriber growth may have had a negative impact on reported MOU/sub.

The company's transaction processing services segments, which includes prepaid services, postpaid billing, and payment services, represented 91% of total revenues and grew 74% year over year. Roaming services continued to decline at an expected 40% rate, while system sales declined 20% following a strong Q4:02.

Transaction processing revenues grew 74% year to date and 18% sequentially largely due to stronger than expected prepaid wireless subscriber growth and modest contribution from the company's Infotech acquisition in Q4:02 (we estimate between 5%-10% of sales.) Stronger than expected subscriber growth resulted from continued promotion of prepaid plans by Verizon, a renewed marketing push by Cingular, and the ramping up of the Simple Freedom brand sold through Walmart (WMT - $54.54). We believe these positive trends are likely to continue as wireless providers become increasingly comfortable with utilizing

Please see disclosure and certification information at the end of this report.



prepaid plans to target underpenetrated segments of the wireless market. In sum, Boston Communications is in the right place at the right time.

**Expenses:** Capex was $14.6 million in the first quarter, which included the company's previously announced purchase of a 93,000 square foot building in Bedford, Massachusetts on March 14 for $9.1 million in cash. On the operating expense side, management noted that engineering, research and development costs increased in the quarter due to an increased headcount, while sales and marketing expenses increased due to the company's presence at this year's CTIA Wireless show in New Orleans. Overall, operating expense levels were in line with expectations.

Gross margins were slightly higher than expectations, with transaction processing gross margins increasing to 76% as a result of the strong volume growth on the company's network. Continual increases in gross margin indicate to us that pricing declines in the company's prepaid outsourcing services can easily be maintained.

**Balance Sheet:** Boston Communications maintained an extremely strong balance sheet throughout the first quarter, and finished Q1 with $2.78/share in cash and no debt despite purchasing a $9.1 million data center. Net of this purchase, cash balances would have increased approximately $2 million in the quarter. Based on current capital spending guidance, the company expects to be free cash flow break even in Q2:03 and generate approximately $2 million in free cash flow each of the last two quarters of the year. DSOs were up nominally from 67 to 71 days (based on our calculations), and within the historical range.

**Customers:** E.Y. Snowden, the company's President and CEO, commented that the company has begun its customary contract renewal discussions with Verizon (VZ - $33.33), and expressed confidence that the re-signing will occur. Management did not provide any updates on existing or new major national customers, but did announce three contract extensions and one new regional carrier. The bcgi Voyager Billing and Customer Care contract extensions included: Virginia Cellular, LLC of Staunton, Virginia; NE Colorado Cellular, Inc. of Fort Morgan, Colorado; and Bermuda Digital Communications, Ltd., d/b/a Cellular One Bermuda, of Hamilton, Bermuda. The new customer, MobileTel, LLC of Larose, Louisiana, has implemented the company's prepaid wireless solution for regional carriers. Boston Communications continues to take market share in the rural segment of the wireless marketplace, and appears to still be in dialogue with a number of larger nationwide players in regards to providing prepaid wireless services.

**Freedom Wireless Update:** As expected, the company incurred an additional $915,000 ($0.03/share after taxes) in legal costs related to the Freedom Wireless patent infringement lawsuit in the first quarter. Management did not report any developments remaining in the suit, and reiterated their confidence in the lack of merit of the case.

**Guidance:** Concurrent with reporting Q1:03 results, management raised full year 2003 EPS guidance to $0.78 to $0.80, including approximately $0.12 of expenses related to the Freedom Wireless lawsuit. Second quarter EPS is expected to be between $0.19 and $0.20 per share, including approximately $0.03/share of after tax expenses related to Freedom Wireless. The following table provides an overview of management's guidance for the Q2:03 and FY2003:

|                | Q2:03 Guidance | FY2003 Guidance |
|----------------|----------------|-----------------|
| Net Adds       | 150k-250k      | 1.1mm-1.3mm     |
| Free Cash Flow | Breakeven      | $2m in Q3, Q4   |
| EPS, GAAP      | $0.19 - $0.20  | $0.78 - $0.80   |
| EPS, Ops       | $0.22 - $0.23  | $0.90 - $0.92   |

We have increased our revenue growth expectations for Boston Communications in 2003 from 27% to 42% and increased our EPS estimate from $0.65 to $0.79. We would note that our previous EPS estimate excluded $0.12/share in legal expenses, while our new EPS estimate includes these expenses. We believe these estimates are reasonably conservative as long as prepaid wireless growth remains steady, but as the first quarter has revealed, the fixed cost nature of the company's business model makes EPS very sensitive to shortfalls or outperformance on the revenue line. Based on the company's current momentum, we believe that EPS outperformance is more likely than disappointment in 2003.

**Summary:** In sum, Boston Communications had a phenomenal Q1:03. Prepaid wireless appears to be finally gaining substantial traction in the US wireless marketplace, and Boston Communications is benefiting from having the right customers and right product offering at the right time. Management appeared extremely confident in re-signing Verizon this year (this represents the largest risk to the stock), which will likely alleviate some investor concern. Based on new

guidance, we are anticipating revenues to grow 42% in 2003 and EPS to grow 132% for BCGI. Although management has not given guidance for 2004 as of yet, on a preliminary basis, we believe that 10%-20% revenue growth and 30%+ earnings growth should be reasonable barring a substantial change in the outlook or pricing for the company's prepaid wireless services. The shares are currently trading at 19.1x our 2003E EPS, and roughly at a market multiple on preliminary 2004 EPS. The EV/EBITDA is currently 5.1x based on our 2003 EBITDA expectations. Therefore, despite the fact that shares of appreciated 18.8% on a year to date basis, we believe the current valuation remains low relative to the company's profitablity and strong balance sheet.

Based on strong Q1:03 results and what appears to still be a compelling valuation, we are maintaining our Outperform/Speculative rating on shares of Boston Communications Group

## Company Description

Boston Communications Group, Inc., based in Woburn, Massachusetts, is a provider of real-time transaction processing solutions to a wide variety of wireless service providers throughout the U.S. The company's core service offering provides wireless companies with a complete outsourced solution for their prepaid wireless service offerings, including subscriber account management and recharge solutions.

**ADDITIONAL INFORMATION AVAILABLE UPON REQUEST**



Rating and Price Target History for: BCGI as of 04-15-03

| 12-13-00 O:$31 | 08-08-01 O:$21 | 10-10-01 O:$14 | 01-10-02 O:$11 | 04-02-02 O:$12 | 04-18-02 O:$14 | 10-15-02 O:NA | 11-11-02 M:NA | 01-30-03 O:NA |

Morgan Keegan Companies Rated:
| Outperform | 42% |
| Market Perform | 52% |
| Underperform | 3% |
| Not Rated | 3% |

Investment Banking Clients within last 12 months:
| Outperform | 9% |
| Market Perform | 5% |
| Underperform | 0% |
| Not Rated | 0% |

For purposes of the NYSE and NASDAQ ratings distribution disclosure requirements, our rating of Outperform, Market Perform and Underperform most closely correspond to Buy, Hold and Sell, respectively.

As of July 9th, 2002, Morgan Keegan & Co. no longer issues price targets.          Created by BlueMatrix

The research analyst responsible for the preparation of this research report certifies that; (a) the views expressed in this research report accurately reflect the research analyst's personal views about any and all of the subject security(ies) and issuer(s), and (b) no part of the research analyst's compensation was, is, or will be directly or indirectly related to the specific recommendations or views contained in this research report.

As of the date of this report, Morgan Keegan & Co. Inc. makes a market in BCGI .

**MK PERFORMANCE RATINGS:**

O = OUTPERFORM (Expected to outperform the S & P 500* over the next 6 months)

M = MARKET PERFORM (Expected to perform the S & P 500* over the next 6 months)

U= UNDERPERFORM (Expected to underperform the S & P 500* over the next 6 months)

*REIT's performance benchmark is total return relative to the NAREIT Equity Index.

**MK SUITABILITY RATINGS:**

S = SPECULATIVE (Business or balance sheet risk materially above that of the average U.S. public company)

M = MARKET RISK (Business or balance sheet risk not materially different from that of the average U.S. public company)

C = CONSERVATIVE (Business or balance sheet risk materially below that of the average U.S. public company)

(VZ):



EXHIBIT 8

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LAWRENCE FISHER, on behalf himself and all others similarly situated, Plaintiff, v. SpecTran CORPORATION and CHARLES B. HARRISON, Defendants. | ) ) ) ) ) ) ) ) ) ) |

Civil Action No. 99-12359-NG

GERTNER, D.J.:

### MEMORANDUM AND ORDER RE:  MOTION TO DISMISS
May 31, 2001

Plaintiff Lawrence Fisher ("Fisher") filed this class action complaint alleging defendants SpecTran Corporation ("SpecTran") and Charles Harrison ("Harrison"), SpecTran's President and Chief Executive Officer, violated the federal securities laws when they failed to update certain sales and earnings forecasts after learning of the loss of substantial business from Lucent Technologies, Inc. ("Lucent").  For the reasons set forth below, I find that defendants did not have a duty to update their forecasts.  Accordingly, defendants' motion to dismiss [docket # 11] is **GRANTED**.

## I.    FACTS

SpecTran is a Massachusetts corporation engaged in the manufacture and sale of certain glass optical fibers and other value-added fiber optic products for use in telecommunications.

Prior to the events underlying the complaint (i.e., the May 28, 1999, financial projections and the June 1999 disclosures by Lucent), Lucent was one of SpecTran's largest customers. During 1998, SpecTran sold Lucent approximately $26.5 million of optical fiber. During the six month period ending June 30, 1999, SpecTran sold Lucent approximately $9.5 million of optical fiber, which equaled 22% of SpecTran's revenue through the first half of 1999.

Beginning in January 1999, SpecTran began exploring financial and strategic alternatives for the company, including the possibility of a merger with or sale to another company. In May 1999, Lucent conducted due diligence review of SpecTran prior to submitting an indication of interest letter.

On May 28, 1999, at SpecTran's annual shareholders' meeting, Harrison informed SpecTran's shareholders that the company expected: (1) net sales to increase by more than 25% for 1999 to $90 million, up from $70 million in 1998; (2) sales would grow at a rate of 12% to 15% through 2003; and (3) the doubling of sales and earnings over this period in SpecTran's Specialty Optics subsidiary. SpecTran also issued a press release to investors that same day that read in pertinent part:

> SpecTran Corporation [] which develops,
> manufactures and markets glass optical fibers
> and value-added fiber optic products,

-2-

projects net sales to grow by more than 25
percent in 1999.  Sales are expected to grow
at a compound annual rate of 12 to 15 percent
through 2003, with earnings per share
expected to grow at an equivalent or faster
rate, chairman and CEO Charles Harrison told
the annual meeting of shareholders here
today.  Included in these financial
projections is an expected doubling of sales
and earnings over this period in SpecTran's
Specialty Optics subsidiary.  The main
factors driving fiber demand this year are
explosive Internet growth, increasing
bandwidth requirements and continued
deregulation of the telecommunications
industry.  He expects this growth in demand
to ease the downward pressure on standard
fiber pricing, which was triggered in part by
industry oversupply problems.  SpecTran is
prepared to take advantage of the positive
market trends, with projected net sales of
more than $90 million in 1999, up from $70
million last year, made possible by added
capacity and continued productivity
improvements at its manufacturing facilities.
Expressing optimism about the outlook for the
second half of 1999, Harrison said, "SpecTran
is a stronger company from a technological
and manufacturing perspective than ever
before, well-positioned to take on the
challenges of our rapidly changing markets."

The press release also included the following cautionary

language:

This press release contains certain forward-
looking statements within the meaning of
Section 27A of the Securities Act of 1933, as
amended, and Section 21E of the Securities
Exchange of [sic] Act of 1934, as amended,
which are intended to be covered by the safe
harbors created thereby.  Investors are
cautioned that all forward-looking statements
involve risks and uncertainties that may

-3-

cause results to differ materially from
expectations, including without limitation,
the ability of the company to market and
develop its products, general economic
conditions and competitive conditions in
markets served by the company.  Forward-
looking statements include, but are not
limited to, global economic conditions,
product demand, competitive products and
pricing, manufacturing efficiencies, cost
reductions, manufacturing capacity, facility
expansions and new plant start-up costs, the
rate of technology change and other risks.
Although the company believes that the
assumptions underlying the forward-looking
statements contained herein are reasonable,
any of the assumptions could be inaccurate,
and therefore, there can be no assurance that
the forward-looking statements included in
this press release will prove to be accurate.
In light of the significant uncertainties
inherent in the forward-looking statements
included herein, the inclusion of such
information should not be regarded as a
representation by the company or any other
person that the objectives and plans of the
company will be achieved.

The complaint contains no allegation that the financial

projections were false, misleading or unreasonable at the time

that they were made.  After Harrison's May 28 statements,

SpecTran's common stock price rose from its closing price of $7

7/16 per share on May 27, 1999, to $9 1/4 per share on May 28,

1999.

Four days after the financial projections issued, on June 1,

Lucent notified SpecTran that "due to excess inventories," Lucent

would "decrease significantly the amount of optical fiber it

would purchase" from SpecTran.  That day SpecTran stock closed at $10 5/16 per share.

Then, on June 17, Lucent notified SpecTran that Lucent would not purchase any additional optical fiber from SpecTran in 1999.[1] SpecTran allegedly determined that it would lose between $5-10 million of revenue for 1999 as a result.[2]

Upon receiving the news from Lucent in June, SpecTran did not disclose the loss of business to shareholders.  Fisher claims the statements made by defendants on May 28, 1999, "became materially false and misleading" after June 1, 1999, when Lucent notified SpecTran that Lucent would significantly decrease its purchase of optical fiber.  It its Form 10-K filed with the Securities and Exchange Commission ("SEC") on March 30, 1999, SpecTran recognized that the loss of Lucent's business "would have a material adverse affect on [SpecTran]."  Fisher claims SpecTran and Harrison had a duty to update the May 28 statements because the loss of Lucent's business materially affected SpecTran's ability to maintain such high sales growth.

---

[1] By June 1, 1999, Lucent had satisfied its minimum annual purchase obligations under its three-year supply agreement with SpecTran, which terminated December 31, 1999.  Prior to 1999, however, Lucent had purchased quantities of optical fiber in excess of the contract's required annual minimum.

[2] In an interview with the <u>Wall Street Journal</u>, published September 15, 1999, Harrison stated that he decided not to disclose the Lucent news to investors because a revised internal projection still had SpecTran on target for $90 million of revenue without Lucent's business.

-5-

During June 1999, Lucent and SpecTran engaged in
negotiations for the sale of SpecTran to, or merger with, Lucent.
On June 23, 1999, SpecTran's Board of Directors unanimously
agreed to accept a Lucent offer to acquire SpecTran for $9 per
share.  That same day, the stock market closed with SpecTran
stock trading at $10 per share.

On July 14, 1999, SpecTran's Board of Directors met to
review legal documents, terms of the merger, and to debate again
the fairness of Lucent's offer.  Lucent and SpecTran entered into
an Agreement of Merger and the Board unanimously recommended that
SpecTran stockholders accept Lucent's offer and tender their
shares for $9 per share pursuant to the terms of the offer.  The
buyout at $9 per share represented a discount of approximately
14% over the one month average closing price of SpecTran stock
prior to the Agreement of Merger.

SpecTran stock closed at $11.50 per share on July 14.  After
the close of trading that day, Lucent and SpecTran announced the
$9-a-share deal, totaling $64.5 million, plus Lucent's assumption
of $35 million of SpecTran debt.  Following the announcement of
the Lucent acquisition, SpecTran's stock price declined to close
at $8 7/8 on July 15 and continued to decline in subsequent
trading.

-6-

On July 21, 1999, SpecTran's SEC filing disclosed Lucent's June 1 and June 17 statements to SpecTran regarding the loss of Lucent's business.

Fisher filed this class action lawsuit on behalf of himself and all other persons who purchased the common stock of SpecTran on the open market during the period June 1, 1999, through and including July 21, 1999 (the "class period"), to recover damages caused by defendants' alleged violation of the federal securities laws. The complaint alleges that during the class period defendants' May 28 statements caused SpecTran's stock to trade at artificially high levels (between $8 and $12 per share), causing harm and injury to Fisher and the class.[3]

Count One charges defendants with violating section 10(b) of the Securities and Exchange Act ("1934 Act") and the SEC's Rule 10b-5 promulgated thereunder. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. Count Two alleges Harrison violated of section 20(a) of the 1934 Act as a controlling person who caused SpecTran to engage in the illegal conduct. 15 U.S.C. § 78t(a).

---

[3] Fisher purchased 8,600 shares of SpecTran common stock during the class period.

-7-

## II.  LEGAL ANALYSIS

Defendants now move the Court to dismiss the action on a multitude of grounds.  I need only address one to dispose of the complaint:  SpecTran did not have a duty to update its forward-looking statements under the Safe Harbor provision of the Private Securities Litigation Reform Act ("the PSLRA").  15 U.S.C. § 78u-5(c).

### A.     Standard on Motion to Dismiss

In evaluating defendants' motion to dismiss, I accept all the factual allegations in the complaint as true and draw every reasonable inference in Fisher's favor.  Garita Hotel Ltd. P'ship v. Ponce Fed. Bank, 958 F.2d 15, 17 (1st Cir. 1992).  A motion to dismiss for failure to state a claim may be granted only if the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.  Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  In reviewing a challenge pursuant to Fed. R. Civ. P. 12(b)(6), I must look only to the allegations of the complaint and, if under any theory they are sufficient to state a cause of action, a motion to dismiss the complaint must be denied.  Knight v. Mills, 836 F.2d 659, 664 (1st Cir. 1987).

Nonetheless, because Fisher alleges fraud, he is also subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b), which provides "[i]n all averments of fraud or mistake,

-8-

the circumstances constituting fraud or mistake shall be stated with particularity."

### B.  SpecTran Had No Duty to Update Its Financial Projections

To state a claim under section 10(b) and Rule 10b-5 against the defendants, Fisher must plead, with sufficient particularity, that the defendants (1) made a false statement or omitted a material fact, (2) with the requisite scienter (fraudulent intent), and that (3) the plaintiff's reliance on the statement or omission caused the plaintiff injury.[4]  Id. at 992.

Fisher does not allege that defendants' statements were false or misleading on May 28, 1999, the day the statements were made.[5]  Rather, Fisher contends that the statement became false

---

[4] Were I to reach the issue I would be compelled to find that Fisher has failed to allege facts that support a strong inference of scienter.  See 15 U.S.C. § 78u-4(b)(2); Fed. R. Civ. P. 9(b); Greebel v. FTP Software, Inc., 194 F.3d 185, 194 (1st Cir. 1999).  The complaint offers nothing more than motive and opportunity allegations:  SpecTran and Harrison had a desire to increase SpecTran's stock price to facilitate SpecTran's acquisition by Lucent.  Those allegations are not sufficient to demonstrate scienter, especially where the complaint is devoid of any of the other types of evidence relevant to show scienter (e.g., insider trading, divergence between internal reports and external statements on the same subject, etc.).  Greebel, 194 F.3d at 196-97.

[5] Projections of future performance, like those issued by defendants here, are generally not actionable under the federal securities laws unless the projections are "worded as guarantees."  Raab v. General Physics Corp., 4 F.3d 286, 290 (4th Cir. 1993).  Predictions of future performance, however, may be actionable "if the forecast might affect a reasonable investor in contemplating the value of a corporation's stock.'"  Suna v. Bailey Corp., 107 F.3d 64, 70 (1st Cir. 1997) (quoting Colby v. Hologic, Inc., 817 F. Supp. 204, 211 (D. Mass. 1993).  This may be the case where the projections are specific and concrete.  In re Boston Tech., Inc. Sec. Litig., 8 F. Supp. 2d 43, 60 (D. Mass. 1998).

As an initial matter, SpecTran's projections are not worded as guarantees, nor do they convey "any promises about future performance and do

-9-

or misleading four days later, on June 1, when Lucent informed

SpecTran that Lucent would reduce its purchases of SpecTran

products.   At that point, according to Fisher, SpecTran had a

duty to <u>update</u> its financial projections or notify the public of

Lucent's disclosure.   For purposes of this motion, I will assume,

---

not project specific numbers that the company will certainly attain."   <u>Suna</u>,
107 F.3d at 70.   Indeed, the Complaint does not even allege that these
statements constituted promises or guarantees of future performance.   But the
statements did include a number of specific predictions:   (1) Net sales would
grow by 25% in 1999; (2) sales would continue to grow at compound annual rate
of 12% to 15% through 2003; (3) earnings per share would grow at 12% to 15% or
greater over the same period; and (4) projected net sales would grow from $70
million in 1998 to more than $90 million in 1999.   Moreover, the statements
increased the trading price of SpecTran shares.

    Despite the specific and concrete nature of the projections, the
predictions here are not actionable on account of the "bespeaks caution"
doctrine, which is now codified at § 78u-5(c)(1)(A)(i).   First, the statements
outline several assumptions underlying the forecasts that could change at a
later date.   For example, the statements read in relevant part:

> Included in these financial projections is an expected
> doubling of sales and earnings over this period in
> SpecTran's Specialty Optics subsidiary.   The main
> factors driving fiber demand this year are explosive
> Internet growth, increasing bandwidth requirements and
> continued deregulation of the telecommunications
> industry.   He expects this growth in demand to ease
> the downward pressure on standard fiber pricing, which
> was triggered in part by industry oversupply problems.

The statements also note, "any of the assumptions could be inaccurate, and
therefore, there can be no assurance that the forward-looking statements
included in this press release will prove to be accurate."

    Second, the projections are accompanied by meaningful cautionary
language within the meaning of the safe harbor provision of the PSLRA.   15
U.S.C. § 78u-5(c)(1)(A)(i); <u>Harris v. Ivax Corp.</u>, 182 F.3d 799, 807, 810, 813-
14 (11th Cir. 1999).   Among other things, the press release included the
following language:   "In light of the significant uncertainties inherent in
the forward-looking statements included herein, the inclusion of such
information should not be regarded as a representation by the company or any
other person that the objectives and plans of the company will be achieved."
Given the contemporaneous cautionary language, and SpecTran's express
acknowledgment that any of the assumptions underlying the projections could
prove inaccurate, no reasonable investor would have read these statements as
promises or guarantees of future performance.   <u>See</u> <u>Suna</u>, 107 F.3d at 69-70.

-10-

without deciding, that the complaint alleges facts, which if true, suffice to demonstrate that the May 28 statement became materially misleading on June 1.[6]

### 1.  **Duty to Correct**

In certain circumstances, a company may have a duty to correct a projection that was reasonable when originally made. This situation could arise if the company later discovers it made some error in its original projection that made the projection unreasonable or untrue when made.  In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1430-31 (3d Cir. 1997) [hereinafter "Burlington Coat"].  Or, company might subsequently discover that it misread a vital piece of data that went into its forecast. (For example, in preparing an internal forecast, a report might have been misread so as to indicate that net sales were 100,000 rather than an actual 10,000).  In that instance, the company then must correct the prior statement within a reasonable time. Id. at 1431.  This case does not involve any duty to correct an earlier financial statement later determined to have been unreasonable when made.

---

[6] As defendants correctly note, it is not at all clear that Fisher succeeds in this endeavor either.

-11-

## 2.    <u>Duty to Update</u>

Fisher relies entirely on an alleged ongoing duty to <u>update</u> SpecTran's financial projections not because of errors when made, but because of subsequent events.  Fisher's complaint hinges on the assumption "that the disclosure of a single specific forecast produced a continuous duty to update the investing public with either new forecasts or hard information that would in anyway change a reasonable investor's perception of the originally forecasted" growth.[7]  <u>Id.</u> at 1432.

---

[7] The Third Circuit has recognized a very narrow set of cases where a duty to update might exist:  Cases involving statements about the structure of the companies, where information allegedly withheld concerned events that could fundamentally change the natures of the companies involved.  <u>Burlington Coat</u>, 114 F.3d at 1433, 1434 n.20; <u>In re Phillips Petroleum Sec. Litig.</u>, 881 F.2d 1236, 1245 (3d Cir. 1989); <u>Greenfield v. Heublein, Inc.</u>, 742 F.2d 751, 759 (3d Cir. 1984).  Likewise, <u>In re Time Warner Inc. Sec. Litig.</u>, 9 F.3d 259, 268 (2d Cir. 1993) the Second Circuit recognizes a duty to update in special circumstances, related to the Third Circuit standard, i.e. where the statements at issue concern projections about a merger with an entity or other strategic partnerships and intervening events suggest that those partnerships will not be consummated or where a corporation is pursuing a specific business goal-- like reducing its debt -- and the approaches to reaching it -- through strategic partnerships, and then considers other, totally different approaches, at a later point, the issue of whether the failure to disclose the alternate approach renders the initial disclosure misleading, is a question for a jury.

But no court, has held that there is a duty to update, in the case of a run of the mill financial projection as here.  While the financial projections may have been made at a time when SpecTran was hoping for a merger or sale of the company at a later date, the **statements themselves** did not address SpecTran's prospects for reorganization (e.g., takeover, merger, sale, or liquidation).  Furthermore, since the non-disclosed information arguably meant that SpecTran would not attain its forecasted growth in 1999, it in no way implicated a fundamental change in the business.

The First Circuit has not resolved the issue of whether such a duty to update exists for run-of-the-mill financial forecasts.[8] However, I agree with other circuits' reasoning dispensing with the contention that such a set of disclosure obligations accompanies the disclosure of a single, ordinary financial projection.  Id. at 1433; Stransky v. Cummins Engine Co., 51 F.3d 1329, 1332-33 (7th Cir. 1995); Hillson Partners Ltd. v. Adage, Inc., 42 F.3d 204, 219 (4th Cir. 1994).  The Third Circuit cogently stated this reasoning:

> [W]e do not think it can be said that an ordinary earnings projection contains an implicit representation on the part of the company that it will update the investing public with all materials information that relates to that forecast.  Under existing law, the market knows that companies have neither a specific obligation to disclose internal forecasts nor a general obligation to disclose all material information.  We conclude that ordinary, run-of-the-mill forecasts contain no more than the implicit

---

[8] Fisher cites the First Circuit's decision in Backman v. Polaroid Corp., 910 F.2d 10, 18 (1st Cir. 1990), for the proposition that a duty to update exists in "special circumstances."  A close reading of that case, however, clearly reveals that the court declined to define what those circumstances consisted of.  All that the Court would indicate is that the statement at issue -- that a new camera was being sold below cost -- was not made misleading by the Company's failure to also disclose at a later point that the sales were below expectations.

Significantly, the Third Circuit's decision in Burlington Coat relies heavily on First Circuit cases decided after Backman, namely, Glassman v. Computervision Corp., 90 F.3d 617 (1st Cir. 1996), and Shaw v. Digital Equip. Corp., 82 F.3d 1194 (1st Cir. 1996) which acknowledge the possibility of "special circumstances" requiring updating, but never define it or indeed find it in the cases before the Court.  See Burlington, 114 F.3d at 1432-33.  The weight of First Circuit authority suggests the court would find no duty to update in the circumstances presented here.

representation that the forecasts were made
reasonably and in good faith. Just as the
accurate disclosure of a line of past
successes has been ruled not to contain the
implication that the current period is going
just as well, disclosure of a specific
earnings forecast does not contain the
implication that the forecast will continue
to hold good even as circumstances change.

Finally, the federal securities laws, as they
stand today, aim at encouraging companies to
disclose their forecasts. A judicially
created rule that triggers a duty of
continuous disclosure of all material
information every time a single specific
earnings forecast is disclosed would likely
result in a drastic reduction in the number
of such projections made by companies. . . .
Therefore, apart from the fact that
plaintiffs' disclosure theory has no support
in the existing regulatory structure,
adopting it would severely undermine the goal
of encouraging the maximal disclosure of
information useful to investors. In sum,
under the existing disclosure apparatus, the
voluntary disclosure of an ordinary earnings
forecast does not trigger any duty to update.

Burlington Coat, 114 F.3d at 1433 (citations omitted).

In addition to the decisional law cited above, the statute,

the PSLRA, explicitly declines "to impose upon any person a duty

to update a forward-looking statement" that falls within the

definition of the PSLRA. 15 U.S.C. § 78u-5(d). There is no

doubt that defendants' financial projections qualify as forward-

looking statements within the meaning of the PSLRA. See 15

U.S.C. § 78u-5(i)(1) (defining "forward-looking statement" to

-14-

include "a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share . . . or other financial items . . . [and] a statement of future economic performance").

In short, Fisher's position has been severely limited and undermined by both the PSLRA itself and recent case law.  See Burlington Coat, 114 F.3d at 1434 n.20 ("[T]he duty to update, to the extent it might exist, would be a narrow one to update the public as to extreme changes in the company's originally expressed expectation of an event such as a takeover, merger, or liquidation."); Eisenstadt v. Centel Corp., 113 F.3d 738, 746 (7th Cir. 1997) (suggesting that the PSLRA eradicated any remnant of a duty to update in circuits where such a duty was previously recognized).  The current state of federal securities law simply does not support Fisher's contention that a duty to update exists when a company discloses an internal financial projection for the benefit of investors.  Even the cases relied on by Fisher acknowledge this point.[9]  E.g., In re Quintel Entm't Inc. Sec. Litig., 72 F. Supp. 2d 283, 292 (S.D.N.Y. 1999) (recognizing "there is no duty to update . . . exclusively forward-looking

---

[9] In particular, the Quintel case, which Fisher argues is "on point," is inapposite.  There, the district court found a duty to correct earlier statements that were later determined to have been unreasonable and misleading at the time they were made.  In re Quintel Entm't Inc. Sec. Litig., 72 F. Supp. 2d 283, 292-93 (S.D.N.Y. 1999).  Also, those statements were not predictions but statements of existing fact.  Id.

statements"); <u>In re Home Health Corp. Sec. Litig.</u>, No. Civ. A.

98-834, 1999 WL 79057, at *18 (E.D. Pa. Jan. 29, 1999) ("Courts

in the Third Circuit have only found a duty to update statements

which were truthful when made when the original statement

concerned fundamental changes in the nature of the company, such

as mergers or takeover attempts, and when subsequent events

produced an extreme change in the continuing validity of that

original statement."); <u>but see Picard Chem. Inc. Profit Sharing</u>

'8)                                              ᴚe

> projects net sales to grow by more than 25
> percent in 1999.  Sales are expected to grow
> at a compound annual rate of 12 to 15 percent
> through 2003, with earnings per share
> expected to grow at an equivalent or faster
> rate, chairman and CEO Charles Harrison told
> the annual meeting of shareholders here
> today.  Included in these financial
> projections is an expected doubling of sales
> and earnings over this period in SpecTran's
> Specialty Optics subsidiary.  The main
> factors driving fiber demand this year are
> explosive Internet growth, increasing
> bandwidth requirements and continued
> deregulation of the telecommunications
> industry.  He expects this growth in demand
> to ease the downward pressure on standard
> fiber pricing, which was triggered in part by
> industry oversupply problems.  SpecTran is
> prepared to take advantage of the positive
> market trends, with projected net sales of
> more than $90 million in 1999, up from $70
> million last year, made possible by added
> capacity and continued productivity
> improvements at its manufacturing facilities.
> Expressing optimism about the outlook for the
> second half of 1999, Harrison said, "SpecTran
> is a stronger company from a technological
> and manufacturing perspective than ever
> before, well-positioned to take on the
> challenges of our rapidly changing markets."

violate section 10(b) of the 1934 Act, and in the absence of a

such a violation, Harrison is not liable under section 20(a).  <u>In</u>

<u>re Cendant Corp. Sec. Litig.</u>, 76 F. Supp. 2d 539, 549 (D.N.J.

1999).


**III. <u>CONCLUSION</u>**

    For the reasons stated above, Fisher's complaint is

**DISMISSED.**


**SO ORDERED.**

**Dated: May 31, 2001**

                            NANCY GERTNER, U.S.D.J.