EXHIBIT 9

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
                              )
IN RE ART TECHNOLOGY GROUP, INC.  )    C.A. No. 01-11731-NG
SECURITIES LITIGATION         )
                              )
```

GERTNER, D.J.:

### MEMORANDUM AND ORDER
September 4, 2003

The defendants in this consolidated securities fraud case move to dismiss [document #14] the lead plaintiffs' amended complaint. For the reasons set forth below, I **GRANT** that motion **IN PART AND DENY** it **IN PART**.


I.    **FACTS AND PROCEDURAL HISTORY**

Defendant Art Technology Group, Inc. ("ATG") markets internal web site management and "e-commerce" software to large corporations. ATG offers a "suite" of Java applications, packaged with development and support services, for use on businesses' Internet servers. The company's two founders, Jeet Singh and Joseph Chung, are also named defendants in this case. At all times relevant to this dispute (essentially from January 25 to April 2, 2001), Singh was ATG's Chief Executive Officer and a member of its Board of Directors, and Chung served in multiple capacities as the company's Chief Technology Officer, Treasurer, and Chairman of its Board of Directors.





The reversal of the booming "dot-com" market, starting in late 1999, is well documented.  The bubble burst for Internet companies that had flourished in the stock market in recent years, and ATG was not excepted from the damage.  Over a six-month period ending in January 2001, ATG's stock value plummeted from its high of $126 per share to a mere $20.

The plaintiffs point to other signs that they claim put ATG and its officers on notice that the company's sales prospects were dim.  Sales to Internet companies, which accounted for 19% of ATG's licensing revenues in the preceding quarter, made up only 10% of ATG's sales in the final quarter of 2000.[1]  In addition, it was determined that the Company's new Dynamo 5.1 Suite product upgrade was not, as advertised, 100% compatible with the Java 2 Enterprise Edition ("J2EE") system.

The lead plaintiffs in this case, Willis Kurtz, Kalman Low, and Mike Low, all purchased ATG stock between January 25 and April 2, 2001.  Kurtz purchased 30,500 shares and claims to have lost more than $455,076.  Kalman Low bought 23,800 shares and suffered damages in excess of $142,700.  Mike Low acquired 16,700 shares of ATG stock and claims a loss of more than $173,278.

---

[1] The plaintiffs take this fact as an indicator that hard times were ahead for ATG.  Subsequent statements of Singh -- the very statements alleged by the plaintiffs as fraudulent -- suggest quite the opposite:  it was a point in ATG's favor that it was growing less dependent on selling products to failing Internet corporations.  Instead, ATG was targeting sales to non-Internet oriented companies hoping to establish an online presence.  See infra Section I.A (describing Singh's invocation of sales to Ford, Reuters, etc.); Section I.B ("'90 percent of our customer base are very large, established firms'").

The plaintiffs ground their claim of securities fraud on specific misstatements attributable either to ATG and/or Singh, as well as several remarks of Wall Street analysts, each of which, so they claim, exaggerated ATG's prospects in order to inflate its stock price -- and in turn fill the pockets of Singh and Chung, shareholders themselves.

A.    **Singh's January 25, 2001 Press Release and On24 Interview**

ATG reported its fourth quarter and year 2000 earnings in a January 25, 2001 press release.  The press release contained the following statements from CEO Singh:

> ATG capped an extraordinary and profitable calendar year 2000 with a record-breaking quarter that was strong across all metrics .
> . . .
>
> *    *    *
>
> The increase in new customer wins to a record number of 131 this quarter, including brands such as Ford Motor Company, Pfizer, and Reuters America, was complemented by excellent repeat business with our growing base of large enterprise customers such as Phillips International, Procter & Gamble, and Sun Microsystems.
>
> *    *    *
>
> We believe the combination of highly competitive product offerings, excellent market positioning, and broad customer base leaves us very well positioned for the coming year.  As a result, we are raising our revenue expectations for 2001.

The press release contained additional language inserted to insulate the company from securities fraud claims based on statements contained in the release.  This language expressly categorized ATG's projections as "forward-looking statements" and disclaimed that there are "known and unknown risks and uncertainties that may cause ATG's actual results . . . to be materially different from any future results . . . expressed or implied by such forward-looking statements."  The press release listed a number of unpredictable variables that could keep ATG's forecasts from coming to pass.  These included "the unpredictability caused by ATG's lengthy sales cycle; the new and rapidly evolving nature of the customer relationship management solutions market; [and] the possibility of errors or defects in ATG's software products."

On the same day, Singh gave a radio-broadcast interview on the On24 Network.  In the interview, Singh stated that ATG had strong growth over the past quarter, had seen a lot of repeat business from existing customers, that he was feeling good about the prospects for the sector in terms of demand, and that the commerce and customer management sector was very healthy.  "[I]n particular," Singh noted, "the rapid acceptance of our newest product offering, ATG Dynamo 5, in this market w[as] very encouraging."  Singh outlined revenue and personnel growth targets of 100% for the coming year:  "We plan to double head count this year.  As of today we are over 1000 people . . . we

-4-

expect to grow that by roughly 100%. Our targeted revenue growth is 100% as well." Singh also spoke of the "flexible" operating budget that would enable ATG to "cut back" if "things go worse."

ATG's stock prices rose 38% the next day.

### B. Singh's January 30, 2001 Statements on CNBC's "Squawk Box," in the Boston Globe, and on CNBC/Dow Jones Business Video

Later in the week, on January 30, 2001, Mr. Singh appeared on CNBC's "Squawk Box" program and made the following statements:

> 90 percent of our customer base are very large, established firms.
>
> \*    \*    \*
>
> It's pretty clear that the large companies are starting to realize that it's not only new business, it's cost savings, it's efficiency. They have a lot of money to spend. They have a lot to gain by doing this. So in terms of revenue numbers, clearly for us, you know, the sweet spot are firms that can buy not only our software once, but keep buying it, start deploying it across the world, not only build commerce applications, but start doing market exchanges and other things as well.

An article printed in the Boston Globe on that same day, headlined "Amid Net Wreckage, 2 Firms Show How to Climb," delivered Singh's recipe for maintaining growth despite the slowed economy:

> There are big dollars being spent by big global enterprise customers.
>
> \*    \*    \*

> It's a market very much dominated by big
> companies that don't only spend money once,
> but come back for more if things work out and
> they have a good experience.

CNBC/Dow Jones Business Video interviewed Mr. Singh on January 30. In that interview, Mr. Singh stated that only 10% of ATG's "numbers" came from dot-coms, whereas the remainder of its customer base was comprised of large and established firms.

### C. Subsequent Statements of Analysts

The plaintiffs allege that at a mid-February Goldman Sachs-sponsored conference, defendants gave still more reassurance to investors and remained upbeat about the quarter. A Dain Rauscher Wessels analyst indicated on February 23, 2001, that, based on all signs from the company, "ATG's pipeline of new and repeat business appears very healthy." A March 8 statement by Needham & Co. analyst Richard Davis crowned ATG as the "best bet in the e-customer relationship management sector."

### D. April 2, 2001, Loss Report

On April 2, 2001, ATG announced that it would post an earnings loss of over $.22 per share. The disclosure triggered massive sales of ATG stock, the value of which declined over the course of the day to as low as $5.40 per share before closing at $5.96. A record volume of more than 24 million shares was traded. That same day Forbes.com awarded ATG the dubious distinction of "Dog of the Day." In the Forbes report Singh gave his company's excuses:

> Toward the end of the first quarter, we saw
> large enterprise customers across many
> vertical industries delay technology
> purchases due to the current economic
> environment. As a result, multiple large
> deals that we had expected to finalize very
> late in the first quarter were not closed.

**E.    Singh and Chung's Stock Sales**

Between January 25 and April 2, 2001, both Singh and Chung made a number of sales of their ATG stock. Singh and Chung each shed 140,000 shares of stock in trades on thirteen days spanning the dates of January 30 and March 13. Their transaction records during this period were identical -- the proceeds of these sales were $4,386,075 per person, or over $30 per share.

In the prior year Singh and Chung sold off 300,000 shares apiece, half in the second quarter of 2000 and half in the third.

**F.    The Lawsuit**

Plaintiff Allen Joel Breiner filed a class action complaint against Art Technology on October 30, 2001. Additional cases made their way into this Court, including _Turner v. Art Technology Group, Inc._, 01-11815-NG; _Bolton v. Art Technology Group, Inc._, 01-11832-NG; _Murphy v. Art Technology Group, Inc._, 01-11869-NG; _Hershman v. Art Technology Group, Inc._, 01-12113-NG; _Khatib v. Art Technology Group, Inc._, 01-12114-NG; and _Ellis Enters. Ltd. v. Art Technology Group, Inc._, 01-12117-NG. On December 13, 2001, I issued an Order consolidating all these and any subsequent actions under the caption for Breiner's case, 01-

-7-

11731-NG.  That Order also named Kurtz and Kalman and Mike Low as lead plaintiffs.

The lead plaintiffs filed an amended class complaint on March 1, 2002.  The complaint claimed violations of Sections 10(b) and 20(a) of the Securities and Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), respectively, and the Securities and Exchange Commission's Rule 10b-5, 17 C.F.R. § 240.10b-5.  Shortly thereafter the defendants moved to dismiss the complaint in its entirety under Federal Rule of Civil Procedure 12(b)(6).

The class action complaint alleges that the statements made during the class period -- between the optimistic ATG press release of January 25 and the company's unfavorable first-quarter earnings report of April 2, 2001 -- were false or misleading because ATG and Singh knew that (1) their Dynamo product was not 100% J2EE compliant, (2) the economic downturn would depress their license revenue growth, and (3) partners with whom ATG had a close relationship had been negatively impacted by the dot-com slowdown.

II.  **LEGAL ANALYSIS**

A court confronted with a Rule 12(b)(6) motion to dismiss a claim is to accept the body of well-pleaded facts in the complaint as true and to draw all reasonable inferences therefrom in favor of the plaintiff.  <u>Rosenberg v. City of Everett</u>, 328

-8-

F.3d 12, 15 (1st Cir. 2003) (citing <u>Cooperman v. Individual Inc.</u>, 171 F.3d 43, 46 (1st Cir. 1999)).  The motion is to be granted if no supportable construction of the pleaded facts sets forth a legally cognizable claim for the plaintiff.  <u>Id.</u>

Although the pleading requirements under the Federal Rules are generally not so stringent, <u>see</u> Fed. R. Civ. P. 8(a) (requiring only a "short and plain statement of a claim showing that the pleader is entitled to relief"), a plaintiff who pleads fraud must plead with greater specificity than is otherwise necessary, <u>see</u> Fed. R. Civ. P. 9(b) ("In all averments of fraud . . ., the circumstances constituting fraud . . . shall be stated with particularity.").

A.   <u>Section 10(b)/Rule 10b-5</u>

Congress, in the Private Securities Litigation Act ("PSLRA"), 15 U.S.C. § 78u-4, burdened the <u>securities</u> fraud pleader with still greater responsibility.  From the start the law has required claims brought under Section 10(b) of the Securities and Exchange Act or Rule 10b-5, to plead the three elements of securities fraud -- (1) that a defendant made a false or misleading statement, (2) that he or she did so with a certain amount of fraudulent intent known as "<u>scienter</u>," and (3) that the plaintiff or the market relied on the statement to the plaintiff's detriment.  <u>Geffon v. Micrion Corp.</u>, 249 F.3d 29, 34 (1st Cir. 2001) (setting forth the elements of a Rule 10b-5

claim); see also Securities & Exchange Comm'n v. Zandford, 535
U.S. 813, 816 n.1 (2002) (reciting that the scope of Rule 10b-5
is "coextensive" with that of Section 10(a) of the statute).

The PSLRA, enacted in 1995, requires more: a plaintiff must
"specify each allegedly misleading statement or omission
including its time, place and content." Aldridge v. A.T. Cross
Corp., 284 F.3d 72, 78 (1st Cir. 2002) (quoting Greebel v. FTP
Software, Inc., 194 F.3d 185, 193 (1st Cir. 1999)) (internal
quotation marks omitted). It is also incumbent on the plaintiff
to allege facts that establish why the impugned statement or
omission was misleading. Id. To the extent that a pleading
makes allegations "on information and belief," it must provide
the source of the information and reasons supporting the
plaintiff's belief. Id. (citing Romani v. Shearson Lehman
Hutton, 929 F.2d 875, 878 (1st Cir. 1991)). And finally, the
plaintiff must, at the stage of pleading, proffer allegations
sufficient to establish that an inference of scienter is "both
reasonable and strong." Id. (citing Greebel, 194 F.3d at 195-
96).

        1.    The Statements

A plaintiff may not base a claim of securities fraud solely
on the overly sanguine remarks of corporate officers. A
"corporate puffery rule" has emerged in the case law to protect
expressions of "loose optimism about both a company's current

state of affairs and its future prospects." <u>Fitzer v. Security</u>
<u>Dynamics Techs., Inc.</u>, 119 F. Supp. 2d 12, 23 (D. Mass. 2000);
<u>see also In re Boston Tech., Inc. Securities Litig.</u>, 8 F. Supp.
2d 43, 54 (D. Mass. 1998). The principle underlying the
corporate puffery rule is that the statement at issue must prove
to be "material" to a reasonable purchaser's decisionmaking, and
the courts recognize that a reasonable purchaser is not overly
susceptible to "optimistic predictions of future potential," <u>Suna</u>
<u>v. Bailey Corp.</u>, 107 F.3d 64, 72 (1st Cir. 1997), or "rosy
affirmation," <u>Shaw v. Digital Equipment Corp.</u>, 82 F.3d 1194, 1217
(1st Cir. 1996) (classifying as immaterial "statements that are
so vague, so lacking in specificity, or so clearly constituting
the opinions of the speaker, that no reasonable investor could
find them important to the total mix of information available").

> a.   <u>The January 25 Statements</u>

The statements that the plaintiffs identify as misleading in
the January 25 press release and in Singh's radio interview on
that day are -- <u>except for Singh's particular statement about</u>
<u>ATG's successful product lines</u> -- not actionable.

The press release described ATG's successful year 2000 and
record-breaking fourth quarter, then announced the company's view
that it was "well positioned for the coming year" and that it
expected still greater revenue in 2001. Singh's follow-up radio
interview developed these themes further, citing record-setting

sales at the end of 2000 and recent purchasing trends in the
industry to support his view that 2001 would bring continued
successes to ATG.

The plaintiffs have no quarrel with ATG's fact statements
about its year 2000 returns.  Likewise, they do not -- because
they cannot, under the law -- challenge its characterization of
those facts, e.g., that repeat business was "excellent" or that
ATG's fourth-quarter showing was "strong across all metrics."
See Number Nine Visual Tech. Corp. Securities Litig., 51 F. Supp.
2d 1, 20-21 (D. Mass. 1999).

The plaintiffs instead locate the fraud in ATG and Singh's
leveraging of these facts to forecast continued growth for the
company, notwithstanding the dot-com downturn and the software
compatibility problems that ATG's products were having with Java.
In response, the defendants cite a sheaf of cases that support a
view of ATG and Singh's conclusions -- that ATG was "well
positioned" and that the coming year would bring continued growth
-- as nonactionable puffery.  See, e.g., In re Sun Healthcare
Group, Inc. Securities Litig., 181 F. Supp. 2d 1283, 1291 (D.N.M.
2002) (finding a company's assertion that it was "well-positioned
to thrive" not actionable); In re S1 Corp. Securities Litig., 173
F. Supp. 2d 1334, 1349 n.11, 1356 (N.D. Ga. 2001) (finding no
fraud in a company's statement that it was "extremely well-
positioned to lead the Internet-based financial services industry
into the century").

It is clear to me that the bulk of ATG and Singh's prospective statements are invested with an optimism sufficiently vague to bring them within the scope of the corporate puffery rule. Courts are to be wary of the false substance that hindsight can bring to a claim of securities fraud. <u>Gross v. Summa Four, Inc.</u>, 93 F.3d 987, 991 (1st Cir. 1996) (describing the First Circuit's repeated holding that one cannot plead "fraud by hindsight"); <u>Serabian v. Amoskeag Bank Shares, Inc.</u>, 24 F.3d 357, 367 (1st Cir. 1994) (finding the plaintiffs' proposal that the court infer a defendant's earlier knowledge and concealment of material information from a subsequently reported net loss to be an "impermissible effort to establish fraud through hindsight").

For this reason, a claim of securities fraud cannot center on a vague projection that never materialized unless the defendant guaranteed specific gains. <u>See</u> <u>Suna</u>, 107 F.3d at 69-70; <u>In re Galileo Corp. Shareholders Litig.</u>, 127 F. Supp. 2d 251, 267 (D. Mass. 2001). ATG and Singh's January 25 forecasts were not specific promises. Even Singh's statements to On24 that ATG expected to double its manpower and revenues in the year 2001 do not amount to actionable guarantees. ATG's failure to live up to these reported expectations does not establish them as misleading statements.

It does not change matters that ATG made its optimistic projections against the backdrop of the downturn for dot-com

companies and the alleged incompatibility of its new software suite with a recent Java upgrade.  Vague projections of future success and "corporate puffery" are not actionable because a reasonable person cannot be expected to rely on them.  Indeed, this was especially the case in January 2000.  Moreover, some of the material that the plaintiffs believe ATG should have disclosed -- the downward trend in the market for dot-com stocks, notably -- was a matter of public knowledge.  ATG clearly had no legal duty to qualify its media communications with cautionary statements about the dot-com market.

Moreover, the press release gave disclaimers expressly stating that ATG guaranteed no results.  The defendants argue that under the PSLRA's "safe harbor" provision, 15 U.S.C. § 78u-5(c),[2] and the "bespeaks caution" doctrine developed by the courts, see, e.g., Boston Tech., 8 F. Supp. 2d at 60-61 (finding a defendant's disclaimers sufficient to protect it from 10b-5

---

[2] In pertinent part, 15 U.S.C. § 78u-5(c) provides:

> [A] person . . . shall not be liable with respect to
> any forward-looking statement, whether written or
> oral, if and to the extent that the forward-looking
> statement is identified as a forward-looking
> statement, and is accompanied by meaningful cautionary
> statements identifying important factors that could
> cause actual results to differ materially from those
> in the forward-looking statement.

15 U.S.C. § 78u-5(c)(1)(A)(i).

liability), this language immunizes ATG from liability based on statements in the press release.[3]

The plaintiffs counter that these cautions have no immunizing effect because they were delivered in meaningless boilerplate form and, further, that the defendants made statements with actual knowledge that they were not true. <u>See</u> <u>In</u> <u>re MobileMedia Securities Litig.</u>, 28 F. Supp. 2d 901, 928 (D.N.J. 1998) ("[V]ague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation.").

Taking my cue from <u>Boston Technology</u>, I find the disclaimer in ATG's press release more than sufficient to trigger the PSLRA's safe harbor and "bespeaks caution" doctrine.  The plaintiffs in <u>Boston Technology</u> alleged that the defendants' statement of continued growth expectations was misleading because they knew or should have known that sales were slowing and that there were "technological problems" with the company's new

---

[3]  Moreover, citing <u>Grossman v. Novell, Inc.</u>, 120 F.3d 1112 (10th Cir. 1997), they contend that this immunity extends further to the substance of Singh's radio interview by association.  <u>See</u> <u>id.</u> at 1122 (holding that cautionary statements need not accompany every disclosure a corporation makes on a given subject, provided that they appear in the "total mix of information" available) (citing <u>Fecht v. Price Co.</u>, 70 F.3d 1078, 1081-82 (9th Cir. 1995)).  And whether or not <u>Grossman</u>'s "total mix of information" principle governs this case, Singh's interview admitted the possibility of setbacks to the business, describing ATG's preparedness for cutbacks "if things go worse."

Because I find the January 25 forward-looking statements to be nonactionable as corporate puffery – the PSLRA's safe harbor and the "bespeaks caution" doctrine provide a second basis for dismissing claims based on these statements -- I need not decide whether this kind of immunity extends beyond the contents of the press release to Singh's interview statements on January 25.

product offerings.  <u>Boston Tech.</u>, 8 F. Supp. 2d at 60.   Those

allegations are remarkably similar to those leveled by the

plaintiffs in this case.  And the cautionary statements in <u>Boston</u>

<u>Technology</u>, like ATG's in this case, described the particular

market vulnerabilities that a company of its profile faced,[4] and

this Court found them sufficient to immunize the company's

statements about its projected growth.   <u>Id.</u> at 61.  The ATG press

release likewise set forth the several variables -- including

ATG's lengthy sales cycle and the possibility of errors in its

software products -- that made its revenue expectations less than

_____

[4] The cautionary statements in <u>Boston Technology</u> read as follows:

> The Company's future operating results may vary
> from period to period.  The Company has operated
> historically with minimal backlog; as a result,
> revenues in any quarter are dependent on orders
> booked, built, and shipped in that quarter.  In
> addition, the Company has experienced a pattern of
> recording the majority of its quarterly revenues in
> the third month of the quarter.  Moreover, the Company
> has relatively few customers and a high average system
> revenue per transaction.  Meanwhile, the Company's
> operating expenses are incurred ratably throughout
> each quarter and are relatively fixed in the short
> term.  As a result, if projected revenues are not
> realized in the expected period, the Company's
> operating results for that period could be adversely
> affected.

> The Company's revenue stream depends on its
> ability to enhance its existing software products and
> to introduce new products on a timely and
> cost-effective basis.  If the Company were to delay
> the introduction of new products, the Company's
> operating results could be adversely affected.

> Certain components of the Company's products are
> currently available from a single source and any
> interruption in the supply of such components could
> adversely affect the Company's operating results.

<u>Boston Technology</u>, 8 F. Supp. 2d at 60-61.

certain.  The statements contained with the release therefore
have the further protection of the "bespeaks caution" doctrine
and the PSLRA's safe harbor provision.

A single actionable statement, however, remains:  Singh's
reference in the radio interview to "the rapid acceptance of our
newest product offering, ATG Dynamo 5."  The complaint alleges
that "The Company's latest edition of their flagship product,
Dynamo 5.1, which had been first shipped to ATG's customers in
third quarter 2000, was not 100% J2EE compatible as advertised."
Though Singh spoke of "Dynamo 5," and the complaint described the
faults of "Dynamo 5.1," it is not entirely clear that Singh was
talking about a different product.  It may well be that Singh
referred to an earlier release, the success of which was
reflected in ATG's 2000 earnings.  But Singh described Dynamo 5
as the company's "newest product" on January 25; the complaint
alleges that the troubled Dynamo 5.1 upgrade hit the market at
the end of 2000.  Until some greater clarity emerges to
distinguish Dynamo 5, described by Singh as well-received, from
the product that the complaint identifies as flawed and rejected
by ATG's customer base, I am reluctant to rule out Singh's
statement as not actionable.

b.    Statements to CNBC and the Boston Globe

The next class of impugned statements -- which includes
Singh's remarks to the Boston Globe and in two separate

interviews with CNBC on January 30 -- is more innocuous than the January 25 statements.  Singh's comments here described the underlying dynamics of his business and ATG's strategies for getting ahead.  He touted the quality of ATG's customer base, but nowhere did Singh falsely represent facts or make specific promises of future performance.

Specifically, on CNBC's "Squawk Box" Singh observed that sales to faltering Internet companies were becoming an ever smaller component of ATG's business (a fact that the plaintiffs do not dispute), and that the key to success in this market is to target established firms who have money to spend and are looking to build an Internet presence.  "90 percent of our customer base," Singh explained, "are very large, established firms." Significantly, the plaintiffs do not contest that statement's veracity.  And although the "Squawk Box" comments described ATG's strategy for continued growth, Singh made no guarantees of success.  In fact, far from guaranteeing anything, Singh did not offer even the vaguest suggestion of ATG's 2001 outlook, as the forward-looking statements of January 25 did.  He only spoke of strategy:  "So in terms of revenue numbers, clearly for us, you know, the sweet spot are firms that can buy not only our software once but keep buying it, start deploying it across the world."

Singh's Boston Globe comments continue in this vein.  The article described ATG's gains in the fourth quarter of 2000 -- all true -- and consulted Singh on the secret to success in an

economy that "already has slammed on the brakes." Singh replied, "It's a market very much dominated by big companies that don't only spend money once, but come back for more if things work out and they have a good experience." Plaintiffs allege that in making this statement, Singh conveyed the false impression that ATG was immune to the slowdown that had been affecting other information technology companies.

Certainly Singh's statement, although it did not speak specifically to ATG, implied that his company was targeting big-spending repeat buyers for its customer base. Nothing about the statement was false or misleading, however, because the statement, while prospective about the company's strategy, offered no prospective assertions about its success. Singh's comments explained ATG's success in the prior quarter but promised no future successes. Nothing in the Boston Globe article supports a charge of securities fraud.

The plaintiffs look also to Singh's remarks to CNBC/Dow Jones Business Video on January 30, 2001. In this interview Singh again sought to downplay ATG's association with the flagging dot-com sector. He observed that dot-coms were accounting for only "about 10%" of ATG's revenues: "That number has been declining sequentially each quarter. Now we believe our exposure to that sector is pretty much at its bottom." The plaintiffs do not dispute the truth of this information. Nor do they dispute the truth of what followed: "We don't take much

-19-

risk with those companies.  But we . . . take most of cash up
front from those firms.  So 90% of our customer base are very
large, established firms."

The complaint's problem with these statements is that "Mr.
Singh specifically assured the market that the Company was not
materially exposed to economically fragile 'dot-com' companies."
Everything Mr. Singh said about his business -- ATG's statistics,
its strategies, its plan to reduce its risk exposure to the dot-
com downturn -- was true.  Though it might be possible to
conclude from this that the value of ATG's stock would continue
to rise, Mr. Singh's statements simply do not qualify as the type
of statement, a specific, <u>material</u> guarantee, that is actionable
under the law.

### c.    Secondhand Statements of Analysts

Finally, plaintiffs point to the remarks of analysts Dain
Rauscher Wessel and Needham & Co. that "ATG's pipeline of new and
repeat business appears very healthy," and that ATG was the "best
bet in the e-customer relationship management sector,"
respectively.  At best, these analyses, proven by hindsight to be
incorrect, might have served as evidence of the success of
Singh's assurances of the company's health.  Standing alone -- as
they must do now, given the Court's findings to this point --
they cannot support a claim of security fraud.

The law does not wholly foreclose a securities fraud claim arising from the statements of outside analysts.  To make out such a claim, a plaintiff must establish three conditions:  that the defendant (1) "entangled" himself in the analyst's articulation of the statement in question, (2) had knowledge that the statement was false or baseless, and (3) failed to disclose this latter fact to investors.  In re Peritus Software Servs., Inc. Securities Litig., 52 F. Supp. 2d 211, 230 (D. Mass. 1999); Boston Tech., 8 F. Supp. 2d at 55.  It is insufficient to show that the statement was traceable to the defendant -- the defendant must somehow have embraced the analyst's rendering. Boston Tech., 8 F. Supp. 2d at 70 ("An outside analyst's mere repetition of an issuer's statements -- absent allegations of positive steps by the issuer to foster the repetition or ratify it -- does not, as a matter of law, constitute entanglement.").

And, of course, under Rule 9(b) and the PSLRA, a plaintiff must plead with particularity the underlying facts supporting an entanglement claim.  The plaintiffs did not do that here. Nowhere in the complaint do the plaintiffs allege how the analysts reached their conclusions about ATG's prospects, and they certainly do not suggest the particulars of an active effort by ATG, Singh, or Chung to shape or encourage the favorable

analysis, or to mislead or delude the analysts.[5]  Without anything

in the complaint to tie the analysts' statements definitively to

wrongful conduct of the defendants, the Dain Rauscher Wessel and

Needham & Co. statements are simply not actionable.[6]

>    **2.    Do the Pleaded Facts Support a Strong Inference of
>            Scienter?**

The defendants also object that the plaintiffs did not plead

facts sufficient to support a strong inference of <u>scienter</u>, or

fraudulent intent.  <u>Greebel</u>, 194 F.3d at 195-96.  And indeed, a

complaint that alleges solely that the defendants "must have

known" a statement was false does not clear the Rule 12(b)(6)

hurdle.  <u>Maldonado v. Dominguez</u>, 137 F.3d 1, 9-10 (1st Cir.

1998).  The purpose of the heightened pleading standard is "to

minimize the chance that a plaintiff with a largely groundless

claim will bring a suit and conduct extensive discovery in the

hopes of obtaining an increased settlement, rather than in the

hopes that the process will reveal relevant evidence."  <u>Id.</u> at 9

---

[5] The plaintiffs' reference to the defendants' reassurance of investors at a mid-February Goldman Sachs conference suffers from the same defect.  The complaint does not allege what was said.

[6] Absent an understanding of precisely what information the analysts considered, and how it affected their analysis, the mere fact that the analysts were wrong is not very telling.  It might be that the analysts' projections were incorrect because the defendants misled them with fraudulent statements (that is, there was fraud, of which the delusion of the analysts is secondary evidence).  It might as easily be the case that the last-minute lapses in sales that doomed ATG for the quarter caught the defendants and analysts alike by surprise (that is, there was no fraud, and the failures of analysts to project a first-quarter loss buttresses an inference that ATG's expressed optimism was sincere).

(quoting <u>Shaw</u>, 82 F.3d at 1223) (internal quotation marks omitted).

One commentator observes:

> [I]t is almost impossible to prove a
> defendant's state of mind, here <u>scienter</u>.
> There is always some uncertainty, and in the
> context of a motion to dismiss, considerable
> uncertainty, about what the defendant knew or
> did not know at the time of the alleged
> misstatement or omission.  The result . . .
> is legal error.  This error comes in the form
> of false positive findings, those where the
> defendant did not commit the fraud, but the
> court finds that the defendant did; and false
> negatives, those where the defendant did in
> fact commit fraud, but the court finds that
> none occurred.
>
> The pleading standard imposed by the
> PSLRA is aimed at the false positive errors,
> commonly referred to as strike suits. . . .
> Unfortunately, the number of false negatives
> is likely to increase.

Hillary A. Sale, <u>Judging Heuristics</u>, 35 U.C. Davis L. Rev. 903, 908 (2002).

Sale explains that courts have crafted a number of "heuristics" of securities fraud pleading, shortcut triggers that route cases to the inevitable dismissal to which the pleading standard condemns them.  <u>Id.</u> at 913 ("A match between an allegation and a dismissal heuristic allows the court to eliminate the allegation, and, eventually, to dismiss the entire complaint.  The process has a game-like dimension where each allegation fits into a dismissal box with its own code.").  The defendants cite at least one of these "heuristics" (and a

-23-

controversial one), arguing that to plead a defendant's "motive
and opportunity" to make a false or misleading statement is not
enough to create a strong inference of scienter.  See Greebel,
194 F.3d at 197 (citing Maldonado v. Dominquez, 137 F.3d 1, 10
n.6 (1st Cir. 1998) (refusing to adopt Second Circuit doctrine
that allows claims to proceed on a mere showing of "motive and
opportunity").  Another heuristic, of more recent vintage,
discounts the scienter value of insiders' stock trades when "the
timing of the trades is not sufficiently suspicious."  Sale,
supra, at 925-26.  The defendants take this position as well.
See Peritus, 52 F. Supp. 2d at 224 (finding that the defendants'
sales of stock during the "Class Period" were not so dramatically
out of line with prior trading patterns as to permit an inference
of scienter).

   Deployment of such "heuristics" in this particular case is
unnecessary and contrary to the spirit of the PSLRA.  A strong
inference of scienter inheres in the one remaining actionable
misstatement alleged in this case -- Singh's January 25, 2000
remark that ATG's Dynamo product line had been well-received,
even as customers were rejecting upgrades due to compatibility
failures in the software.  Given the well-pleaded facts that the
Dynamo line was ATG's flagship product and that Dynamo sales were
suffering as a result of flaws in the software, it is no stretch
at all to infer that ATG - and Singh, for that matter -- knew
about those flaws at the time of the January 25 radio interview.

Scienter in this case clearly rests on more than a bald assertion that the defendants knew their product was flawed.  More to the point, a suit based on this alleged misstatement is not the sort of false positive "strike suit" that the PSLRA means to weed out at the Rule 12(b)(6) stage.


III. CONCLUSION

For the reasons set forth above, the defendants' motion to dismiss [document #14] is **GRANTED IN PART AND DENIED IN PART**. The Court rules that all of the statements identified as misleading are nonactionable _except_ for Singh's reference, in the January 25, 2001, radio broadcast, to the "the rapid acceptance of our newest product offering, ATG Dynamo 5."


SO ORDERED.

Dated: September 4, 2003

NANCY GERTNER, U.S.D.J.

EXHIBIT 10

**BCGI**
**First Quarter Earnings Release Conference Call**
**Leader, Ely Snowden**
**ID #9584673**
**04/16/03**

**Date of Transcription:   April 19, 2003**

**BCGI**
**ID #9584673**                                                                    **Page 2**

Operator:    Good afternoon.  My name is Amanda and I will be your
conference facilitator.  At this time I would like to welcome
everyone to BCGI First Quarter Earnings Release Conference Call.
 All lines have been placed on mute to prevent any background
noise.

After the speakers' remarks, there will be a question and answer
period.  If you would like to ask a question during this time, simply
press star, then the number one on your telephone keypad.  If you
would like to withdraw your question, press star, then the number
two.  Thank you.  Ms. Nicholas, you may begin your conference.

Ms. Nicholas:    Good afternoon.  By now you should have had a chance to view
today's press release.  If anyone still needs a copy, please call us at
212-445-8453 and request a fax or e-mail.  Alternatively, you can
view and download the release at the Boston Communications
Group corporate website at www.bcgi.net.  On the line with us
today are Ely Snowden, President and CEO, and Karen Walker,
Chief Financial Officer of Boston Communications Group.

Please note that management is happy to speak privately with
investors and analysts regarding overall strategy, industry trends
and historical issues.  However, more specific questions regarding
updates on financial guidance or other material information will
only be discussed on widely disseminated press releases or via
open conference calls such as the one being held today.

I would also like to caution everyone that various remarks that the
company may make about the company's future expectations,
plans and prospects constitute forward-looking statements for
purposes of the Safe Harbor provisions under the Private Securities
Litigation Reform Act of 1995.  Actual results may differ
materially from those indicated by these forward-looking
statements as a result of various important factors including those
discussed in Form 10-K for the year ended December 31, 2002,
which is on file with the SEC.  In addition, any forward-looking
statements represent our views only as of today, April 16, 2003,
and should not be relied upon as representing our views as of any
subsequent date.  While we may elect to update forward-looking
statements at some point in the future, we specifically disclaim any
obligation to do so even if our estimates change, and therefore you
should not rely on these forward-looking statements as

**BCGI**
**ID #9584673**                                                                                    **Page 3**

representing our views as of any subsequent dates. Now without further delay, I would like to turn the call over to Ely Snowden. Please go ahead, Ely.

Mr. Snowden:                    Thank you, Allison. And again, welcome to Boston Communications Group First Quarter 2003 Conference Call. We're happy to be talking with you today about yet another record-breaking quarter with outstanding financial results, success in strategic goals, and unprecedented momentum. A quarter ago amongst all the good financial news we had to talk about on our last conference call, the one element that I chose to single out was the top line. If you recall, our fourth quarter 2002 year over year revenue growth of almost 50% for the enterprise as a whole, and more than 60% in our billing and transaction processing services business, stood out in the slower growing wireless industry as testimony to the strong position that our customers' products targeting teams(?), budget conscious and credit challenge had captured in their overall product portfolios. This quarter I am even happier to note that the top line is accelerating with year over year revenue growth of 53% for the enterprise, and 74% in our billing and transaction processing services business. And why not? We're helping the best carriers in America by giving them the tools to unlock the potential of the highest growth opportunities left in wireless, and to profitably serve them with lower operating costs. It is this complete package of BCGI's capabilities that is helping our carrier customers to achieve the best of quantity and quality. And each of quantity and quality are evident in two of the important record-breaking metrics for our prepaid business this quarter. Quarter end subscribers of 3.35 million, a 69% increase over a year ago, March 31, 2002, and average usage per subscriber of 106 minutes per month, up another 22% from the first quarter of 2002.

A particularly pleasant surprise this quarter was the sustained growth we experienced as growth additions across most all of our carrier customer programs continued with nice momentum well beyond the typical end of holiday promotion. This could be attributed to the concept we've discussed before. That the prepaid product category has become a much more central part of our carriers' product portfolios. A very good example of this is a brand new promotion going on right now where Cingular Wireless and McDonald's are promoting KIC, Keep in Contact, Cingular's

BCGI
ID #9584673

**Page 4**

prepaid products, as part of a nationwide McDonald's promotional game. As many as 40 million people will be exposed to KIC's brand imagery appearing on cups, bags and french fries sleeves during McDonald's month long Winning Time promotion, with a chance to win one of hundreds of Motorola 331 phones with $100 worth of Cingular KIC airtime. Even just this program's employee incentives of free KIC airtime to nearly 700,000 McDonald's crew around the country has to rank as one of the largest wireless promotions ever.

It's important to note that we are taking advantage of our commercial success and relative strengths to make prudent investments that further our competitive advantage. The telecom and data hosting center we bought as part of a building purchase announced last month, as well as the newest network elements we've been purchasing and installing in our platform this year, are bringing BCGI's network and operations to a level where they are inarguably world class, of a standard equal to or above that which our most demand customers might deploy for themselves.

Along with these hard assets, we are having great success recruiting top caliber talent across our organization. And it doesn't hurt that we're enjoying such relative strength at a time when the general weakness of the industry and of the economy generally avails us of better than ever personnel and values for these investments.

So it may be obvious from the commercial success that our carriers are having with their prepaid products, as well as from the strengthening of our technological and overall competitive position during the past year that I think it deserves mention outright. That BCGI is enjoying strong relationships with our carrier customers. We've announced new multi-year contracts with nearly all of our carrier customers over the last nine month, including Cingular Wireless nationwide [UNINTELLIGIBLE] contract just last July. And the one exception to this is Verizon Wireless, whom we noted in our recent 10-K filing, has a contract with us that is up for renewal during the course of this year. And recently, Verizon Wireless has begun a customarily contract renewal process with us that we expect to result in the renewal of our prepaid services agreement with them.

BCGI
ID #9584673

Page 5

Finally, in the midst of all the success we're enjoying in our core
real time subscriber management business, we continue to invest
and to execute on our strategic plan in building strong positions in
the growth opportunities we've identified and launched over the
last nine month in BCGI payment services and BCGI billing. It
will be because of our ability to successfully sow the seeds of these
newest growth initiatives while directing the explosive growth of
our core business, all managed with BCGI's hallmark fiscal
discipline that we hope to report such success as we are today for
years to come.

Now I would like to hand the call over to Karen Walker, our Chief
Financial Officer, to discuss our financial performance and
guidance.

Ms. Walker:

Thank you, Ey. First of all, let me say that with several months
under our belt, 2003 is proving to be another excellent year
following what was a record 2002. For the first quarter of this year
we generated record revenues of 23.1 million dollars,
approximately 50% higher than the first quarter of '02. Our first
quarter GAAP net income was 18 cents per share, which includes
three cents per share in legal charges primarily related to Freedom
Wireless. This net income exceeded our GAAP guidance of 10 to
12 cents, and was also more than 60% ahead of our fourth quarter
'02 GAAP earnings of 11 cents per share.

Once again, the key drivers to our growth come from our billing
and transaction processing services, or BTPS business. This
business is comprised of our prepaid wireless, wager, billing and
customer care, and payment services products. Total BTPS
revenues were 21.1 million dollars for the quarter, a 74% increase
over Q1 '02, and an 18% sequential increase. As Ely said, most of
the growth for this business was generated by our prepaid wireless
services as 455,000 net subscribers were added to the platform,
bringing the total number of subscribers to 3.35 million as of
March 31st. Our net add number was higher than we estimated as
we did not experience the typical post-holiday declines in gross
additions. Rather, gross additions across most all of our customer
carrier programs, whether they were legacy programs or new
programs, continued with nice momentum throughout most of the
quarter. Average billed minutes of use increased slightly to 106
per month, per subscriber, a 22% year over year increase, and a 1%

BCGI
ID #9584673                                                                    **Page 6**

sequential increase.

Churn for the quarter was about 8% per month, reflecting a
decrease from the 9.2% we reported in Q4. Our average billed rate
per minute declined 5% sequentially, and was slightly lower than
expected since the volume of minutes we billed was greater than
expected. Thus, carriers were able to avail themselves of more
discounts from the increase in billed minutes. The economics of
our predominantly fixed cost infrastructure in our prepaid model
continued to prove its strength as BTPS gross margins increased to
76% compared to 73% in Q4 '02 and 68% in Q1 '02.

Prepaid systems revenues were about a million dollars as there
were fewer large system sales during the quarter. Slower revenues
resulted in gross margins of 46% for the quarter. Our roaming
services revenues decreased 22% sequentially, reflecting continued
decline of this business. Gross margin declined slightly as a result
of the revenue decline. We continue our efforts to further reduce
the costs to operate this business. And as we have stated in the
past, roaming services requires minimal overhead to operate, and it
has helped our sales efforts when targeting tier two and tier three
carriers. That said, we continue to monitor this business to insure
it delivers the appropriate level of value to the company.

Note that the first quarter of 2003 represents the first full quarter of
revenues and operating expenses associated with our acquisition of
Infotech [PHONETIC] and our Voyager billing and customer care
products. I would like to point out that we are very pleased with
the progress of our integration and success to date.

Our engineering, research and development expenses increased
over the previous quarter as additional headcount are being added
to support our continued focus on developing competitive features,
functionality and products, while also managing our growth.

Our attendance at the CTIA Trade Show resulted in the typical first
quarter increase in sales and marketing expenses. This show
continues to be our flagship show, and the level of interest in our
products is very compelling.

As expected, depreciation decreased compared to the previous
quarter principally as a result of some of our assets being fully

BCGI
ID #9584673                                                          **Page 7**

depreciated during the quarter. Capital expenditures totaled 14.6 million dollars for the quarter, which includes about 9.0 million dollars for the purchase of our building.

Our balance sheet continues to remain strong with cash and short-term investments of about 49 million dollars as of March 31st, and our DSO was within target at 73 days compared to 69 days at December 31st.

I'd now like to spend some time talking in more detail about our outlook for the remainder of 2003. As noted in the release, we are increasing our GAAP earnings guidance to 78 to 80 cents per share, which includes after-tax quarterly legal charges of approximately three cents per share until the Freedom Wireless matter is resolved. This compares to our previous GAAP guidance of 52 to 58 cents, and is more than 4X '02 GAAP earnings. I should note that we remain confident that we do not infringe on the Freedom Wireless patents, and that the patents are invalid in light of prior art. During this year, the court has been conducting procedures which are standard for patent cases, and the completion of these procedures dictate the timing of our summary judgment motions and other procedures regarding the case. As we have stated in the past, we expected to file summary judgment motions sometime during this quarter and hear the results of those motions at a later date. Although this may still happen, there are no firm dates or schedules as to when motions can be filed and then decided upon. Thus, although we believe that our case continues to progress well, and that there's been no change to our position in the case, there are no developments to report at this time.

For the second quarter of '03 we expect GAAP earnings to range between 19 to 20 cents per share, including legal charges of three cents per share. This guidance reflects continued growth in BTPS, although at lower levels as we enter the seasonally slow second and third quarters. Our guidance continues to reflect our investment in payment services, which we expect to be one to two cents per share, per quarter for the near term. In addition, it reflects additional operating costs to own and move our data center into the new building. As we highlighted in our March 14th press release announcing the purchase of our Bedford building, the long-term economics of this facility are extremely attractive, and its premier, high-end telecommunications, electrical and mechanical equipment

**BCGI**
**ID #9584673**

should support BCGI's expected future growth and carrier class infrastructure. Our revised guidance reflects expected year over year growth in BTPS revenues of approximately 50%, an increase from the 40% we had stated in last quarter's call. This is based on our expectations that our carrier customers will continue to execute well in their prepaid programs, while also considering the upcoming slower seasonal quarters in Q2 and Q3, where churn from the holiday season typically occurs and the carriers have fewer promotions. Our guidance for '03 reflects net prepaid subscriber additions to range between 1.1 and 1.3 million subscribers. Accordingly, we expect to add approximately 150 to 250,000 net additions in Q2. Our guidance for average only use per subscriber, per month remains unchanged with the expectation that the average should grow approximately 12 to 15% year over year. However, if subscriber additions and therefore total billed minutes is higher than originally expected, we anticipate a greater decrease in our average rate per minute and expect that it will decline at about 18 to 20% year over year.

As we have proven, our pricing discounts have enabled us to be price competitive while still maintaining very attractive gross margins. Because of our investment in payment services and our new building, as well as price decreases we expect from higher volume use, we anticipate that our gross margins will be at about Q1 levels throughout the remainder of the year.

Although our pipeline continues to be very strong, our guidance does not assume any significant new business. It does, however, assume that most of our carrier customers will continue to grow their prepaid programs at levels we have seen and expect to see based on our experience and the carriers' plans. We anticipate that our '03 ER&D investment will remain consistent at about 12 to 13% of revenues for the remainder of the year. We also expect that sales and marketing will remain at or slightly below Q1 levels as a percentage of revenue for the remaining quarters of '03, but our G&A expenses should decrease to about 7% of revenue.

As noted in our March 14th release, we increased our cap ex guidance for '03 to approximately 32 million dollars. This increase is principally due to the acquisition and build-out of our new building. Additionally, we expect depreciation and amortization expense to increase approximately 11 to 12% year

**BCGI**
**ID #9584673**                                                                    **Page 9**

over year. We expect that our free cash flow will be at about breakeven in Q2 and generate approximately 2.0 million in both the third and fourth quarters.

BCGI achieved a number of milestones in 2002 which were instrumental in enabling us to begin 2003 with such positive performance. We continue to be very focused on our long-term objectives. This includes offering compelling product propositions, managing our growth effectively, and executing smartly and strategically. We are fortunate to be a leader in a service that is in its infancy, and is one of the only growth opportunities in telecommunications, and specifically wireless. This has only enhanced our ability to execute smartly and strategically, whether it is our purchase of a new facility at a fraction of its original investment or ability to attract and retain top talent through our organization. We don't take our leadership for granted and we work hard for it every day. And we continue to be very excited about the opportunities that are ahead of us that should continue to provide long-term shareholder value.

I would now like to ask the Operator to open the call to questions.

Operator:            At this time I would like to remind everyone, if you would like to ask a question, please press star one on your telephone keypad. We'll pause for just a moment to compile the Q&A roster. Your first question comes Carlos Cannell with Cannell Capital.

Mr. Cannell:         Hi. A couple of questions for you, Karen.

Ms. Walker:          Sure.

Mr. Cannell:         What has the company spent year to date defending itself on the Freedom Wireless litigation?

Ms. Walker:          That's the three cents a share which is just over about 900,000 dollars.

Mr. Cannell:         Okay. I don't have the entire release. And what has the company spent since the litigation commenced?

Ms. Walker:          About 11 million dollars – a little over that.

**BCGI**
**ID #9584673**                                                      **Page 10**

| | |
|---|---|
| Mr. Cannell: | Would the company -- |
| Ms. Walker: | That's over about a three-year period. |
| Mr. Cannell: | Would the company consider just hiring – I don't know – ten or twenty lawyers and just doing it in-house? |
| Ms. Walker: | I'm not sure that that would be any cheaper. |
| Mr. Snowden: | I'm not sure cheap is the right word. It's about quality too. So I'm not sure the best intellectual property attorneys are ready to be hired by a corporate counsel. |
| Mr. Cannell: | What about the headcount of Freedom Wireless? Is it just a bunch of lawyers in Las Vegas? Do they have operations? Do you know how many people are employed by Freedom Wireless? |
| Mr. Snowden: | Our understanding is almost none. It's a shell purposely – only for the pursuit of the patents which they hold. I don't believe there's even attorneys necessarily employed there. |
| Mr. Cannell: | Okay. So where does there funding come from? |
| Mr. Snowden: | It's been raised from a number of sources including offshore partnerships. |
| Mr. Cannell: | Okay. Thank you. Nice quarter. |
| Ms. Walker: | Thank you. |
| Operator: | Your next question comes from Mike Lattimore with Raymond James & Associates. |
| Mr. Lattimore: | Good afternoon. Congratulations everyone. |
| Ms. Walker: | Thanks, Mike. |
| Mr. Snowden: | Thank you. |
| Mr. Lattimore: | It looks like your business has some leverage to it there. |
| Mr. Snowden: | That's what we like about it. |

BCGI
ID #9584673                                                                                    **Page 11**

| | |
|---|---|
| Mr. Lattimore: | In terms of the subscriber additions in the quarter, was that pretty much all organic growth or was there still some leftover conversions there? |
| Ms. Walker: | There were no conversions during the quarter, Mike. We completed all of our conversions last year. |
| Mr. Lattimore: | Okay. So it was all organic. Great. And then in terms of the timing of the subscribers as they came into the quarter here, did you see most of them come on early, or was it linear, or later in the quarter? How did that work? |
| Mr. Snowden: | As I mentioned in my little speech, and as I think we described in the press release as well, while the first quarter is typically the opposite of the fourth quarter, it comes in the beginning of the quarter because of the end of holiday promotions and then they typically tail off, sometimes fairly rapidly. During the course of the quarter we were very pleasantly surprised to really not see that typical post-holiday tailing off, but rather sustained growth through much of the quarter. |
| Mr. Lattimore: | Thanks for the clarification. And then in terms of just gross margin going forward, assuming you get additional subscribers and the revenue they bring with it, why wouldn't gross margin continue to inch up a little here? |
| Ms. Walker: | A couple of reasons are the investments in our new building, the investment in payment services, and then there's also – there's a mix change that happening too within BTPS because as we grow our payment services business, as well as our Voyager business, which have very healthy, yet lower margins than what we have seen from the prepaids business. |
| Mr. Lattimore: | Okay. That makes sense. I guess just lastly, on the acquired business itself, you said you're very happy with the progress there. Can you either provide through the amount of revenue contribution to sort of generally how it's performing versus last quarter? |
| Mr. Snowden: | On just the acquired business alone? |

**BCGI**
**ID #9584673**                                                                    **Page 12**

| | |
|---|---|
| Mr. Lattimore: | Yes. |
| Mr. Snowden: | We don't break that out. Because you know we announced two new carrier customers at the last quarter's conference call, and we described today the renewal of three agreements on that platform. So it's going as well as expected. |
| Mr. Lattimore: | Okay. Great. Thanks a lot. Great numbers. |
| Ms. Walker: | Thanks. |
| Operator: | Your next question comes from Travis McCourt with Morgan Keegan. |
| Mr. McCourt: | Good afternoon. Nicely done. |
| Mr. Snowden: | Thanks, Travis. |
| Ms. Walker: | Thanks, Travis. |
| Mr. McCourt: | My biggest question is you talked a lot last quarter, Ely, about kind of the state of the industry, a lot of [UNINTELLIGIBLE] carriers finally looking to do something more aggressive on prepaid, and you guys specifically talking to a bunch. Just kind of give us an update on that, and then also the state of competition. I guess one of the downsides of success is you attract more competition. What have you seen on that front relative to say six to nine months ago? |
| Mr. Snowden: | Let's see. Okay. So prospects for growth are as good as ever. All of the things I described at the end of last quarter are true this quarter. I just didn't feel like I needed to get up on my box and talk at length again about the idea that we have still significant growth opportunities left in front of us. If anything, this last quarter we demonstrated the kind of startling growth that could come even without the new customer wins, although some of it is a result of the fact that we did have those wins in the last half of last year that are now nicely contributing. And I don't mean to cut it short because I think the prospects for new business are good. As we've said all along, we have not included any of those in our guidance for '03, and our guidance yet still shows very significant increases, thanks to the good business our customers are doing. But at the same time, our prospects certainly are as good as ever, and |

BCGI
ID #9584673                                                                 **Page 13**

that ultimately the long-term opportunity we believe resides in a hybrid world where the kinds of unique skills BCGI has in real time subscriber management come into more and more kinds of rate plans, or become available to more and more kinds of subscribers that can use them, that we think that opportunity is large, will unfold over time, and that we're better positioned than ever to help bring those kinds of tools to a number of carriers to enable that kind of plan with them. I just gave you such a long, rambling answer, I'm trying to remember the second half of your question.

Mr. McCourt:          Just the state of the competition, what you've seen in the last six to nine months, and how you guys continue to differentiate yourself in the marketplace at this point.

Mr. Snowden:          Yes. I think part of why we are doing as well as we are is to a degree a result of literally the weakening of much of our competition, many of whom don't have the same kind of economic model we do, and most of whom don't have the technological expertise, and features, and capabilities we do. So all of those things have helped to build what we're enjoying today in terms of some success, but also frankly what we continue to see and get fed back to us with regard to competitive positioning. That isn't to say we're asleep and resting on our laurels because we're not. The competition is there. It has always been from a range of parties – very large infrastructure vendors, guys with multi-billion dollar corporations. It's been from some parties who have approached the business in a manner more similar to us. It's been from people as diverse as people who work with the electronics and handsets and modify theirs, as well as, of course, finally the billing system providers. So those are really the four categories of competitors, each of them still there, each of them still competing in one way or another. And I think what we have done is to continue to monitor, understand, and investigate any of the unique skills or capabilities each of them has, and to work to make those kinds of things work well for us. And frankly, leapfrog them with our platform, with the developments in our platform, and the new features that we are either already in the marketplace with or frankly are in development with that we haven't yet opened up to the marketplace. So a long-winded answer. We're feeling as good as ever about competition position.

BCGI
ID #9584673                                                                              Page 14

Mr. McCourt:          And I guess finally, I didn't get a chance to read the press release
                      on the new customers in detail. But were any of the new customers
                      cross sell opportunities, buying both the [UNINTELLIGIBLE], the
                      Voyager and your prepaid platform? And what is the outlook for
                      cross-sell opportunities in your mind?

Mr. Snowden:          Right. In the answer that came out today, we had one new carrier
                      customer for prepaid connections, so our prepaid offering into a
                      small market of well-established carriers in Louisiana, MobileTel
                      [PHONETIC]. The other three announcements were re-signatures
                      of renewals of Voyager post-paid contracts. None of them then
                      represented cross-sell opportunities yet consummated, but as we
                      highlighted from the beginning, all of them I think represent
                      opportunities to do just that, and we continue to feel very good
                      about the prospects for that. But also recognize, as I think we've
                      highlighted, when we bought Infotech Solutions Corp., it came to
                      us with less than 10 new carriers on it. So it's not like the cross-
                      sell list is gigantic. But I think our abilities and opportunities for
                      cross-sell are more the other way around, that our market presence
                      with 70 carriers as customers would extend well to a new post-paid
                      billing platform that we could help introduce to the broader
                      marketplace, and that continues to seem as good an opportunity as
                      ever. But in this answer I'm giving, I'm getting too long-winded, I
                      would have to say that if you recall, the reason we bought Infotech
                      Solutions wasn't even about this cross-selling opportunity, or even
                      just about entering the post-paid billing and customer care
                      business. It was first and foremost about the fact that we believed
                      the large hybrid opportunity is a very good opportunity for which
                      BCGI is uniquely positioned with our real time subscriber
                      management tool, and Infotech Solutions had software developed
                      already that we would necessarily need to develop to become
                      experts in the hybrid space. And on that basis alone, we have
                      already more than justified the purchase of this company.

Mr. McCourt:          Great. Nicely done, and thanks for your concise answers.

Mr. Snowden:          Ha-ha. All right.

Operator:             Your next question comes from Todd Rosenbluth with Standard &
                      Poors.

Mr. Rosenbluth:       Hi. Good afternoon. A couple of quick questions. One, a

BCGI
ID #9584673                                                                    **Page 15**

|  |  |
|---|---|
|  | clarification.  Did you say that none of the new customers that were signed at the end of the last quarter are part of 2003's guidance and the increase in guidance? |
| Ms. Walker: | No, no.  What we have not included in our '03 guidance is any business from new customers. |
| Mr. Rosenbluth: | That you haven't currently signed contracts with? |
| Ms. Walker: | [UNINTELLIGIBLE] contracts with.  So, yes, part of the growth that we experienced in the first quarter was the result of our legacy customers, if you will, and not the ones that we signed up in the latter part of '02, as well as the customers that we signed up in the latter part of '02, gaining more momentum on their products and offerings. |
| Mr. Rosenbluth: | Okay.  And bearing in mind that we understand that none of your customers have reported results yet, and you may not want to get into specifics, are you comfortable breaking out the top carriers and the percentage of revenues at the end of the first quarter as you've done at the end of last year? |
| Ms. Walker: | Yes, absolutely.  And in fact if you read the last part of our press release in the forward-looking statement section, we note that Verizon was 51% and Cingular was 27%.  That's up slightly compared to our full year 2002, but there's not a lot of change in the BTPS revenues.  That happened more as a result of the roaming revenue going down and systems revenue being a little lower than expected. |
| Mr. Rosenbluth: | Okay.  I didn't catch that reading the release quickly before the call.  And then one last question.  The percentage of system sales compared to overall revenues dropped from the fourth quarter to the first quarter.  Is that something that you see as a trend going forward that's less of a focus and there's less of a demand for the system sales? |
| Ms. Walker: | No, we still feel we've got a pretty strong pipeline there.  Our Q4 revenue was much higher than expected, so that was an unusually strong quarter for us.  But we usually target about 1.5 million in revenue per quarter, so it's lower than that target, but a lot of it is the nature of system sales and the lumpiness of those sales from |

**BCGI**
**ID #9584673**                                                                      **Page 16**

|                     |                                                                                         |
|---------------------|-----------------------------------------------------------------------------------------|
|                     | quarter to quarter, unlike our nice recurring revenue in the BTPS business.             |
| Mr. Snowden:        | Let me just add in there. I think, Todd, you've got a point which is the main reason why we love the real time subscriber management business as an outsource provider, is that we do avoid with financials the capital markets pressures and other pressures, and frankly some obsolescence – technological obsolescence pressures that box sellers have had, which is why I described earlier on that our competitive position is as strong as it's ever been. Our systems business is a box seller, but it is purposely at a level at which it is small, which it can serve well and continue to serve well the care customers that we have well targeted typically in the Caribbean and Latin America and some African countries for the platform we sell. And we feel confident about our ability to continue to meet guidance as we described at that level. |
| Mr. Rosenbluth:     | Okay. Thank you very much.                                                               |
| Operator:           | Your next question comes from Howard Smith of First Analysis.                            |
| Mr. Smith:          | Good afternoon and congratulations. Two questions. The tax rate – I think it was 38% in the first quarter – is that were you expect to be throughout this year? |
| Ms. Walker:         | Yes, that's right, Howard.                                                               |
| Mr. Smith:          | Okay. And clearly more and more of your business in the billing and transaction processing segment is coming from non-prepaid permanent charges as you bring in these other services. Is there some way to track that? Will you start giving some statistics or talk qualitatively about the progress there so we can get a sense of – I'm not exactly sure – what customers are under management or something like that? |
| Ms. Walker:         | We can talk in general terms, a little bit about Voyager and so forth this quarter, but the bulk of the revenue as far as the materiality of the revenues, clearly are in the minutes of use area. So the other revenues are nice and doing well, but they're not material enough to break out or spend a lot of time talking about them differently from the overall BTPS revenue. But if there were any particular – |

BCGI
ID #9584673                                                          **Page 17**

| | |
|---|---|
| Mr. Smith: | Is it fair to say -- because just as I'm doing my model here, I'm calculating it's approaching 10% of that line. Am I mistaken in that? |
| Ms. Walker: | That's probably a bit high. |
| Mr. Smith: | Okay. Thanks. |
| Mr. Snowden: | And probably it shouldn't be a surprise that the most material part of the non-prepaid part of BTPS is the Voyager billing and customer care business. That business has not ever had the kind of growth curve that we have in prepaid or that you might expect in the brand newest services like SMS, [UNINTELLIGIBLE], etc. So the weighting of growth I think is still favoring prepaid over non-prepaid - |
| Mr. Smith: | That's helpful. Thank you. |
| Mr. Snowden: | - until the new businesses gain more materiality. |
| Mr. Smith: | Thank you. |
| Operator: | Your next question comes from Steve Galisha with Sidoti and Company. |
| Mr. Galisha: | Hi. Could you talk about the progress in converting carrier customers to IN technology, how that's going, and maybe what kind of percentage of your total subs are using that kind of system? |
| Mr. Snowden: | For those who aren't familiar, we have a range of technologies for which we provide prepaid, even over our core outsourced service bureau platforms. In earlier days it was first able to be done, and frankly often still. Usually it should be done using simple trunk voice to get calls off of carrier networks, to intervene in those calls, to tear them down – the message to the subscribers, and manage them. We have developed more efficient and better, more scalable designs using the intelligent network architecture in America's networks. And perform much of that call management by simply dialing up the voice only as needed to message their subscriber, but otherwise controlling the cost with the IN platform and allowing the call to literally remain in the carrier's network, simply under the control of our remote service control part and architecture |

**BCGI**
**ID #9584673**

Page 18

platform. Because of the efficiency and in particular because of the cost reduction that principally accrues to the carrier from moving to IN and avoiding all that voice trunking for all the calls, we've been promoting it and highlighting that it's the best technology to which all carriers should move. And at this point in time, more than 50% of all of our carriers' businesses have converted, and all of our recent acquisitions have gone directly onto the intelligent network platform. So we will carry on with that further and expect a completion over the course of probably the next year, a year and a half at the very longest.

| | |
|---|---|
| Mr. Galisha: | Okay. Thanks. |
| Operator: | Your next question comes from Greg Gorbichenko with Group Capital Markets. |
| Mr. Gorbichenko: | Hi. Thanks. Good afternoon, guys. |
| Ms. Walker: | Hi, Greg. |
| Mr. Snowden: | Hi, Greg. |
| Mr. Gorbichenko: | Boy, after following you guys for almost four years, this is one of the best quarters I've seen, so congratulations I think is necessary here. |
| Ms. Walker: | Thanks. |
| Mr. Snowden: | Thank you. |
| Mr. Gorbichenko: | You bet. How's Boost going? We haven't heard a lot about it out there. Can you just maybe touch on that quickly and then I'll ask some more questions? |
| Mr. Snowden: | Sure. And as always, I can talk to you about what our care customers have said publicly. In the case of Boost and Nextel, Tom Kelly, the Chief Operating Officer at Nextel, described to their investors after their first – sorry, after their year end conference call, as part of the conference call discussion, that he thought it was doing well, that he has subscribed over 30,000 new subscribers in the course of less than three months in business. If you describe and compare that ratably in terms of penetration over |

**BCGI**
**ID #9584673**                                                                      **Page 19**

a given period of time, it compares very favorably to many of the prepaid programs that I consider us to be competing against. I think – not off the record – on the record discussion comments included a comment about the profitability of the teen subscriber being better than average. So it sounds like good things. Those are all the kinds of color I can give you with regard to the program. We obviously know much more than that in terms of details, but they're not ours to deliver.

| | |
|---|---|
| Mr. Gorbichenko: | Okay. And, Karen, I know you probably said it, but I missed it. What was churn for this quarter? |
| Ms. Walker: | About 8%. |
| Mr. Gorbichenko: | Eight percent. What was it at the end of the year last year? |
| Ms. Walker: | Fourth quarter was 9.2% per month. |
| Mr. Gorbichenko: | It looks like a little bit better churn, so I'm assuming that that helped out with the strong net adds, but you probably had some strong gross adds too to get high to that number. You did break out in the cautionary language about the 80% coming from Cingular and Verizon. Is that – can I assume that the subs were about 80% too coming from those two? |
| Ms. Walker: | No, you really can't because of the various pricing structures. Obviously our carriers that have more subscribers are generating more minutes of use, and therefore getting down to lower tiered pricing. So on average their pricing is lower than customers that have fewer subscribers. So it's not – mathematically you can't do it that way. |
| Mr. Gorbichenko: | Can you give us any color on that? |
| Ms. Walker: | I can't because as we said before, we can't disclose any information that the carriers haven't publicly disclosed. |
| Mr. Gorbichenko: | Okay. Well, let me tell you my thought process and you can say yes or no. I would think that the bulk of the gross adds would be coming from Verizon and Cingular simply because they've been launching these new programs, and your other stuff is more legacy business. Do you think that's a safe assumption? |

BCGI
ID #9584673                                                                              **Page 20**

Mr. Snowden:          Not really.  And the Nextel and Alltel business is our brand new
                      [UNINTELLIGIBLE], so there was nothing there legacy, and they
                      all are about new growth.  They have not given specific highlights
                      other than that comment I mentioned of 30,000 subs by year end.

Ms. Walker:           As I mentioned in my comments, Greg, our growth did not tail off
                      at the end of Q1 as it has in the past, after the holidays, and that
                      was because both our legacy carriers that we've had on our
                      platform for a long time, as well as new carriers, all had nice
                      propulsion(?) going into the latter part of the quarter.

Mr. Gorbichenko:      Were they transfer business or new business?

Ms. Walker:           New business in general.  New contracts that we signed last year.

Mr. Snowden:          And in specific, I think someone asked already, and Karen
                      described zero conversions, so it was all organic growth.

Mr. Gorbichenko:      That's what I'm looking for.  And then I guess I'll close up with
                      the last two questions.  Where do you see pricing going?  I know
                      it's constantly sliding.  I think it's like 20% year over year,
                      something like that.  Maybe I'm off, but I'm just trying to get the –
                      and then cash balances.  I know you guys are doing a lot of
                      investing, and you are clearly growing the business, but is there a
                      point in time when we'll start to see that cash balance climb?

Ms. Walker:           Yes.  To answer both your questions, I mentioned in the notes that
                      we expect pricing to go down at about 18 to 20% year over year.
                      It's a little higher than what I guided last quarter, which was about
                      16 to 18%, so up at the higher end and a little over that.  And that's
                      principally because as our growth has accelerated, the carriers are
                      taking advantage of the price discounts.

Mr. Gorbichenko:      Could you get into that – that pricing slide?

Mr. Snowden:          Greg, the great news is our decline in prices are a function of, as
                      Karen has described, the tiered pricing we give carriers.  That
                      tiered pricing takes full account of our cost structure, which is very
                      fixed.  So our margins actually go up as the pricing goes down.
                      But all Karen is saying is the time has been compressed.  So a
                      percentage change on a year over year basis, we're going to give a

BCGI
ID #9584673

**Page 21**

|  |  |
|---|---|
| | higher number because we just compressed maybe two quarters of growth into one or three quarters into one with all the adds in usage such that both our margin went up like we hadn't expected, and our pricing discounts are going to be a lot faster. |
| Mr. Gorbichenko: | That's helpful. And then the cash balances, Karen? |
| Ms. Walker: | Our free cash flow will be at about breakeven in Q2, and generate about 2.0 million dollars in the third quarter, and another 2.0 million in the fourth quarter. So our cap ex with the purchase of the building is obviously impacting that in the short-term, but in the long-term, that will continue to grow. |
| Mr. Gorbichenko: | Super. Okay. Great quarter. Thanks. |
| Mr. Snowden: | Thanks, Greg. |
| Operator: | Once again, if you would like to ask a question, please press star one on your telephone keypad. Your next question comes from Greg Spiegel with Pilot Advisors. |
| Mr. Spiegel: | Hi. I just wanted to see if we could get an update on contract negotiations with Verizon. |
| Mr. Snowden: | I just gave some on the note in my speech, and that was that we have begun the customary contract renewal process with Verizon. |
| Mr. Spiegel: | Okay. And if you can share any thoughts you may have on the impact of potentially lower pricing on the contract. |
| Mr. Snowden: | I think Karen has given guidance on pricing, all of which is contemplating what we presume would happen during the year. |
| Mr. Spiegel: | Okay. That's it. Thanks. |
| Operator: | Your next question comes from Jeffrey Rapp of Morgan Keegan. |
| Mr. Rapp: | You didn't think I was going to let this one go by, did you? |
| Mr. Snowden: | Hi, Jeff. |
| Mr. Rapp: | So my question might actually predate Greg a little bit, but I want |

**BCGI**
**ID #9584673**                                                                    **Page 22**

|                    |                                                                                                                                              |
|--------------------|----------------------------------------------------------------------------------------------------------------------------------------------|
|                    | to know if anybody remembers a guy named Tim Weller from BLJ?                                                                                  |
| Mr. Snowden:       | I certainly do.                                                                                                                               |
| Mr. Rapp:          | Okay. Because I think I've got his report and I may have to dust that off and actually read through it because I kind of remember his price target, and it's starting to sound a little interesting again. |
| Mr. Snowden:       | I like hearing that talk.                                                                                                                    |
| Mr. Rapp:          | So I wanted to know if you guys remembered that one. My question is if you strip out everything – your investments, your legal expenses, you're probably losing a little bit – I don't know what you're doing in the systems business and everything else, what's a rough number that the core prepaid business is actually – what is its run rate right now? |
| Mr. Snowden:       | I would love sort of describing those metrics, as I mentioned in my up-front –                                                                |
| Mr. Rapp:          | I love hearing them. That's why I'm asking the question.                                                                                      |
| Mr. Snowden:       | I appreciate it. The actual top line, which I bragged about so much a quarter ago, accelerated even further this quarter with growth rates even raising up above the high growth rates we experienced last quarter. So year over year growth in BTPS revenue was 74% this first quarter of '03 versus first quarter of '02. And that's compounded from 69% more subscribers, 22% more minutes per subscriber, and what you might calculate to be about an 18% price decline. So all great stuff, as we have described in particular with Greg just now. The price decline happened as a result of the fact that more minutes come and our costs are fixed. |
| Mr. Rapp:          | So I'm just trying to figure out if you come to a bottom line number if you get X out of legal expenses, the investments you guys are making. It seems like '03, the run rate in the core business would be a dollar or better. |
| Mr. Snowden:       | This quarter – we don't talk anymore about pro formas. Those aren't worth it. We actually don't know. But excluding legal expenses, we had 21 cents per share. |

**BCGI**
**ID #9584673**                                                        **Page 23**

| | |
|---|---|
| Mr. Rapp: | Right.  And then your investments you're making in the other businesses, one to two cents a quarter, and all the other stuff.  If you just strip all that away, the core business on the share base looks like it's run rating at a dollar or better in '03. |
| Ms. Walker: | Yes.  Keep in mind, Jeff, that we're able to leverage a lot of our existing infrastructure and so forth to launch payment services.  So that's been something that's been very attractive for us in doing that.  So when you look at the bulk of our operating costs, the lion's share of it is devoted to our prepaid wireless business. |
| Mr. Rapp: | Is there any chance for any more share repurchases? |
| Ms. Walker: | That's something we look at and continue to evaluate it. |
| Mr. Rapp: | Okay.  That's it.  No more questions. |
| Ms. Walker: | You had to ask that, didn't you, Jeff? |
| Mr. Rapp: | Oh, come on.  Whatever.  Nice quarter. |
| Ms. Walker: | Thanks, Jeff. |
| Operator: | Your next question comes from Neil McConnell with Perennial Advisors. |
| Mr. McConnell: | My question has been answered, thanks. |
| Mr. Snowden: | Very good. |
| Operator: | At this time, there are no further questions.  Are there any closing remarks? |
| Mr. Snowden: | Well, good.  Thank you all for joining us today.  As you can hear, this has been a most successful quarter for us and we couldn't be more excited about the future of BCGI.  So thank you for your time. |
| Operator: | Thank you for participating in today's BCGI First Quarter Earnings Release Conference.  You may now disconnect.  [END OF CONFERENCE CALL] |

BCGI
ID #9584673