EXHIBIT 11

10-K 1 d10k.htm FORM 10-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2002**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission File Number 333-4128**

# BOSTON COMMUNICATIONS GROUP, INC.
**(Exact Name of Registrant as Specified in its Charter)**

| | |
|---|---|
| **MASSACHUSETTS**<br>(State or Other Jurisdiction<br>of Incorporation or Organization) | **04-3026859**<br>(I.R.S. Employer<br>Identification No.) |
| **100 Sylvan Road, Suite 100, Woburn, Massachusetts**<br>(Address of Principal Executive Office) | **01801**<br>(Zip Code) |

**Registrant's telephone number, including area code:  (781) 904-5000**

**Securities registered pursuant to Section 12(b) of the Act:**

**None**

**Securities registered pursuant to Section 12(g) of the Act:**

**Common Stock, par value $.01 per share**

Indicate by check mark whether registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   YES ☒   NO ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.   ☐

Indicate by check mark whether the registrant is an accelerated filer (as defined in Exchange Act Rule 12b-2)   YES ☒   NO ☐

The approximate aggregate value of the voting stock held by non-affiliates of the registrant, computed by reference to the closing

We have purchase obligations and non-cancelable operating lease commitments for office space and equipment, many of which are renewable at our option. Future payments due under purchase obligations and non-cancelable operating leases are as follows for the years ending December 31, (in thousands):

| | Operating Leases | | Unconditional Purchase Obligations | | Total Contractual Obligations |
|---|---|---|---|---|---|
| 2003 | $ | 1,755 | $ | 1,189 | $ | 2,944 |
| 2004 | | 1,301 | | — | | 1,301 |
| 2005 | | 1,173 | | — | | 1,173 |
| 2006 | | 241 | | — | | 241 |
| 2007 and beyond | | 56 | | — | | 56 |
| Total payments due | $ | 4,526 | $ | 1,189 | $ | 5,715 |

## Off Balance Sheet Arrangements

During 2002, we did not engage in:

- material off-balance sheet activities, including the use of structured finance or special purpose entities,

- material trading activities in non-exchange traded commodity contracts, or

- material transactions with persons or entities that benefit from their non-independent relationship with us.

## Certain Factors That May Affect Future Results

*The loss or significant reduction of business from one of our major customers, including Verizon Wireless or Cingular Wireless, would have a material adverse effect on our business.*

Historically, a significant portion of our revenues in any particular period has been attributable to a limited number of customers in the wireless telecommunications business. This concentration of customers intensified in 2002 compared to the prior year due to the increased minutes of use of some of our largest customers and carrier consolidation. Specifically, Verizon Wireless represented 49% and Cingular Wireless represented 25% of our consolidated revenues in the twelve months ended December 31, 2002. Our dependence on Verizon and Cingular is expected to continue at similar levels in 2003, until our new carrier customers and expanded programs generate more revenue.

Our Verizon Wireless prepaid wireless services contract and certain other contracts expire in 2003 and beyond. While we expect to renew these contracts, when and if each of the contracts is renewed, some contractual rates per minute may be lower than in previous years. A decline in subscriber levels and minutes of use could adversely affect revenue and gross margins. These contracts are not exclusive and therefore do not prevent our customers from using competitors' billing and transaction processing platforms. A loss of business from any of our major customers, including non-renewal of contracts or a decrease in business due to factors outside our control, would have a material adverse effect on our business, financial condition and results of operations.

*An unfavorable judgment in the Freedom Wireless lawsuit or any other lawsuit would have a material impact on our business.*

In March 2000, Freedom Wireless filed a suit against us and a number of wireless carriers claiming that we and the other defendants infringe a patent of Freedom Wireless. In March, 2001 Freedom Wireless amended the complaint to include a continuation patent. Freedom Wireless seeks injunctive relief and damages in an unspecified amount. In addition, we are contractually obligated to indemnify the other defendants for any damages that they incur as a result of this dispute.

26

EXHIBIT 12

# Boston Communications Group
(BCGI:NASDAQ)    **Outperform 2**

EQUITY RESEARCH

June 12, 2003
Communications Software
Company Brief

Boston Communications Group offers wireless operators the ability to quickly and cost-effectively deploy a feature-rich prepaid wireless service. The company's core offering is a combination of proprietary software, a national network and distribution capabilities. Their customers include some of the largest wireless operators in the U.S.

Mike Latimore
(404) 442-5862
Michael.Latimore@RaymondJames.com
Duane Pfennigwerth, Res. Assoc.

| | | | |
|---|---|---|---|
| Current Price: $16.30 (6/12/2003/9:55am) | GAAP EPS: | 2002A | $0.19 |
| Target Price: $21.00 | FY=DEC | 2003E | 0.79 |
| Suitability: Speculative | | 2004E | 0.94 |

## BCGI: Company Visit

Yesterday, we met with BCGI's CEO in Boston and toured the company's network operations center.

While management did not give an update on the quarter's progress, BCGI remains upbeat about its prospects. Our channel checks indicate the prepaid market is continuing to grow at a healthy pace versus last year and BCGI should benefit from that in the upcoming quarters.

The head of network operations described a shift in their network infrastructure to an intelligent network foundation, lowering overall costs and increasing capacity by 10 fold. Several top customers are shifting their subscribers to this technology. We were also impressed with the numerous checks and applications BCGI has in place to prevent and resolve network and data management issues.

Management discussed the possibility of how BCGI could work with Sprint PCS (PCS/$5.44/Strong Buy) to implement a prepaid offering during Sprint's billing system conversion. In addition to providing an overlay solution on Sprint's network and operations systems, BCGI could offer a feature that would initiate the BCGI service only when an account reached a certain pre-determined level.

The company suggested that new pricing models are possible over time, shifting to a per-sub vs. a per-minute basis. While not charging on a per sub basis today, an average rate per sub has been consistent at about $2 per sub, per month. This could make sense as more customers shift to the intelligent network-based service.

A possible strike at Verizon (VZ/$39.97/Market Perform), scheduled for August 4, would likely not affect their position at Verizon, but if subscriber growth slows because of a strike, that could have an effect on prepaid as well. Management did not comment on negotiations at Verizon, but did refer to a recent statement by the 50% customer, where Verizon said it was happy with BCGI and the outsourcing solution.

We reiterate our **Outperform** rating on BCGI and $21 target based on approximately 22x our 2004 EPS estimate of $0.94.

**Please read Investment Risks/Analyst Certification on page 2 and disclosure information on page 3.**

All expressions of opinion reflect the judgment of the Research Department of Raymond James & Associates, Inc., (RJA) at this date and are subject to change. Information has been obtained from sources considered reliable, but we do not guarantee that the foregoing report is accurate or complete. Other departments of RJA may have information which is not available to the Research Department about companies mentioned in this report. RJA or its affiliates may execute transactions in the securities mentioned in this report which may not be consistent with the report's conclusions. RJA may perform investment banking or other services for, or solicit investment banking business from, any company mentioned in this report. For institutional clients of the European Economic Area (EEA): This document (and any attachments or exhibits hereto) is intended only for EEA Institutional Clients or others to whom it may lawfully be submitted. Raymond James in the U.K. is regulated by the Securities and Futures Authority.
© 2003 Raymond James & Associates, Inc.


RAYMOND JAMES & ASSOCIATES, INC.

**Specific Investment Risks related to the Industry or Issuer**

**Company Risks**
The main risk for investors in BCGI remains the company's exposure to Verizon Wireless, about 50% of revenue, and the potential for insourcing.

The views expressed in this report (which include the actual rating assigned to the company as well as the analytical substance and tone of the report) accurately reflect the personal views of the analyst(s) covering the subject securities. No part of said person's compensation was, is, or will be directly or indirectly related to the specific recommendations or views contained in this research report.

### Important Investor Disclosures about our Relationships with Boston Communications Group.

**Stock Ratings:** The common stock of Boston Communications Group currently has a **Outperform** rating. Within our four-tiered rating system, Strong Buy means that the stock is expected to appreciate and produce a total return of at least 15% and outperform the S&P 500 over the next six months; Outperform means the stock is expected to appreciate and outperform the S&P 500 over the next 12 months; Market Perform means the stock is expected to perform generally in line with the S&P 500 over the next 12 months and is potentially a source of funds for more highly rated securities; and Underperform means the stock is expected to underperform the S&P 500 or its sector over the next six to 12 months and should be sold.

Out of approximately 508 stocks in the Raymond James coverage universe, 48% have Strong Buy or Outperform ratings (Buy), 40% are rated Market Perform (Hold) and 11% are rated Underperform (Sell). Within those rating categories, 26% of the Strong Buy- or Outperform (Buy) rated companies either currently are or have been Raymond James Investment Banking clients within the past three years; 16% of the Market Perform (Hold) rated companies are or have been clients and 9% of the Underperform (Sell) - rated companies are or have been clients.

The information below indicates our target price and rating changes for BCGI stock over the past three years.



**General Risk Factors:** Following are some general risk factors that pertain to the projected 12-month target prices included on our research for stocks rated Strong Buy or Outperform:  (1) Industry fundamentals with respect to customer demand or product / service pricing could change and adversely impact expected revenues and earnings; (2) Issues relating to major competitors or market shares or new product expectations could change investor attitudes toward the sector or this stock; (3) Unforeseen developments with respect to the management, financial condition or accounting policies or practices could alter the prospective valuation; or (4) External factors that affect the U.S. economy, interest rates, the U.S. dollar or major segments of the economy could alter investor confidence and investment prospects. For specific risks on the issuer please refer to Specific Investment Risks on the previous page.

**Analyst Holdings and Compensation:** Equity analysts and their staffs at Raymond James are compensated based on a salary and bonus system.  Several factors enter into the bonus determination including the analyst's success in rating stocks versus an industry index, support effectiveness to the retail and institutional sales forces, traders, and investment bankers, institutional research votes, as well as overall productivity and revenue generated in covered stocks.

**Raymond James Relationships:** Investors should assume that Raymond James is seeking or will seek investment banking or other business relationships with the companies in this report. **Raymond James & Associates makes a NASDAQ market in shares of BCGI.**

RJA or its officers, employees, or affiliates may (1) currently own shares, options, rights or warrants and/or (2) execute transactions in the securities mentioned in this report that may or may not be consistent with this report's conclusions.

**Disclosure information, as well as more information on the Raymond James rating system and suitability categories, is available at www.rjcapitalmarkets.com/SearchForDisclosures_main.asp. Copies of research can be obtained by contacting any Raymond James & Associates or Raymond James Financial Services office (please see www.rjf.com for office locations) or by sending a written request to the Equity Research Library, Raymond James & Associates, Inc., Tower 3, 6th Floor, 880 Carillon Parkway, St. Petersburg, FL 33716.**

Additional information is available on request.                    This document may not be reprinted without permission.

EXHIBIT 13

1

1    UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF MASSACHUSETTS
2
                                    Civil Action
3                                   No. 00-11972-WGY

4    * * * * * * * * * * * * * * * *
                                   *
5    In re:  ALLAIRE CORPORATION   *    MOTION HEARING
6    SECURITIES LITIGATION         *
                                   *
7    * * * * * * * * * * * * * * * *

8            BEFORE:  The Honorable William G. Young,
                          District Judge
9

10   APPEARANCES:

11

12           JOHNSON & PERKINSON (By Dennis J. Johnson, Esq.)
         1690 Williston Road, South Burlington, Vermont 05403
                         - and -
13           MILBERG, WEISS, BERSHAD, HYNES & LERACH, LLP (By
         Brad N. Friedman, Esq.), One Pennsylvania Plaza, New
14       York, New York 10119
                         - and -
15           WOLF, HALDENSTEIN, ADLER, FREEMAN & HERZ, LLP (By
         Thomas Burt, Esq.), 270 Madison Avenue, New York, New
16       York 10016
                         - and -
17           MOULTON & GANS, LLP (By Nancy Freeman Gans,
         Esq.), 133 Federal Street, Boston, Massachusetts 02110,
18       on behalf of the Plaintiffs

19           GILMAN & PASTOR (By Peter A. Lagorio, Esq.),
         Stonehill Corporate Center, 999 Broadway, Suite 500,
20       Saugus, Massachusetts 01906, on behalf of Abraham S.
         Kassin
21
             HALE & DORR (By William H. Paine, Esq. and
22       Jonathan A. Shapiro, Esq.), 60 State Street, Boston,
         Massachusetts 02109, on behalf of the Defendants
23

24                                  1 Courthouse Way
                                    Boston, Massachusetts
25
                                    September 25, 2001

1          THE CLERK:  Calling Civil Action 00-11972, In re:

2     Allaire Corp.

3          THE COURT:  Would counsel identify themselves.

4          MR. JOHNSON:  Your Honor, I'm Dennis Johnson with

5     the firm of Johnson and Perkinson, South Burlington,

6     Vermont.  I represent the putative class.

7          MR. FRIEDMAN:  Brad Friedman from Milberg, Weiss,

8     Bershad, Hynes and Lerach, counsel for the class.

9          MR. BURT:  Thomas Burt, Wolf, Haldenstein, Adler,

10     Freeman and Herz, for the class.

11          MS. GANS:  Nancy Freeman Gans, Moulton and Gans,

12     also for the class.

13          MR. LAGORIO:  Your Honor, Peter Lagorio, Gilman

14     and Pastor, for the individual plaintiff, Abraham Kassin.

15          MR. PAINE:  Bill Paine and Jonathan Shapiro, Hale

16     and Dorr, for the defendants.

17          THE COURT:  All right.  Let me ask just a

18     procedural question first.  Shouldn't I consolidate

19     Mr. Kassin's lawsuit with In re: Allaire for all purposes.

20          Let me ask Mr. Kassin's counsel first.  Doesn't

21     that make sense that you rock along here with the whole

22     group?

23          MR. LAGORIO:  We discussed that, your Honor.  We

24     decided for the purposes of the motion to dismiss to do

25     that.  Obviously there's no class issue with Mr. Kassin,

1    it's not a proposed class representative, so that would be

2    one exception.

3            THE COURT:  Well, shouldn't I -- maybe I don't

4    understand the procedure.  We will treat it together with

5    respect to the motion to dismiss.  But suppose you get by

6    the motion to dismiss.  Shouldn't I just have one case

7    here, and discovery in one case is good in both and the

8    like.

9            MR. LAGORIO:  I would think that the issues are,

10   would be similar other than the class certification

11   procedures.

12           THE COURT:  All right.  And you have no objection

13   to that?

14           MR. PAINE:  That's fine with us.

15           THE COURT:  The cases are consolidated for all

16   purposes.

17           Now, let me ask the plaintiffs here.  The motion

18   to dismiss is against you folks.

19           What role, if any, do you think that this Court's

20   order in Lirette v. Shiva, the procedural order at 999

21   F.Supp. 154, what role do you think that plays?

22           MR. JOHNSON:  Well, your Honor, I read that order.

23   I read the Fitzer case.  It was our take of it, and I will

24   confess that I drafted this complaint in big part, that if

25   we specified the source of the information, told you where

1    we got our facts and provided reliability to those sources,

2    that we had in fact satisfied that.  I did not read the

3    transcript, I will tell you, and then you subsequently had

4    the hearing in Fitzer.  I'm not sure that we haven't fully

5    satisfied what you want anyway.  If we haven't we're

6    certainly happy to replead it.  But I think that -- I mean,

7    I took a look at the holding in Shiva which says, you know,

8    the complaint is either pled on information and belief, or

9    on statements of personal knowledge by a potential witness,

10   or corporate documents.

11         THE COURT:  But you haven't -- you can't begin to

12   suggest that you have specified for each of the statements

13   the supporting materials.  You have -- this is a very, very

14   long complaint.

15         But -- how about this.  Plaintiff shall specify,

16   as to each particular allegation, that is, every sentence

17   or clause separated by a comma or conjunction, whether that

18   allegation is made upon information and belief or is

19   supported by some document or statement on personal

20   knowledge by a potential witness.  Sources need not be

21   specified, but the Court needs to know which is which.

22         MR. JOHNSON:  This complaint in large part, your

23   Honor, is pled on the, after the or part of that sentence.

24         THE COURT:  You haven't done that, have you?

25         MR. JOHNSON:  Well, we basically alleged that

5

1    personal knowledge will support all of these things by some

2    witness.

3            THE COURT:  Well, you haven't done it phrase by

4    phrase.

5            MR. JOHNSON:  It was because the entire complaint

6    basically was being based upon either a witness's testimony

7    who we interviewed or a corporate document other than the

8    plaintiffs personal knowledge.

9            Now, the defendants would argue it must be

10   plaintiffs personal knowledge.

11           THE COURT:  Well, we'll let the defendants argue

12   when --

13           MR. JOHNSON:  I certainly interpreted your opinion

14   to be tell me whether it's information and belief as to

15   every clause, or tell me whether you believe it's

16   supportable by a witness's testimony or a document.  Now,

17   we had thought it was all in the latter category.

18           THE COURT:  Well, I guess I can straighten that

19   out.

20           Now, let me ask the defense here.  I think they've

21   got to replead this.  And they've got to sort of categorize

22   this great mass of material and then maybe we'll, we'll

23   address it.

24           Do you have any objection to their repleading it?

25           MR. PAINE:  Well, may I say this.  We've been

1    here, all of us together, the Milberg, Weiss firm, the Hale

2    and Dorr folks and you, on the Lirette case, on the RSA

3    case, and now in this case.  And I will say that in none of

4    the responses to your order initially set forth at 999

5    F.Supp. have the plaintiffs ever come close.  And I don't

6    think, and I don't think it's appropriate for them to be

7    sent off with leave to replead and impose upon us, I mean,

8    we've got something like $300,000 worth of lawyers time

9    into this case, I don't think that we should be set off to,

10   to have to make a detailed response to something that

11   doesn't get there on the following issue.  Which is that

12   there is a distinction between saying that there is some

13   support for that which is separated by a comma or a period

14   and saying what that support is.

15        THE COURT:  Oh, I think I can handle that.  I

16   guess my problem -- and we may, you and I, now be ships a

17   little passing in the night.

18        I write for a reason, not just to see things I

19   write appear here in F.Supp.  I write in sort of the

20   teaching mode.  We're grappling with the new statute.  I

21   respect, I follow as best I can the decisions of the First

22   Circuit Court of Appeals.  But when I write, and I respect

23   the views of my colleagues who write, I'm sort of grappling

24   with the statute.  But I didn't enter the Lirette order in

25   this case.  So my question to him was a, was a fair

1    question.

2              MR. PAINE:  Fair enough.

3              THE COURT:  Fair in the sense that one would think

4    that if he wanted to get by this judge he would read

5    sensibly what I ordered.  There's a great mass of

6    undigested material here.  I have done my best to sort

7    through it along with other people.  And it's not

8    satisfactory.  You're right, it doesn't come close.

9              So now I'm about to enter an order that will force

10   them to jump through the hoop with exquisite detail.  But I

11   think given how much is riding on this, the whole battle,

12   Congress has decided, is in the motion to dismiss.  It's

13   only once in a blue moon that these cases ever go to trial.

14   And I think I would be terribly remiss to -- I'm certainly

15   not going to throw a case out saying, gee, you know, I've

16   written on this before and you're the same law firm and why

17   don't you pay attention to what I write.  My instinct is to

18   say, now, this is exactly what I want and you've got X

19   amount of time to do it and then we'll have to be -- I

20   understand.  But it appears that that's what Congress

21   wants.  If the battle -- there are more of these cases than

22   have ever been before.  And in a wry way, you may take

23   comfort in this, it looks like there's going to be a lot

24   more coming down the pike.  And they'll all be fought out

25   on the motions to dismiss where Congress has converted

1    every legal, every factual allegation into a legal

2    standard.  It is, it is a bizarre way to proceed,

3    especially when they don't get any discovery.

4         So I'm -- unless there's some legal reason for not

5    giving them another chance, I'm going to give them another

6    chance.

7         MR. PAINE:  Well, obviously I can't, I can't

8    quarrel with your logic in that regard.  I do think,

9    however, that we should revisit for a moment the, first the

10   original order and the sources need not be identified

11   portion thereof.  That was -- that order came out the day

12   after an extensive oral argument before you over at BU Law

13   School in which the question, in which the source

14   identification question was limited to the issue whether

15   you have to name names or not.  I don't think that it's

16   appropriate under the PSLRA to essentially say, well, okay,

17   with respect to this, you know, take any paragraph in the

18   21 page paragraph that commences the existing complaint,

19   most of which start out with the, with the clause

20   defendants knew, plunk, that the technology was useless,

21   for example, to shorthand one.  Then they've got at the end

22   of that 21 pages a sentence which says all of the

23   allegations hereon are based upon discussions with

24   distributors, third parties, people who never worked at

25   Allaire and who aren't even alleged to have spoken to

1    anyone at Allaire.

2          Therefore, with respect to that train of

3    allegations which start the defendants know, there is no

4    way, there is no doubt that there is at least an element of

5    inference, of lawyers gloss with respect to that

6    allegation.  And the notion that they can get away under

7    the PSLRA with saying this is based upon unidentified

8    documents and unidentified people and unidentified

9    information from unidentified people --

10         THE COURT:  Okay.

11         MR. PAINE:  -- doesn't do it.

12         THE COURT:  Hold off a moment.

13         MR. PAINE:  Yes.

14         THE COURT:  And let me assay the order.

15         MR. PAINE:  Thank you.

16         THE COURT:  And then we'll talk about the order.

17         Here's the order.  The plaintiffs shall, within 45

18   days of today's date, specify as to each particular

19   allegation, specifically every sentence or clause separated

20   by a comma or conjunction, whether that allegation is made

21   upon information and belief or is supported by some

22   document or statement on personal knowledge by a potential

23   witness for each challenged statement -- well, back off a

24   moment.  Where allegations are made on information and

25   belief, or on investigation of counsel, the source of the

1  information, to include content, time, place and speaker,

2  and the basis for the belief must be stated with

3  particularity.  I guess that would be two paragraphs.

4      Three.  Analysts' statements.  The 32 challenged

5  statements by analysts must be clearly delineated from the

6  15 challenged statements by the defendants rather than

7  interspersed throughout the complaint.

8      Paragraph four.  Analysts' statements.  The class

9  must set forth specifically the basis for its belief that

10  specific defendants were entangled with the specific

11  analysts all with the degree of specificity required by

12  Rule 9(b).  Specifically, for each challenged analyst

13  assertion, the complaint must specify which of the

14  defendants is alleged to have spoken with the analysts,

15  when and where this communication took place, and the

16  content of the communication.

17      Paragraph five.  Scienter.  The class must set

18  forth the particularized facts, including the nature of any

19  documents or reports, and give the time, place and content

20  of any communication giving rise to an inference of

21  scienter.

22      Paragraph six.  Insider trading.  The class must

23  set forth with particularity the facts from which it can be

24  inferred that particular defendants trading during the

25  class period was unusual or suspicious.  For example, the

1    amount of trading conducted by a specific defendant before,

2    during and after the class period.

3          Paragraph seven.  Loss causation.  The class must

4    plead with particularity facts from which it can be

5    inferred that particular defendants failure to disclose

6    Spectra's fundamental flaws caused the loss for which it

7    seeks recovery.

8          Paragraph eight.  The class must describe with

9    specificity the daily duties that each of the defendants

10   fulfilled at Allaire, each defendant's role in the alleged

11   fraud, and each defendant's knowledge of the fraud.

12         Now, not to argue, but to, to discuss, we'll ask

13   the plaintiffs first, questions about that?

14         MR. JOHNSON:  Well, I guess I have several.  If I

15   understand the first part of your order, your Honor,

16   basically you want to know, is it enough then if we say

17   this statement is made on information and belief, or it

18   will be supported by a witness or a document.  That would

19   satisfy you in the first instance, or the first cut of your

20   first paragraph?

21         THE COURT:  First paragraph, which you've got to

22   identify --

23         MR. JOHNSON:  And anything on information and

24   belief --

25         THE COURT:  For each clause you've got to tell me

1   what it is.

2           MR. JOHNSON:  Okay.  And we can I guess shorthand

3   that, I guess, meaning you would be happy with that?

4           THE COURT:  However, however an intelligent

5   person --

6           MR. JOHNSON:  Right.

7           THE COURT:  -- could follow it.  You can do it by

8   underlining or something.

9           MR. JOHNSON:  Okay.

10          THE COURT:  But I've got to know for each clause

11  whether it's on information and belief or personal

12  knowledge.

13          MR. JOHNSON:  Okay.  In terms of statements to

14  analysts, I guess I'm somewhat confused about the number of

15  statements attributed to the company by anyone and the

16  number attributed to the analysts.  I mean, we believe that

17  the company made numerous statements in their public

18  filings with the SEC and the press release.

19          THE COURT:  I have to say the thing that's been

20  most helpful to me is the defendant's breakdown of these

21  challenged statements.  That's what I've been working on.

22  That's what I've found most helpful.

23          MR. JOHNSON:  Okay.  Well, then what we need to do

24  then is we need to clarify that.  Because the defendants

25  have selectively picked portions of paragraphs we didn't

13

1   even focus on and weren't italicized in our brief and

2   they've tried to elevate those to fit their arguments.  I

3   was certainly prepared to talk about that today.  But we

4   will give you a complaint that gives you specifically what

5   parts of those paragraphs, every one will be italicized and

6   bolded so you know exactly which statement in the paragraph

7   we are alleging was falsely issued by the defendants.  So

8   that there's no mistake about that.  So that the defendants

9   cannot pick and choose out of a paragraph that we put in

10  for context which portion they want to focus on.

11          THE COURT:  That's not a question, that's a

12  statement.

13          MR. JOHNSON:  Okay.

14          THE COURT:  And that's paragraph one.  I expect

15  that --

16          MR. JOHNSON:  Now --

17          THE COURT:  -- and I expect the other six.

18          MR. JOHNSON:  I guess, I guess a question, how the

19  standard that you have set is any different than the Ninth

20  Circuit based on Silicon Graphics which has never been

21  accepted by the First Circuit.  I mean, this is the type of

22  detailed pleading, what defendants saw what on what day and

23  what did he know, what was his duty in the company.  And we

24  can give you general descriptions of what they did.  We

25  know what their authority is.  We can give you what their

14

1    responsibilities were for supervising it.  But in terms of

2    the detail you've asked, I think that some points within

3    that that in fact this is extremely close to Silicon

4    Graphics.

5             THE COURT:  That's my order.

6             MR. JOHNSON:  Okay.

7             THE COURT:  Defense have any questions?

8             MR. PAINE:  No.  Thank you, your Honor.

9             THE COURT:  All right.  Now, there are some

10   matters about Mr. Kassin.  Let's hear from his counsel for

11   a moment.

12            You're not close enough to have, close enough in

13   time here in the First Circuit to maintain this action

14   under 20A, are you?

15            MR. JOHNSON:  We are not asserting a 20A claim --

16            THE COURT:  No, it's Mr. Kassin's attorney.

17            MR. JOHNSON:  I'm sorry.

18            THE COURT:  I'm inclined to dismiss that without,

19   without leave to replead it.  The 20A, sir?  But I want to

20   hear you before I do.

21            MR. LAGORIO:  I'm sorry, I guess I don't

22   understand exactly the issue.

23            THE COURT:  Section 20A --

24            MR. LAGORIO:  Yes.

25            THE COURT:  -- of the Exchange Act.

1       MR. LAGORIO: Yes.

2       THE COURT: Is it not true that you make a claim

3   under that section? Am I mistaken?

4       MR. LAGORIO: That's correct.

5       THE COURT: Well, I'm inclined to dismiss it.

6   Because there's, there's not sufficient contemporaneity in

7   time with your own trading. The class doesn't make that

8   claim. You do. I'm inclined to dismiss it. But I don't

9   want to do it without at least hearing you.

10      MR. LAGORIO: Well, I'm not, to be honest with

11  you, I'm not familiar exactly with the contemporaneous day

12  to day --

13      THE COURT: All right. So you're not going to

14  press it?

15      MR. LAGORIO: If that's your finding then I'll

16  defer to that.

17      THE COURT: It is. It's dismissed.

18      Also you've got a negligence -- or you've got a

19  common law claim for fraud and deceit here. That fails and

20  I'm dismissing that under the -- because you haven't come

21  up to the standards of 9(b). That's dismissed.

22      Now, since we're going to replead in a single

23  complaint that ought to take care of the matter.

24      All right, 45 days for such repleading.

25      MR. LAGORIO: Your Honor?

16

```
 1              THE COURT:  That's the order.  Yes?

 2         MR. LAGORIO:  May I just ask one question --

 3              THE COURT:  Yes.

 4         MR. LAGORIO:  -- to clarify what you said at the

 5    end.  When we replead, will we be allowed to replead the

 6    common law claim?

 7              THE COURT:  I don't see any basis for it, but you

 8    can replead it if you can meet the standards of 9(b).  Yes.

 9         MR. LAGORIO:  Okay.  I just wanted to -- thank

10    you.

11              THE COURT:  Fine.  Thank you all.

12         (Whereupon the matter concluded.)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


I, Donald E. Womack, do hereby certify that the above proceedings were reported by me stenographically and this transcript represents a true and accurate transcription of said proceedings.

---

DONALD E. WOMACK
Official Court Reporter
1 Courthouse Way, Suite 5510
Boston, Massachusetts 02210
(617) 439-8877