EXHIBIT 15

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

IN RE:    CHIPCOM CORPORATION        )    CIVIL ACTION NO.
          SECURITIES LITIGATION      )    95-11114-DPW

MEMORANDUM AND ORDER
April 29, 1996



I.

This is a consolidated putative class action alleging securities fraud violations by Chipcom Corporation ("Chipcom") and certain individual defendants.[1]  Specifically, plaintiffs allege violations under § 10(b) (Count I) and § 20(a) (Count II) of the Securities Exchange Act of 1934.  The action is brought on behalf of purchasers of Chipcom common stock during the period of February 8, 1995 through and including May 26, 1995

---

[1]The individual defendants are:
John Robert Held ("Held")
    -President and Chief Executive Officer, member of Board
    of Directors
Robert Peter Badavas ("Badavas")
    -Senior Vice President, Finance, and Chief Financial
    Officer
Bruce L. Cohen ("Cohen")
    -Senior Vice President, Field Operations
Menachem E. Abraham ("Abraham")
    -Senior Vice President, Product Development, and Chief
    Technical Officer
Jerald G. Fishman ("Fishman")
    -member of Board of Directors

("the class period").[2]

The plaintiffs contend that during the class period the defendants made materially false and misleading statements, and failed to disclose information regarding Chipcom's operations, competitive position and future business prospects. Especially at issue is defendants' alleged knowledge that the primary distribution channel, International Business Machine Corporation ("IBM"), was 1) oversupplied with Chipcom's products, 2) experiencing difficulties selling the products, and 3) reducing orders, thereby drastically affecting Chipcom's revenues. A

---

[2]The named plaintiffs are:

| Plaintiffs | Purchase Date | Shares | Share Price |
|---|---|---|---|
| Manuel & Barbara De Sousa | February 10, 1995 | 100 | $46.50 |
| Anthony Malozzi | March 3, 1995 | 5000 | $35.625 |
| | March 29, 1995 | 5000 | $42.375 |
| | March 29, 1995 | 5000 | $42.50 |
| | March 30, 1995 | 5000 | $40.75 |
| | March 30, 1995 | 5000 | $39.625 |
| Carol Benjamin | March 30, 1995 | 500 | $38.25 |
| Marc Linsky | April 5, 1995 | 150 | $33.25 |
| Sean Carney | April 13, 1995 | 500 | $32.75 |
| N. Giannantonio | April 13, 1995 | 500 | $32.75 |
| | May 23, 1995 | 500 | $34 |
| Constandine & Mary Machakos | April 20, 1995 | 300 | $28.75 |
| Daniel List | May 1, 1995 | 200 | $32.25 |
| Lucille Nappo | May 9, 1995 | 300 | $35 |
| Victor Mosso | May 15, 1995 | 20 | $32.50 |

critical consideration in these claims is *when* Chipcom became aware of this situation and *what* duty it had to disclose what it knew.

Chipcom announced on April 19, 1995 that second quarter IBM revenue would be approximately $24 million (20% less than the first quarter). On May 26, 1995, Chipcom lowered the prediction to $15 million (50% less than the first quarter). That day, Chipcom's stock plummeted by $11 7/8 or 37%.[3] Plaintiffs allege that Chipcom had knowledge of the gravity of the situation before May 26, indeed before April 19, and had a duty to disclose its knowledge.

The original complaint in this action was filed on May 30, 1995, four days after the precipitous fall in stock price. A second consolidated complaint was filed on September 13, 1995. A third version, the "Consolidated First Amended Complaint" ("Complaint"), challenged by defendants' motion to dismiss, is now before me.

II.

Chipcom designed, manufactured and distributed computer networking fault-tolerant intelligent switching systems, including hubs and internetworking and network management products.[4] During the relevant period, Chipcom was the world's

---

[3] Approximately 1,502,300 shares were traded, representing almost 10% of all outstanding shares.

[4] On December 29, 1995, Chipcom merged into 3Com Corporation, and ceased to exist. (Defs.' Reply to Pls.' Opp'n at 1, n.1.) At all relevant times, Chipcom's stock was traded on NASDAQ, and

3

third largest supplier of intelligent hubs, and approximately 70-80% of revenues were generated from the sales of intelligent hubs. (Compl. ¶ 47.) Switching hubs allow users "to build and manage networks with dissimilar hardware and software technologies within an entire building or campus or across remote locations of an enterprise." (Compl. ¶ 16(a).) "Fault tolerant" technology allows networks to run without interruption, if a connection or component should fail.[5] (Compl. ¶ 48.)

Chipcom marketed and sold its products primarily through third-party distribution channels, including value-added resellers, original equipment manufacturers and distributors (collectively "resellers"). Although Chipcom dealt with 245 resellers worldwide, the single most important reseller was IBM.

---

was registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78l. Approximately 16,910,109 shares of Chipcom stock were outstanding as of March 10, 1995. (Compl. ¶ 16(b).) Chipcom was incorporated in Delaware with its principal place of business in Southborough, Massachusetts.

[5]Chipcom's various hub products included:
1) the ONline System Product Family (introduced in 1990) [product 8250];
2) the ONcore Switching System (the ONline system designed for high end enterprise networks, introduced in the first quarter of 1994) [product 8260];
3) the InfiNET Switching Solutions (family of packet-switching products providing increased network capacity and speed, including the Galactica Network Switching Hub, introduced in 1994); and
4) the ONsemble StackSystem (Ethernet and Token Ring hubs, designed for remote sites or workgroups, incorporating technology from third-party vendors; introduced during the first quarter of 1995 but not available for distribution).

(Compl. ¶ 49.)

4

(Compl. ¶ 50.)

Chipcom's relationship with IBM began in September 1992 upon the signing of the "Alliance Agreements."[6] The Alliance Agreements established a mutually beneficial marketing and development affiliation: the companies would make available to each other certain products, and agreed to jointly develop hub technology. For example, IBM would gain access to Chipcom's hub and switching technology, and Chipcom would gain access to IBM's research on Token Ring technology and Asynchronous Transfer Mode ("ATM") technology.[7] (Compl. ¶¶ 51-52.)

The Alliance Agreements also provided for a comprehensive meeting and review process. First, the Agreements provided that each company would appoint an Alliance Executive, a Marketing Executive, a Financial Executive, and a Development Executive, all of whom (known as the "Alliance Executive Committee") would be jointly responsible for overseeing the Agreements. (Compl. ¶¶ 53-55.) Further, the Agreements required: 1) that the Alliance Executive Committee meet semi-annually, 2) that the President of Chipcom and the IBM General Manager for Networking Services Line of Business ("NSLOB") meet annually, and 3) that there would be

---

[6]The companies signed three integrated commercial agreements: the Master Agreement, the Remarketing Agreement and the Development Agreement (collectively known as the "Alliance Agreements"). (Compl. ¶ 51.)

[7]ATM is a cell switching technology designed to simultaneously transport data, voice and video at greater speeds than standard Ethernet or Token Ring. IBM was the sole supplier of ATM and Token Ring expertise to Chipcom in 1994. (Compl. ¶ 75.)

individual Marketing/Remarketing, Financial, and Development meetings each quarter, during which time important information such as volume outlooks, industry trends, project status, and relevant financial data would be shared. (Compl. ¶¶ 58-63.)

Specifically, the Remarketing Agreement required either party, after deciding to remarket the other party's product, to submit 1) an initial three-year forecast of volume requirements, 2) interval three-month forecasts for the coming twelve month period, and 3) firm purchase orders at least ninety days prior to a delivery date.[8] (Compl. ¶¶ 64-65.) Chipcom recognized the importance of the forecasts, stating in its March 30, 1995 10K report that the "volume of products to be sold by the Company to IBM [was] based on forecasts supplied by IBM and not on specific purchase requirements." (Compl. ¶ 69.) In addition to the formal requirements, plaintiffs allege that informally

> IBM and Chipcom constantly communicated at various organizational levels . . . in order to remain current as to the state of all aspects of their relationship, including inventory needs, product and spare parts levels, forecasts of purchasing requirements, development projects, engineering changes and the sales and purchases of Remarketing products.

(Compl. ¶ 62.)

Chipcom began selling products to IBM under the Alliance Agreements in the fourth quarter of 1992. Over the next two years, sales to IBM increased dramatically:

---

[8]Modifications or cancellations of purchase orders were strictly controlled, triggering penalties under an agreed upon schedule. (Compl. ¶ 67.)

IBM Contribution to Chipcom Revenues
(in millions)

| | 1993 | 1Q94 | 2Q94 | 3Q94 | 4Q94 | 1994 | 1Q95 |
|---|---|---|---|---|---|---|---|
| Total Revenue | | 51.9 | 61.3 | 71.7 | 82.9 | 267.8 | 86.2 |
| IBM $ | 34.0 | 15.5 | 25.7 | 29.6 | 31.6 | 102.4 | 30.6 |
| IBM % | 21.2 | 29.9 | 41.9 | 41.3 | 38.1 | 38.2 | 35.5 |

(Compl. ¶¶ 81, 85) (percentages supplied.)

Accordingly, Chipcom's total revenues increased.  A February 7, 1995 press release announced that the fourth quarter of 1994 and fiscal year 1994 were "the most successful periods in the Company's 11-year history" (Compl. ¶ 84; Appendix, Ex. 3), that fourth quarter 1994 revenues were up 72% from the fourth quarter of 1993, and that earnings for the quarter were up 77%.  (Compl. ¶ 84.)

Chipcom's total revenues continued to increase from the fourth quarter of 1994 through the first quarter of 1995.  In fact, an April 19, 1995 press release statement reported record first quarter revenues for 1995 of $86.21 million, a 66% increase over the first quarter of 1994.  In addition, the company announced quarterly net income of $8 million--or $0.45 per share --a 300% increase over the first quarter of 1994.  (Compl. ¶ 111.)  IBM's contribution to total revenues dipped only slightly from $31.6 million to $30.6 million.  (Compl. ¶ 85.)

Also on April 19, 1995, Chipcom made its first *public projection* for the second quarter, announcing that IBM revenues would be in the $24 million range (20% down from first quarter).  Since February, the *internal* projections for second quarter IBM revenues had dropped from $30 million to approximately $22 million throughout March, with the exception of a $32 million

7

March 17 estimate.  Nevertheless, since early February, the
*yearly* IBM revenue projections remained constant, and the yearly
*total* revenue projections actually increased during early March.
(Appendix, Exs. 1, 2, 15, 16, 20.)

Ultimately, however, sales to IBM suffered a more severe
setback during the second quarter of 1995.  On May 26, 1995,
Chipcom lowered the prediction to $15 million (50% down from
first quarter).  The plaintiffs allege that the defendants knew
of the gravity of the developing "IBM problem," yet misled
investors by failing to disclose the information--while
continuing to make optimistic statements--thereby artificially
inflating stock prices.  In support, plaintiffs' Complaint
identifies numerous statements alleged to have been made by
Chipcom, the individual defendants and other third-parties.  The
statements are derived from various documents--press releases,
internal memos, transcripts of conference calls with analysts,
and transcripts of interviews.[9]  Finally, plaintiffs set forth

---

[9]I note that defendants too readily reduce the 79-page, 164-
paragraph Complaint to "seven statements." (Defs.' Mem. in Supp.
of Mot. to Dismiss at 3.)  In contrast, the meandering and
loosely organized Complaint repetitively weaves fragmented
portions of over twenty documents throughout the 164 paragraphs,
creating the illusion of greater quantity.
    At an April 10, 1996 hearing on the motion to dismiss, the
plaintiffs identified as actionable eight dated communications,
captured in identifiable documents, which I find contain sixteen
discrete statements.  I find the proper approach for review is to
demarcate each "discrete unit" of language capable of legal
analysis.  "Statements" for purposes of securities analysis does
not necessarily refer to "documents" or "sentences" but to
identifiable language capable of legal analysis.  See, e.g.,
Shapiro v. UJB Financial Corp., 964 F.2d 272, 284 (3rd Cir.),
cert. denied, 506 U.S. 934 (1992) ("In light of the confusion
that pervades plaintiffs' allegations, we conclude that the
entire complaint must be reorganized. . . . on remand plaintiffs

additional facts consisting of internal projections, and insider

trading figures.

**A.    Alleged Actionable Statements**
     (emphasis added)

[February 7, 1995: 1994 yearly and quarterly results announced.]

1.    February 8, 1995 Press Release:

a. [Chipcom and IBM] today announced a significant,
   multiyear expansion to the existing strategic,
   worldwide development and marketing alliance between
   the two firms, originally signed in September, 1992,
   to now include several new product and technology
   areas.
   (Appendix, Ex. 4; Compl. ¶ 150(a)(i), 89.)

b. Held Statement
   This extension strengthens our already strong alliance
   with IBM. . . . The IBM-Chipcom relationship has been
   mutually beneficial from day one, and we are obviously
   extremely delighted that IBM has endorsed our Ethernet
   and Token Ring stackable hubs and Ethernet switching
   technologies as important additions to their product
   arsenal.
   (Appendix, Ex. 4; Compl. ¶ 91.)

2.    March 6, 1995 Abraham Statement in Business Wire:
   [Chipcom, IBM and Ericsson announcing their intention to enter
   into a strategic relationship to introduce multimedia networking
   solutions to business communication market.]

a. This three-company relationship builds on Chipcom's already
   strong and recently expanded strategic alliance with IBM and
   is the next step in deepening and widening our existing
   reseller relationship with Ericsson. . . .
   (Appendix, Ex. 17; Compl. ¶¶ 99, 150(c)(i).)

---

should rearrange the existing allegations into discrete units
that are, standing alone, each capable of evaluation under the
legal principles we have set forth").
     In addition, at the April 10, 1996 hearing I ordered that
the original documents which plaintiffs contend captured the
actionable statements be promptly submitted to the court as an
appendix to the Complaint.  The reasons for requiring the
Appendix were 1) to allow assessment of the Complaint in light of
Rule 9(b)'s particularity requirement, and 2) to provide context,
completeness, and comparison against plaintiffs' truncation and
paraphrasing in the Complaint.
     I may refer to the full texts of plaintiffs' documents--now
an Appendix to the Complaint itself--under the authority of
Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993) and San Leandro
Emergency Medical Group v. Philip Morris Companies, 75 F.3d 801,
808-809 (2d Cir. 1996).

      **b.** The broad, complementary technology base of Ericsson, IBM and Chipcom will serve as an <u>excellent foundation for the exciting product development activities ahead of us</u>.
(Appendix, Ex. 17; Compl. ¶¶ 99, 150(c)(i).)

**3.** <u>March 30, 1995 Held Letter in Annual Report</u>:

[addressing several reasons for the success during 1994 . . . ] Chipcom's <u>third-party relationships were important</u> to the Company's success in 1994, especially our strategic marketing and development alliance with IBM which <u>remains strong and mutually beneficial</u>. IBM's ongoing[10] investments in [ATM] and Token Ring technologies, combined with Chipcom's internal development efforts, <u>will allow us to continue our expansion</u> in these important areas.
(Appendix, Ex. 21; Compl. ¶¶ 75, 83.)[11]

**4.** <u>April 5, 1995 Business Wire Report</u>:
[preliminary first quarter 1995 revenues announced]

[D]ue to recent heavy trading volumes in its stock [the company decided to announce] preliminary financial results for the first quarter. . . . <u>The company announced that, on the basis of information available to date, revenue for the quarter is expected to be approximately $86 million</u>, and earnings per share are expected to range between $0.44-$0.46.
(Appendix, Ex. 22; Compl. ¶ 104.)

**5.** <u>April 6, 1995 Radio Interview (Held Statements)</u>:

      **a.** [The] Company <u>expects to have another very good year</u>. We are forecasting <u>for the year</u> . . . analysts are forecasting and we are supporting forecast[s] which would place the Company at the $370 million revenue range and the $2 dollar to maybe a little above range for earnings <u>for the year as a whole</u>. <u>Those</u>

---

[10]Plaintiffs use the adjective "continuing" (<u>see</u> Compl. ¶ 39), while "ongoing" is used in the original document. (Appendix, Ex. 21.)

[11]An almost identical statement by Held appeared in the February 7, 1995 press release announcing 1994 yearly and fourth quarter results:

Chipcom's third-party relationships were also important to the company's success [ ] especially our strategic marketing and development alliance with IBM which <u>remains strong and mutually beneficial</u>. IBM's ongoing investments in ATM and Token Ring technologies will allow us to <u>continue expanding</u> our product lines in these important areas.
(Appendix, Ex. 3, Compl. ¶ 84.)

10

forecasts, are very reasonable. . . .

   b. [The] IBM relationship <u>continues to be a very
important relationship</u> for Chipcom, in multiple
senses.  It is both a technology relationship as well
as a sales channel.

   c. [A]s a sales channel it has been <u>very, very successful</u>
for us.  We are <u>very happy</u> with the way it's
performing <u>overall</u> . . . year to year <u>growth has been
very strong</u>. . . .

   d. [Chipcom and IBM's transition from ONline to ONcore
is] <u>going very well</u>. . . . [T]he exact balance between
these two products is always a little hard to
forecast.  IBM is [] moving through the transition as
are we . . . in any transition, <u>you have to be very
careful</u> about how you manage the stock [IBM's
inventory].  But IBM's actual performance in Q1 for
both products [ONline and ONcore] <u>was substantially
higher</u> than it was, for example, a year ago.
(Appendix, Ex. 24; Compl. ¶¶ 106-108; 35.)[12]

6.   <u>April 11, 1995 Robertson Stephens & Co. Statement</u>:
   (distributed April 19, 1995)

   Chipcom's management preannounced guidance for the
quarter that was completely consistent with previous
guidance and our expectations for the quarter.  As a
result, the final results should come as no surprise
to anyone.  The real issue remains forward guidance.
<u>There have been numerous concerns</u> expressed among
investors that Chipcom's business with IBM (40% of
revenue) <u>may not be growing as fast as it had been in
previous quarters</u> and that IBM may have some inventory
building throughout its organization.  As such
investors seem concerned with future earnings
potential.  <u>Management has indicated that it feels
comfortable with the IBM relationship and current
demand</u>, and it has not changed financial guidance <u>for
the year</u>.
(Appendix, Ex. 25; Compl. ¶ 109.)

7.   <u>April 19, 1995 Press Release</u>:

   Driven by <u>strong performances in its reseller channels</u> and
continued customer acceptance of the company's products and
overall technology direction, [Chipcom] today announced
record sales for the first quarter of its 1995 fiscal year,
ended April 1. [reporting revenues of $86.21 million, a 66%
increase over the first quarter of 1994, and net income of
$8 million, or $0.45 per share, a 300% increase over the
first quarter of 1994.]
(Appendix, Ex. 26; Compl. ¶¶ 111, 112.)

---

[12]I note that plaintiffs' Complaint makes material omissions
when compared to the original document now supplied in the
Appendix.

8.   <u>April 19, 1995 Conference Call with Analysts</u>:

   a. <u>Badavas Statements to Analyst</u>
      Gross margins in the quarter [Q1 1995] of 52.7% was
      fully <u>in line with our expectations</u> and our guidance .
      . . Distribution [to] IBM in the quarter, $30.6
      million [was] fully in line with our guidance as of
      the February conference call . . . .
      (Appendix, Ex. 27; Compl. ¶ 32.)

   b. I would nominally say at this point that it is <u>our
      expectation based on what we know now</u> that our
      sequential shipment stream to IBM <u>will be down
      approximately 20% from its first quarter level</u>.  To do
      the arithmetic, that says that we are in the <u>$24
      million range</u> in the second quarter.
      (Appendix, Ex. 27; Compl. ¶¶ 36, 116.)

   c. <u>Held Statements to Analysts</u>
      IBM did get off to a <u>slow start</u> from a sales point of
      view during the early part of the year, that and mix
      issues . . . which result from the transition of
      products from 8250 to 8260 has <u>resulted in an
      imbalance in the IBM inventory position</u> which does
      mean that we do expect that in <u>all probability we will
      be reducing our Q2 IBM shipments to rebalance, to give</u>
      them a chance to rebalance their inventory, <u>a problem
      which we expect to be by us by the end of Q2</u>.
      (Appendix, Ex. 27; Compl. ¶ 114.)

   d. [T]he product transition from 8250 to 8260
      business has created an imbalanced inventory position
      at IBM.  This <u>will in all probability mean reducing
      our Q2 IBM shipments to rebalance</u>, to give them a
      chance to rebalance their inventory.  <u>We expect by the
      end of Q2 IBM will be back on track and in balance</u>.
      This reduction is being nicely picked up by steady
      healthy growth in our trade channels.
      (Appendix, Ex. 27; Compl. ¶¶ 35, 108.)

B.   Additional Statements By Defendants

      In addition to the allegedly actionable statements,

plaintiffs refer to the following public statements by

defendants:

   1.  <u>May 12, 1995 10-Q Report</u>:

      [R]evenue derived from IBM <u>during the second quarter</u>
      of 1995 <u>will be below</u> the level reported in the first
      quarter <u>due to an inventory imbalance</u> that <u>currently
      exists</u> within IBM.
      (Compl. ¶ 133.)

   2.  <u>May 26, 1995 Press Release (Held Statement)</u>:
      [There will be] lower shipment levels to IBM . . .

12

consequently, Chipcom's <u>revenue expectations</u> for the <u>second quarter</u> <u>and the year</u> will be reduced. (Compl. ¶ 136.)

3.   <u>May 26, 1995 Conference Call to Analysts</u>:
[Announcing IBM second quarter revenue projection of about $15 million, 50% down from first quarter results, and a yearly earnings projections almost 50% lower than April 6, from $2.00 per share to $1-$1.30 per share.]
(Compl. ¶ 138.)

   a. <u>Held Statement</u>:
Our revenue shortfall seems to be directly related to a major reorganization that happened in IBM early in 1995 in the field, the networking sales specialists in the U.S. which we had trained in 1993 and 1994 were disbursed throughout the general salesforce and apparently this caused a drop in activity which showed up as a reduction in the pipeline for new order. <u>The pipeline from Q3 to Q4 1994 activity carried us in Q1</u> [1995], but apparently was <u>quite dry by the end of Q1</u>. (Compl. ¶ 139; 71.)

   b. <u>Badavas Statement</u>:
[IBM] does not currently sell ONsemble . . . they will begin selling ONsemble in the second half of the year. (Compl. ¶ 118.)

C.   **Additional Statements By Analysts**

In addition to the allegedly actionable Business Wire (A4) and Robertson Stephens (A6) statements, plaintiffs refer to certain other third-party statements:

1.   <u>February 10, 1995 Boston Business Journal</u>:

[Noting the high percentage of Chipcom sales through IBM was sparking industry speculation that IBM would buyout Chipcom].
(Compl. ¶ 93(a).)

2.   <u>February 15, 1995 Computergram International</u>:

[Chipcom and IBM] are getting so co[z]y [that IBM may be acquiring Chipcom].
(Compl. ¶ 93(b).)

3.   <u>February 15, 1995 PaineWebber Statement</u>:

[Announced an extension of Chipcom's relationship with IBM, IBM's agreement to take Chipcom's new stackable hubs and switching hubs, and a resulting $10 million increase in IBM's contribution to Chipcom's revenues.]

13

The <u>signing of an extended relationship with IBM . . .</u>
<u>will sustain 30-40% revenue growth in the IBM channel</u>
<u>in 1995.  Non-IBM channels are still very healthy</u>
(estimated 64% growth in 1995) and the faster growth
here would normally lead to improving gross margins. .
. . More important, the extension of the relationship
signals no wavering in IBM's commitment to CHPM . . .
<u>interdependencies are building between both parties</u> .
. . .

(Compl. ¶¶ 150(b), 93(c).)


4.   <u>April 20, 1995 Cowen & Co. Statement</u>:

Chipcom [attributed the inventory imbalance] to IBM's
forecasting process which resulted in orders ahead of
their customer's requirements. . . . Chipcom <u>expects</u>
<u>IBM inventory levels to normalize in 2Q</u> . . . .
(Compl. ¶¶ 37, 130.)


5.   <u>April 20, 1995 NatWest Statement</u>:

The key issue in the quarter was the IBM relationship,
and an <u>inventory problem</u> . . . which will result in
lower sequential shipments to IBM in 2Q.  The company
indicated that inventory of specific modules . . . are
currently in <u>oversupply at IBM</u>, and projects that it
will take several months to work through the
inventory. . . . <u>The company indicated that the reason</u>
<u>for the inventory imbalance was related to IBM's</u>
<u>internal planning</u> over the last two quarters. . . .
Although we are concerned by the buildup of inventory
at IBM, we believe that much of this concern is
already reflected in the price of the stock and that
<u>there is a credible scenario for a turnaround in the</u>
<u>second half.</u>
(Compl. ¶¶ 124, 125, 130.)


6.   <u>April 20, 1995 Robertson Stephens & Co. Statement</u>:

[I]nvestors have been very concerned recently about
Chipcom's relationship with IBM.  The concerns ranged
rom a complete falling apart of the relationship to
too high of inventories in the IBM channel  . . . On
the analysts' conference call . . . <u>management stated</u>
<u>that IBM does have too much inventory of the current</u>
<u>generation intelligent hubs (IBM 8250) and that it</u>
<u>will take at least one full quarter to work through</u>
<u>the problem.</u>
(Compl. ¶ 123.)


7.   <u>April 20, 1995 PaineWebber Statement</u>:

The company indicated that while shipments may be down
as much as 20% in Q2, <u>CHPM felt it could rectify the</u>
<u>IBM problem by the end of Q2.</u>
(Compl. ¶¶ 37, 122.)


14

8.  **May 30, 1995 Robertson Stephens & Co. Statement:**

    [after stating that they would be lowering their
    investment recommendation . . .] It is very hard for
    us to conceive of demand for these products dropping
    so precipitously in such a short time period. We can
    only conclude that either the shipment levels in 1994
    were significantly higher than end demand, therefore
    the inventory problem is much greater than described
    or IBM's reselling of the next generation 8260
    (Chipcom's ONcore) is not going as well as Chipcom
    would have hoped.
    (Compl. ¶ 144.)

9.  **June 7, 1995 Wall Street Journal Article Entitled,**
    **"Chipcom Shares Dumped Prior to IBM's News":**

    [Chipcom spokesperson] says the information was
    released in a 'timely fashion.' . . . But an IBM
    spokesman was less certain. He said there were
    several meetings between IBM and Chipcom officials
    'earlier in the year' at which the developing problems
    were discussed.
    (Sahid Declaration, Ex. 1; Compl. ¶¶ 6, 71, 142-143.)

## D.  Internal Projections

The Complaint sets forth the following internal projections

for revenues (in millions):

| 1995 | Second Quarter (IBM) | 1995 (IBM) | Total |
|------|------|------|------|
| January 16, 1995 | $37 | 148 | 430.5 |
| February 6, 1995 | $30 | 127.7 | 382 |
| March 3, 1995 | $22 | 128 | 421 |
| March 6, 1995 | $22 | 129.7 | 422.7 |
| March 17, 1995 | $32[13] | 129 | 380 |
| April 19, 1995* | $24 | -- | -- |
| April 26-27, 1995 | $24 ($2.4 from ONsemble) | 109.1 | 370.7 |
| May 26, 1996* | $15 | -- | 330-350 |

*made public

_____

[13]I note that plaintiffs assert in the Complaint that the
March 15 second quarter projection was $22, presumably to bolster
their contention that Chipcom knew throughout March--and failed
to disclose--that IBM's second quarter revenues would be
significantly lower than the first quarter. (Compl. ¶ 87.)
However, the March 17 internal projection document submitted by
plaintiffs to particularize this allegation shows a figure of $32
million, substantially undermining this argument. (Appendix, Ex.
20.)

15

(Appendix, Exs. 1, 2, 15, 16, 20, 33, 35, 42; Compl. ¶ 87.)

In addition, plaintiffs refer to the following non-public statement captured in an April 5, 1995 internal memorandum. The memorandum comments on historical facts, and, in general terms, projections for the first quarter:

1. <u>April 5, 1995 Internal Memorandum</u>:

> We met today with IBM to review Q1 volumes. Since the recent drop in our stock price <u>has been attributed by many</u> to softness in our IBM business, it is important that we understand the real numbers. . . . The <u>1Q95 numbers are partial because they do not include all March shipments</u>. . . . When shipments to US, Canada, Latin America and Asia/Pacific are added, the 1Q95 results should go up at least 25%. <u>The point is that year-to-year growth is strong. Quarter-to-quarter results show a decline</u> that reflects the normal seasonality of IBM business. The 8250 is on-track against the seasonal plan, while <u>the 8260 is somewhat behind, but not disastrously so. 8260 volumes in 1Q95 were negatively affected by numerous problems in the new token ring products</u>. IBM does not track shipments to internal IBM customers, which were <u>very strong</u> in 1Q95. . . . The point is that IBM's hub business is <u>reasonably healthy</u>. . . . it could be a lot better, it they assign better sales people to networking. We are working hard to convince them to do this.
> (Appendix, Ex. 23; Compl. ¶ 103.)

E.    **Alleged Insider Trading**

Finally, the Complaint details alleged trading by the individual defendants during the class period:

| Insider | Date | # Shares | Sold Price |
|---|---|---|---|
| Menachem Abraham | 2/10/95 | 17,155 | $45.75 |
| John Held | 2/10/95 | 10,000 | $45.75 |
| Robert Badavas | 2/10/95 | 10,000 | $46.00 |
| John Meyer[14] | 2/10/95 | 10,000 | $46.50 |
| Bruce Cohen | 2/16/95 | 15,000 | $42.875 |
| | | | |
| Jerald Fishman | 3/09/95 | 500 | $42.50 |
| | 3/10/95 | 500 | $43.00 |
| | 3/10/95 | 500 | $43.38 |
| | 3/17/95 | 2,000 | $43.50 |
| | | | |
| Menachem Abraham | 4/26/95 | 12,000 | $30.00 |
| Bruce Cohen | 4/27/95 | 6,000 | $32.00 |
| | 4/27/95 | 9,000 | $32.25 |
| John Held | 4/27/95 | 2,000 | $32.25 |
| | 4/27/95 | 4,000 | $32.00 |
| Robert Badavas | 4/28/95 | 10,000 | $31.88 |
| John Held | 4/28/95 | 4,000 | $31.75 |

| Totals: | Shares Sold | Proceeds | Est. Profits[15] |
|---|---|---|---|
| Menachem Abraham | 29,155 | $1,144,841[16] | |
| Bruce Cohen | 30,000 | $1,250,000 | >$580,000 |
| Robert Badavas | 20,000 | $778,800[17] | >$530,000 |
| John Held | 20,000 | $777,000 | >$475,000 |
| Jerald Fishman | 3,500 | $151,440 | |
| ~~John Meyer~~ | ~~10,000~~ | ~~$465,000~~ | |
| | 112,655 | $4,567,081[18] | |

(Compl. ¶¶ 8, 17-23, 150-51.)

---

[14]I note that John Meyer, Vice President of Human Resources, is *not* a named defendant. Meyer sold 10,000 shares on February 10, 1995 realizing proceeds of $465,000. He then purchased 10,000 shares on the same day for approximately $187,000, a gain at sale of over $278,000. (Compl. ¶ 23.)

[15](Compl. ¶¶ 17-22.)

[16]This figure is based on the 17,155 figure indicated in ¶¶ 150(a)(ii) and 151 of the Complaint. Elsewhere, it appears that plaintiffs have used the figure 17,500, producing a total number of shares sold of 29,500 and total proceeds of 1,160,625 (see ¶ 8, 20). In addition, the 17,155 figure, which I employ, produces a grand proceeds total of $4,567,081. (Cf. Compl. ¶ 29.)

[17]Plaintiffs inadvertently indicate the total as $778,000.

[18]Cf. $4,517,815 (Compl. ¶ 29.)

17

### III.

In reviewing the motion to dismiss, I "take the allegations in the complaint as true and must make all reasonable inferences in favor of the plaintiffs." Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993) (citing Monahan v. Dorchester Counseling Ctr., 961 F.2d 987, 988 (1st Cir. 1992)). Furthermore, I may grant dismissal only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Roeder v. Alpha Indus., 814 F.2d 22, 25 (1st Cir. 1987) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).

A.    Section 10(b) and Rule 10b-5

Count I alleges violations of § 10(b), and corresponding Rule 10b-5, of the Securities Exchange Act of 1934, against both Chipcom and the individual defendants. Section 10(b) makes it unlawful:

> To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). In conjunction, Rule 10b-5, promulgated by the Securities and Exchange Commission, further provides that:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
> (a) To employ any device, scheme, or artifice to

18

defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5 (emphasis added).

In order to state a claim under § 10(b) and Rule 10b-5, the plaintiffs must show that: (1) the defendants made a misrepresentation or omission of material fact, (2) with scienter, (3) upon which the plaintiffs relied, (4) and that caused damages to the plaintiffs.  Van De Velde v. Coopers & Lybrand, 899 F. Supp. 731, 734 (D. Mass. 1995) (citing Basic v. Levinson, 485 U.S. 224, 230-32 (1988)).  A material fact is one that is "likely to be viewed by the reasonable investor as significantly altering the total mix of available information."  Colby v. Hologic, Inc., 817 F. Supp. 204, 209 (D. Mass. 1993) (citing TSC Indus., Inc. v. Northway, 426 U.S. 438, 445 (1976)); Lucia v. Prospect St. High Income Portfolio, Inc., 36 F.3d 170, 175 (1st Cir. 1994).  The Supreme Court has defined the scienter requirement as "a mental state embracing intent to deceive, manipulate or defraud."  Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194, n.12 (1976).

In addition, Rule 9(b) of the Federal Rules of Civil Procedure requires that the plaintiffs state all allegations of fraud, such as those presented here, with particularity.  Fed. R. Civ. P. 9(b).  The First Circuit strictly construes this

19

requirement in the securities fraud context:

> [G]eneral averments of the defendants'
> knowledge of material falsity will not
> suffice. Consistent with Fed.R.Civ.P. 9(b),
> the complaint must set forth 'specific facts
> that make it reasonable to believe that
> defendant[s] knew that a statement was
> materially false or misleading.' The rule
> requires that the particular 'times, dates,
> places or other details of [the] alleged
> fraudulent involvement' of the actors be
> alleged.

Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d 357, 361 (1st

Cir. 1994) (citations omitted).[19] If the allegations of fraud are

based upon information and belief, the complaint must state "the

source of the information and the reasons for the belief."

Romani v. Shearson Lehman Hutton, Inc., 929 F.2d 875, 878 (1st

Cir. 1991). The plaintiffs must meet these requirements even if

the "fraud relates to matters peculiarly within the knowledge of

---

[19]Contrary to defendants' allegation, plaintiffs do not argue
that "notice pleading" is the correct standard. Plaintiffs
merely rely on First Circuit cases, such as Wayne Investment,
Inc. v. Gulf Oil Corp., 739 F.2d 11, 13 (1st Cir. 1984), which
link particularity to notice. For example, Wayne describes the
"special pleading requirement" of "particularity" as "provid[ing]
the defendant with notice of the grounds on which plaintiff's
fraud claim rests." Id.
   Defendants correctly argue that the roles of the individual
defendants must also be particularized, Manchester Manufacturing
Acquisitions, Inc., v. Sears, Roebuck & Co., 802 F. Supp. 595,
600 (D.N.H. 1992), in order to insure that officers and directors
are not sued solely on the basis of status, Loan v. Federal
Deposit Ins. Corp., 717 F. Supp. 964, 968 (D. Mass. 1989), and so
that each defendant is given notice of his specific alleged role.
Konstantinakos v. Federal Deposit Insurance Corp., 719 F. Supp.
35, 38 (D. Mass. 1989). Here, unlike the facts in Loan and
Konstantinakos, plaintiffs have attributed specific statements to
defendants Held, Badavas, and Abraham (but not to Cohen or
Fishman.) However, as discussed below, while individual roles
may be particularized, the statements are not actionable.

the opposing party." Id.; Lucia, 36 F.3d at 174. "To survive a

motion for dismissal [] a complaint must contain, at a minimum,

'factual allegations that would support a reasonable inference'

that 'circumstances adverse' to the defendant's statements 'were

known and deliberately or recklessly disregarded' at the time the

statements were made." Colby, 817 F. Supp. at 210 (citing

Romani, 929 F.2d at 878.)[20]

---

[20]I note, but do not here rely upon the fact, that the
pleading standard has recently been heightened by the December
22, 1995 enactment--overriding the President's veto--of the
Private Securities Litigation Reform Act of 1995, Pub. L. No.
104-67, § 101(b), 109 Stat. 737, 747 (to be codified at 15 U.S.C.
§ 78u-4). Section 101(b), adding a new section 21D to the
Securities Exchange Act of 1934, was designed to conform to Rule
9(b), to resolve differences within the circuits, and to
strengthen existing pleading requirements--following but not
codifying the pleading standard of the Second Circuit. Conf.
Rep. No. 104-369, 104th Cong., 1st Sess. (1995).
    Although not applicable to pending actions (see § 108) such
as this, Section 101(b) provides that a complaint should be
dismissed if the requirements of paragraphs (1) and (2) are not
met:

> (1) MISLEADING STATEMENTS AND OMISSIONS--In any private
> action arising under this title in which the plaintiff
> alleges that the defendant--
>> (A) made an untrue statement of a material
>> fact; or
>> (B) omitted to state a material fact
>> necessary in order to make the statements
>> made, in the light of the circumstances in
>> which they were made, not misleading;
> the complaint shall specify each statement alleged to
> have been misleading, the reason or reasons why the
> statement is misleading, and, if an allegation
> regarding the statement or omission is made on
> information and belief, the complaint shall state with
> particularity all facts on which that belief is formed.

> (2) REQUIRED STATE OF MIND--In any private action
> arising under this title in which the plaintiff may
> recover money damages only on proof that the defendant
> acted with a particular state of mind, the complaint

In this case, plaintiffs argue that a reasonable inference can be drawn from the close relationship with IBM (including the meeting and review process), the internal projections, the extent of insider trading, as well as statements by defendants and outsiders, that defendants knew *before* May 26--as well as before April 19--that second quarter IBM revenue would be significantly lower.  Thus, plaintiffs argue for a contextual analysis of all proffered facts, see McMahan & Co. v. Wherehouse Entertainment, Inc., 900 F.2d 576, 579 (2d Cir. 1990), cert. denied, 501 U.S. 1249 (1991), while defendants analyze and dismiss the statements individually.

1.    Alleged Actionable Statements

As discussed above, the Complaint contains numerous statements of varying types by defendants--historical summaries, predictions, puffery--as well as statements by third parties. However, analyzed individually, I find none of the allegedly actionable statements supports a cause of action.

First, with respect to historical statements, "defendants may not be held liable under the securities laws for accurate

---

shall, with respect to each act or omission alleged to violate this title, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

§ 101(b) (emphasis added).
    The Act does not specify the required state of mind, and a Conference Committee amendment was rejected which would have incorporated the Second Circuit's standard of allowing a "strong inference" to be demonstrated by particularized pleadings of motive, opportunity or recklessness.  See, e.g., San Leandro, 75 F.3d at 813; Conf. Rep. No. 104-369, 104th Cong., 1st Sess. (1995).

reports of past successes, even if present circumstances are less rosy." <u>Serabian</u>, 24 F.3d at 361; <u>Capri Optics Profit Sharing v. Digital Equipment Corp.</u>, 950 F.2d 5, 8 (1st Cir. 1991) (accurate past results not actionable). <u>See also In re Caere Corporate Securities Litigation</u>, 837 F. Supp. 1054, 1058 (N.D. Cal. 1993) (historical statements "contain no implicit prediction that those events or conditions will continue in the future").

Second, "optimistic predictions about the future that prove to be off the mark likewise are immunized unless plaintiffs meet their burden of demonstrating intentional deception." <u>Serabian</u>, 24 F.3d at 361 (citations omitted); <u>Capri Optics Profit Sharing</u>, 950 F.2d at 11 (finding "well poised [for the next quarter]" no promise of future success and thus not actionable). In <u>Serabian</u>, the First Circuit stated that a defendant could, for example, state: "'This is our eighth consecutive quarter in which our gross has increased,' [without the] duty to add, for the benefit of market buyers, 'We are concerned about the next one.'" <u>Id.</u> at 361, n.4. The First Circuit explained, however, that the rule might be different if "defendant's apprehension was of a disaster." <u>Id.</u> (citation omitted.) <u>See also In re Healthcare Compare Corp. Securities Litigation</u>, 75 F.3d 276, 281 (7th Cir. 1996) ("forward-looking statements need not be correct; it is enough that they have a reasonable basis") (citation omitted).[21]

_____

[21]The Private Securities Litigation Reform Act of 1995 (<u>see</u> above n. 20) appears also both to clarify and heighten the pleading and proof requirements for forward-looking statements, by adding a new section 21E to the Securities Exchange Act of

Similarly, vague and general positive comments--"puffery"--concerning the present *or* future are not actionable.  Serabian, 24 F.3d at 361 ("look[ing] to the future with great optimism" is "clearly inactionable puffing") (citation omitted).  See also San Leandro Emergency Medical Group v. Philip Morris Companies, 75 F.3d 801, 811 (2d Cir. 1996) (vague statements not actionable because no reasonable investor would rely on them); Gross v. Summa Four, Inc., No. C-94-364-B, 1995 WL 806823 at *10 (D. N.H. Nov. 8, 1995) (same); Rand v. Cullinet Software, Inc., 847 F. Supp. 200, 208 (D. Mass. 1994) (finding statements "optimistic about the year ahead" and "long term prospects bright" not actionable) (citing cases).

Analyzed individually none of defendants' statements are actionable.[22]  Historical statements are found in A1(b) ("IBM-Chipcom relationship has been mutually beneficial from day one");

---

1934.  Again, I note--although I do not treat as operative in this case commenced before the effective date of the Act--that section 102(b) of the Act creates a "safe harbor" for forward-looking statements that are:

(A)  (i) identified as forward-looking and accompanied by meaningful cautionary statements or
     (ii) immaterial; or
(B)  (i) made by a natural person who did not have actual knowledge that the statements were false or misleading; or
     (ii) made by a business entity, by or with the approval of an executive officer, who did not have actual knowledge that the statements were false or misleading.

See § 102(b).

[22]I will refer to the statements by the letter and number denoting the statements in section II above.

24

A3 ("third-party relationships were important"); A5(c) ("[IBM
channel] has been very, very successful" . . . "very happy with
[performance] overall" . . . "year-to-year growth has been very
strong"); A5(d) ("performance [in 1Q95] for both products was
substantially higher [than 1Q94]"); A7 and A8(a) (reporting 1995
first quarter results); and A8(c) (transition "has resulted in an
imbalance in the IBM inventory position").

Future-oriented comments are found in A4 ("revenue for
[1Q95] expected to be approximately $86 million"); A5(a)
("expects to have another very good year" . . . "forecasting . .
. $370 million revenue range. . . for the year"); A8(b) ("our
expectation . . . $24 million range in the second quarter");
A8(c) ("expect to be by [inventory problem] by the end of Q2");
and A8(d) ("by the end of Q2 IBM will be back on track and in
balance . . . reduction is being nicely picked up by steady
healthy growth in our trade channels").[23]

Finally, general, positive statements, describing the
present and future relationship with IBM are found in A1(a)
("significant multiyear expansion"); A2(b) ("excellent
foundation" . . . "exciting product development activities"); A3
("important" . . . "continue our expansion"); A5(b) ("continues
to be a very important relationship"); A5(d) ("[transition to new
products] going very well . . . in any transition you have to be

---

[23]Moreover, based on Chipcom's internal projection charts
submitted by plaintiffs in the Appendix, Chipcom believed that
1995 would, generally, be a successful year, consistent with the
$370 million public projection.  (See above section II(D).)

very careful about how you manage the stock"); and A6

("management has indicated that it feels comfortable with the IBM

relationship and current demand").[24]

Plaintiffs argue that defendants' use of the word "strong"

---

[24]Moreover, the analyst statement (A6), is also not
actionable because there is insufficient allegation of
entanglement. In general, where "defendants are alleged only to
have authorized or acquiesced in [statements] . . . or they are
attributed no role at all in the dissemination of the
statements," the requirements of Rule 9(b) have not been met.
Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d 357, 368 (1st
Cir. 1994). Similarly, the Second Circuit has concluded that
dismissal of imputed statements is appropriate unless a defendant

> sufficiently entangled itself with the
> analysts' forecasts to render those
> predictions attributable to it . . . [by
> placing] its imprimatur, expressly or
> impliedly, on the analysts' projections.

Elkind v. Liggett & Myers, Inc., 635 F.2d 156, 163 (2d Cir.
1980). See also Raab v. General Physics Corp., 4 F.3d 286, 287
(4th Cir. 1993) ("The securities laws require [the company] to
speak truthfully to investors; they do not require the company to
police statements made by third parties for inaccuracies, even if
the third party attributes the statement to [the company]"); In
re Caere Corporate Securities Litigation, 837 F. Supp. 1054,
1059-60 (N.D. Cal. 1993) (sufficient entanglement occurs, for
example, when a defendant has reviewed the analysts' statements
and made an implied representation that the information is true).
   Plaintiffs assert that defendants routinely communicated
with several securities firms including PaineWebber, Robertson
Stephens & Co., NatWest Securities, and Cowen & Co. (Compl. ¶
30), and that routine conference calls followed a "standard
format" of giving "pre-release" guidance on operations and
financial prospects. (Compl. ¶¶ 31-33.) Plaintiffs argue that
"defendants made these communications in order to cause or
encourage them to issue favorable reports concerning Chipcom and
. . . to falsely present the operations and prospects of Chipcom
to the marketplace in a favorable light and to artificially
inflate the market price of Chipcom's common stock." (Compl. ¶
31.) However, while plaintiffs have alleged facts of "guidance"
(see Compl. ¶¶ 30-33, 37, 109), they have alleged facts of
ratification only in A5(a).

in certain future-oriented statements goes beyond mere puffery:
A1(b) (multiyear extension "strengthens our already strong
alliance with IBM"); A2(a) ("three-company relationship builds on
Chipcom's already strong and recently expanded strategic alliance
with IBM"); and A3 ("alliance with IBM [ ] remains strong and
mutually beneficial").

Not surprisingly, the adjective "strong" frequently appears
in challenged statements, but the weight of authority finds that
such language is mere puffery in a context like that alleged
here. See, e.g., San Leandro, 75 F.3d at 805-807, 811
("expecting a strong year" . . . "Marlboro is still very strong
in the face of very low pricing" . . . "the tobacco business is
strong and growing" . . . "We expect 1993 to mark another year of
strong growth in earnings per share" . . . "we expect to maintain
a strong competitive position in the discount category"); Searls
v. Glasser, 64 F.3d 1061, 1067 (7th Cir. 1995) ("[we] anticipate
continued strong demand for tire products") (quoting Cione v.
Gorr, 843 F. Supp. 1199, 1205 (N.D. Ohio 1994)); Capri Optics,
950 F.2d at 11 ("international business . . . remains strong");
Fisher v. Acuson Corp., No. C93-20477RMW, 1995 WL 261439 at *4
(N.D. Cal. April 26, 1995) ("[the new product establishes] a
strong platform"); Gross, 1995 WL 806823 at ** 2-3, 8 ("strong
financial position" . . . "business is very strong" . . .
"business remains strong"); In re Syntex Corp. Securities
Litigation, 855 F. Supp. 1086, 1096 (N.D. Cal. 1994) ("[we
expect] a very strong fiscal 1993"); In re Ross Systems

<u>Securities Litigation</u>, No. C-94-0017-DLJ, 1994 WL 583114 at *8

(N.D. Cal. July 21, 1994) ("strong" . . . is example of "vaguely

worded expectation"); <u>In re Caere Corporate Securities</u>

<u>Litigation</u>, 837 F. Supp. at 1057-1058 ("continuing strong

sales").[25]

Plaintiffs urge consideration of <u>McCarthy v. C-Cor</u>

<u>Electronics, Inc.</u>, 909 F. Supp. 970 (E.D. Pa. 1995).  In

<u>McCarthy</u>, the plaintiffs alleged that the following press release

was actionable:

> Looking ahead, we expect strong revenues for
> the second half of the year, although in the
> third quarter, the earnings are expected to
> reflect the start-up costs for Reedsville.
> We anticipate a strong fourth quarter and
> continue to have a record backlog.

909 F. Supp. 974-75.  Judge Pollak denied the motion to dismiss,

finding that the reference to "strong revenues" there was *not*

inactionable "puffing."  However, while rejecting the approach of

the Fourth and Fifth Circuits--that predictions are immaterial

unless worded as guarantees, <u>id.</u> at 976-77 (citing <u>Raab v.</u>

<u>General Physics Corp.</u>, 4 F.3d 286, 290 (4th Cir. 1993); <u>Krim v.</u>

<u>BancTexas Group, Inc.</u>, 989 F.2d 1435, 1446 (5th Cir. 1993))--the

<u>McCarthy</u> court explained that each prediction must be given

independent analysis.  The court listed factors to consider,

---

[25]<u>Cf.</u> <u>Serabian</u>, 24 F.3d at 364-365 (denying motion to dismiss
when sufficient facts showed internal knowledge of problems
*combined with* public statements describing capabilities as
"strong"); <u>Shapiro</u>, 964 F.2d at 283 (finding collection of
statements which specifically addressed loan loss reserves--
including "adequate," "adequately maintained," "strong," and
"solid"--properly stated claim).

e.g.: 1) the specificity of the prediction ("strong demand" being more vague than "strong revenues"); 2) how far into the future the prediction extends ("long term predictions are necessarily less reliable"); and 3) the degree to which the prediction is inherently difficult or unreliable, for example the success of a merger. McCarthy, 909 F. Supp at 977. Judge Pollak found that the statement at issue--which specifically addressed "strong revenues," looked into the future only three to six months, and involved the prediction of revenues which are "susceptible to somewhat reliable prediction"--was sufficient to state a claim. Id.

In sharp contrast, defendants' alleged statements incorporating the word "strong" are much less specific, each relating to the vague word "alliance."[26] Second, the statements look much farther into the future ("multiyear expansion") (see A1(a)). Third, the success of an "alliance" is inherently more difficult to measure with specificity than is the success of revenues. Thus, I find McCarthy supports defendants' argument that the statements here involving "strong" are not actionable.[27]

---

[26]In fact, the only references to "strong" as applied to "revenues" are found in arguably historical statements: D1 ("[Y]ear-to-year growth is strong; "shipments to internal IBM customers [] were very strong in 1995"); and A7 (1Q95 results "driven by strong performances in its reseller channels").

[27]Moreover, as in Rand, defendants' claim of a "strong alliance," without guaranteeing the future, rested on solid evidence of a very close relationship. Rand v. Cullinet Software, Inc., 847 F. Supp. 200, 212 (D. Mass. 1994) ("customer acceptance of our products remains strong").

Plaintiffs also urge consideration of <u>Virginia Bankshares,</u> <u>Inc. v. Sandberg</u>, 501 U.S. 1083, 1090-95 (1991) (holding that knowingly false statements of belief or opinion, such as "high" value or "fair" price, may be actionable under 10(b)). However, as <u>Rand</u> has noted, <u>Virginia Bankshares</u> does not automatically transform puffery into an actionable statement. <u>Rand</u>, 847 F. Supp. at 208 (D. Mass. 1994). The key factor is whether a reasonable investor would have considered the statement important in initiating or continuing the investment. <u>Id.</u> Similarly, <u>McCarthy</u> recognized that even if language is as vague as that in <u>Virginia Bankshares</u>, a *case-by-case* analysis should be employed. <u>McCarthy</u>, 909 F. Supp. at 976. Thus, <u>Virginia Bankshares</u> holds only that if a reasonable investor would rely on the prediction then it would be actionable if false or misleading. Here, because the statements were so vague, they cannot, in turn, be actionable. See <u>Gross</u>, 1995 WL 806823 at * 10; <u>Capri Optics</u>, 950 F.2d at 10; <u>Cione</u>, 843 F. Supp at 1203.

Furthermore, in connection with certain of the allegedly actionable statements, the defendants did provide cautionary statements on April 6, 1995 ("[T]he exact balance between these two products is always a little hard for forecast. IBM is [] moving through the transition as we . . . in any transition [you] have to be careful how you manage the stock") (<u>see</u> A5(d)), and on April 19, 1995 ("it is our expectation based on what we know now that our sequential shipment stream to IBM will be down

approximately 20% from its first quarter level" . . . "IBM did

get off to a slow start" . . . "resulted in an imbalance in the

IBM inventory" . . . "in all probability we will be reducing our

Q2 IBM shipments") (see A8(b)(c)). Even the statement "we are

very happy with the way it's performing overall" (see A5(c)),

implies a consideration of the "whole picture"--both positive and

negative factors--and was fully consistent with yearly

projections. Thus, as the Second Circuit explained in San

Leandro:

> the forward looking statements regarding
> projected [ ] earnings reflect hope,
> adequately tinged with caution, and that the
> total mix of information available to the
> market cannot reasonably be found to be
> misleading. . . . In any event, even the most
> positive statements by Philip Morris
> representatives at that time consisted of
> relatively subdued general comments . . .
> such puffery is not actionable.

San Leandro, 75 F.3d at 811.

    2.    Duty to Disclose

    Ultimately, plaintiffs argue that it is the failure to

disclose information in conjunction with the above statements

which is actionable. A duty to disclose "does not arise from the

mere possession of nonpublic market information." Chiarella v.

United States, 445 U.S. 222, 235 (1980). But companies must

disclose material information if there is a duty to disclose it.

Roeder, 814 F.2d at 26. "When a corporation does make a

disclosure--whether it be voluntary or required--there is a duty

to make it complete and accurate." Id. (citing SEC v. Texas Gulf

Sulphur Co., 401 F.2d 833, 860-61 (2d Cir. 1968), cert. denied,

31

394 U.S. 976 (1969)).  Thus, even statements that are literally

true may be actionable because of a failure to disclose:

> Some statements, although literally accurate,
> can become, through their context and manner
> of presentation, devices which mislead
> investors.  For that reason, the disclosure
> required by the securities laws is measured
> not by literal truth, but by the ability of
> the material to accurately inform rather than
> mislead prospective buyers.

Lucia, 36 F.3d at 175 (citation omitted).

However, when a duty to disclose arises, only material

information must be disclosed, pursuant to the requirements of a

§ 10(b) action.  This is information which "a reasonable investor

might have considered important in the making of [the investment]

decision."  Roeder, 814 F.2d at 25.  This "does not mean that by

revealing one fact about a product, one must reveal all others

that, too, would be interesting, market-wise . . . ."  Backman v.

Polaroid Corp., 910 F.2d 10, 16 (1st Cir. 1990).

Furthermore, it is axiomatic that there can only be a duty

to disclose if there is *knowledge* of something requiring

disclosure.  This brings the analysis back to the threshold issue

of particularity:  whether there are facts sufficient to show

knowledge.  It is clear in this connection that knowledge may be

inferred from other facts.  Serabian, 24 F.3d at 365 (finding

auditor's and consultants' reviews permitted inference that the

bank knew, or should have known, that its statements were

inconsistent);  Steiner v. Unitrode Corp., 834 F. Supp. 40, 44-45

(D. Mass. 1993) (denying motion to dismiss due to inference of

knowledge).  See also Goldman v. Belden, 754 F.2d 1059, 1070 (2d

Cir. 1985) (finding complaint stated claim where knowledge could
be inferred from a variety of facts).

Defendants argue that there was no duty to disclose because
defendants had no direct or indirect knowledge, and that
plaintiffs are relying solely on the "hindsight theory." It is
"well established that plaintiffs in a securities action have not
alleged actionable fraud if their claim rests on the assumption
that the defendants *must have known* of the severity of their
problems earlier because conditions *became so bad later on*."
Serabian, 24 F.3d at 367 (emphasis added). See also Greenstone
v. Cambex Corp., 975 F.2d 22, 25-26 (1st Cir. 1992); Berliner v.
Lotus Development Corp., 783 F. Supp. 708, 710 (D. Mass. 1992)
(finding conclusionary allegations of knowledge insufficient to
state claim).

Plaintiffs steadfastly argue that they are not relying on
the hindsight theory, but rather on *facts* which show a reasonable
inference that defendants had the requisite knowledge before
April 19, 1995. These facts consist of 1) the alleged actionable
statements, 2) defendants' internal projections, 3) insider
trading, 4) additional statements by third-parties, and 5) the
meeting and review process with IBM. I decline to accept
plaintiffs' argument.

First, the allegedly actionable statements, as analyzed
above, have been shown not to be actionable when considered
separately. Second, defendants have no duty to reveal internal

33

projections or marketing plans.[28]  <u>Wilensky v. Digital Equipment</u>
<u>Corporation</u>, 903 F. Supp. 173, 177, 181 (D. Mass. 1995);  <u>Vaughn</u>
<u>v. Teledyne</u>, 628 F.2d 1214, 1221 (9th Cir. 1980) (finding no duty
to disclose projections).[29]  <u>But see</u> <u>San Leandro</u>, 75 F.3d at 810

---

[28]The defendants similarly have no duty here to disclose
known trends, despite securities regulations cited by plaintiffs.
(Compl. ¶¶ 24, 88.)  For example, Rule 303 states that in filing
periodic reports with the SEC, the company must:

> Describe any known trends or uncertainties
> that have had or that the registrant
> reasonably expects will have a material
> favorable or unfavorable impact on net sales
> or revenues or income from continuing
> operations.  If the registrant knows of
> events that will cause a material change in
> the relationship between costs and revenues .
> . . the change in the relationship should be
> disclosed.

17 C.F.R. § 229.303(a)(3)(ii).  <u>But see</u> 17 C.F.R. § 229.303(a)
(Instruction 7) ("Registrants are encouraged but not required to
supply forward looking information. . . .")
    These requirements do not on their own support plaintiffs'
private cause of action.  <u>Wilensky v. Digital Equipment</u>
<u>Corporation</u>, 903 F. Supp. 173, 181 (D. Mass. 1995) (finding that
even the "relevance of Item 303 violation to a 10b-5 suit remains
subject to some dispute").  <u>See also</u> <u>Greenstone v. Cambex Corp.</u>,
975 F.2d 22, 26-27 (1st Cir. 1992) (finding plaintiff did not
adequately specify facts to find liability on known trend grounds
where complaint alleged company's knowledge in only general
terms).

[29]Although a partial disclosure of a projection may require
additional disclosures to ensure completeness and accuracy,
<u>Vaughn v. Teledyne</u>, 628 F.2d 1214, 1221, n.7 (9th Cir. 1980),
defendants made no public projections for the second quarter of
1995 <i>before</i> April 19, 1995.  The April 6, 1995 statements by Held
(A5)--limited to a yearly projection and other vague
puffery--avoided making a prediction for the second quarter.  In
fact, cautionary statements were made concerning the product
transition.  A favorable longterm projection does not require
disclosure of an upcoming quarter.  <u>See</u>, <u>e.g.</u>, <u>In re Caere</u>
<u>Corporate Securities Litigation</u>, 837 F. Supp. at 1058.  Moreover,
I do not find these general future predictions actionable because
there are no facts which indicate deception (e.g., that the

(cautioning that marketing plans are not *per se* immaterial, rather "duty to disclose" is the critical question). In any event, I do not find that the internal projection of $22 million for Q295 during early March--notwithstanding the March 17 estimate of $32 million--was materially different from the April 19, 1995 projection of "the $24 million range." Plaintiffs have offered no facts to show that the defendants had knowledge *prior to May 26* that the projection would dip to $15 million.[30]

Third, as discussed above, the statements allegedly made by analysts are not separately actionable because they are either repetitive of defendants' statements, equally vague, or because they are not attributable to the defendants. More particularly, the statement quoted in the Wall Street Journal (C9), despite being referred to six times by plaintiffs in their Opposition Memorandum and numerous times in the Complaint, is not actionable because the statement notably fails to meet the particularity standard. Not only is the statement unattributed to an

---

defendants knew that the second quarter of 1995 was going to be a "disaster"). Serabian, 24 F.3d at 361, n.4. The April 5, 1995 internal memorandum (D1), discussing "numerous problems," is not sufficiently particular to equate with "disaster." Indeed, plaintiffs unfairly truncate the statement from the original document, omitting language such as "reasonably healthy," and that while quarter-to-quarter results showed a decline, it was "not disastrously so." Moreover, the memorandum labels the figures as "partial" for various reasons. (Appendix, Ex. 23.)

[30]Plaintiffs' reliance on Kirby v. Cullinet Software, Inc., 721 F. Supp. 1444, 1451-53 (D. Mass. 1989), is inapposite. Moreover, in contrast to In re Lotus Development Corp., 875 F. Supp. 48, 52 (D. Mass. 1995), on which plaintiffs also rely, here the defendants admitted rather than denied potential problems, and adjusted projections accordingly.

35

identifiable person, but it is anonymously attributed to an IBM, rather than Chipcom, official. See Time Warner Inc. Securities Litigation v. Ross, 9 F.3d 259, 265-66 (2d Cir. 1993), cert. denied sub nom. 114 S. Ct. 1397 (1994) (finding caselaw supports dismissal of completely unattributed statements).

Fourth, I recognize that "insider trading in suspicious amounts or at suspicious times, of course, could help the [plaintiffs]." Greenstone, 975 F.2d at 26 (citing In Re Apple Computer Securities Litigation, 886 F.2d 1109, 1117 (9th Cir. 1989), cert. denied, 496 U.S. 943 (1990) (trading may be probative when "dramatically out of line with prior trading practices")); Topogna v. Egan, 141 F.R.D. 370, 373 (D. Mass. 1992) (sale of stock may support inference of fraud). However, plaintiffs fail to plead with particularity--or even generally-- the amount of trading normally conducted by these individuals, including the sale of exercised options. Thus, comparisons with prior practices are impossible.

Finally, plaintiffs set forth the organizational structure for meetings between Chipcom and IBM, as called for in the original Alliance Agreements. (See above, section II.) However, plaintiffs again rely on conclusory statements, without facts and particularity. Apart from stating that meetings occurred on February 20-21, 1995 (Compl. ¶ 96) and May 2, 1995 (Compl. ¶ 132), plaintiffs have alleged no facts showing that a meeting took place wherein defendants received the requisite knowledge-- i.e., what would later be reported on May 26, 1995--apart from

36

*what was already disclosed on April 19, 1995.*

Thus, I find that even considering the totality of the figures, facts, and statements, plaintiffs' synergistic argument must fail. In each area, plaintiffs have either failed to set forth facts with sufficient particularity to support their "failure to disclose" argument, or, as in the case of the allegedly actionable statements, they are simply not actionable standing alone. Here, the sum of the parts does not make plaintiffs' case whole. Reasonable inferences may be drawn in securities cases, but here the inferences are not sufficient to make out a cause of action.

B.  "Control Person" Liability under Section 20(a)

Count II alleges a violation of Section 20(a) of the 1934 Act against the individual defendants. Section 20(a) provides that:

> Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a) (emphasis added).

The First Circuit has held that "in the securities context, control means 'the possession, direct or indirect, of the power to direct or to cause the direction of the management and policies of [an entity], whether through the ownership of voting

securities, by contract, or otherwise.'" <u>Sheinkopf v. Stone</u>, 927 F.2d 1259, 1270 (1st Cir. 1990) (citations omitted).

Here, because I find that Chipcom is not liable, the individual defendants cannot be held liable pursuant to § 20(a), and therefore the Complaint fails to state a "controlling person" claim.

### IV.    <u>Conclusion</u>

For the reasons set forth more fully above, I hereby ALLOW defendants' motion to dismiss. The plaintiffs having been afforded sufficient opportunity to put their pleadings as well as they can, this grant of the motion to dismiss is without leave to amend.

_Douglas P. Woodlock_

DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE